[No. S055415. Aug. 5, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT WESLEY COWAN, Defendant and Appellant.

404

410

412

414

COUNSEL

Mark Goldrosen, under appointment by the Supreme Court; Weinberg & Wilder and Nina Wilder for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Julie A. Hokans, Eric L. Christoffersen, John A. Thawley and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORENO, J.**—A Kern County jury found defendant Robert Wesley Cowan guilty of the first degree murders of Clifford and Alma Merck (Pen. Code, §§ 187, subd. (a), 189)[1] and found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and murder during the commission of robbery and burglary (§ 190.2, subd. (a)(17)(A), (G)).[2] As to both murders, the jury found that a principal had been armed with a firearm (§ 12022, subd. (a)(1)), and the court found that defendant had suffered a prior serious felony conviction (§ 667, subd. (a)). The jury was unable to reach a verdict on a murder count involving a third victim, Jewell Russell, resulting in a mistrial on that count.

At the penalty phase of the trial, the jury returned verdicts of death for Alma's murder and life imprisonment without the possibility of parole for Clifford's murder. The trial court denied defendant's automatic application to modify the verdict (§ 190.4, subd. (e)) and imposed the death sentence with a one-year arming enhancement for Alma's murder, a consecutive sentence of life imprisonment without the possibility of parole plus a one-year arming enhancement for Clifford's murder, and a five-year enhancement for the prior serious felony conviction.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTUAL BACKGROUND

### A. *Introduction*

Clifford and Alma Merck, an elderly Bakersfield couple, were found dead in their home on September 4, 1984, the Tuesday after Labor Day. Clifford had been shot, Alma had been strangled, and their house had been ransacked, with numerous items stolen. Jewell Francis Russell was found dead in his home in Shafter on September 7, 1984. He had been beaten and his throat had been slashed. Defendant was not arrested and charged with these murders until 1994, after a Kern County Sheriff's Department fingerprint examiner reexamined the latent fingerprints lifted from the Merck murder scene and concluded that two latent prints matched defendant's prints. In addition, new ballistics tests suggested that a gun stolen from the Mercks and linked to defendant was the weapon used to kill Clifford Merck. Evidence that

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Section 190.2, former subdivision (a)(17)(i) and (vii), which were in effect at the time of the crimes in 1984, were renumbered without relevant substantive change in 1995. (Stats. 1995, ch. 478, §§ 2, 3, 4, pp. 3564–3567; Prop. 196, as approved by voters, Primary Elec. (Mar. 26, 1996).)

defendant had possessed items of the Mercks' property and had made inculpatory statements also tied him to the Merck and Russell murders.[3]

B. *Guilt Phase*

1. *The prosecution's case*

a. *The killing of Clifford and Alma Merck*

In September of 1984, Clifford and Alma Merck lived on McClean Street in East Bakersfield. Clifford was 75 years old and Alma was 81; they had been married for almost 33 years. Defendant lived approximately four blocks away on Easter Street.

Clifford owned a Colt .25-caliber automatic pistol with white grips and a two-inch barrel. He also owned a metal cigarette lighter cover with a "kachina" or "rain god" design on it, and a tooled leather wallet in which he kept his driver's license. Alma owned a turquoise ring and costume jewelry, including a pearl bracelet, a necklace watch, a diamond watch, and earrings. She had at least two jewelry boxes—one green, and the other a musical box with a dancing figurine on top. Clifford liked to mark his property with his initials, and he marked some of his wife's property with her initials as well. Clifford had etched his initials on the inside of the grips of his Colt .25-caliber pistol.

On August 31, 1984, the Friday before the Labor Day weekend, Alma's son Robert Johnson called the Mercks and told them that he and his wife would be visiting the following Tuesday. Margarita Macias, who lived across the street from the Mercks and sometimes drove them places because Clifford could not see well, last saw the Mercks the following day, Saturday, September 1.

Robert Johnson and his wife arrived at the Mercks' house as promised on the morning of Tuesday, September 4, 1984. Johnson first went to the back door and knocked, but nobody answered. He then went to the front door and knocked, but also got no answer. Looking through the front window, he did not see anybody, but he heard the Mercks' dog barking. Johnson returned to the back door, which was not locked, opened it, and peered into the service porch area, which served as a laundry room. Inside, he saw items of the

---

[3] Defendant's brother Gerald Cowan was charged with the Merck and Russell murders along with defendant. Gerald was convicted of the voluntary manslaughter of Russell pursuant to a no-contest plea, and the other charges against him were dismissed. (See *Cowan v. Superior Court* (1996) 14 Cal.4th 367 [58 Cal.Rptr.2d 458, 926 P.2d 438].) Gerald was not tried with defendant and did not testify against him.

Mercks' property lined up from the back door to the kitchen. Sensing something was wrong, he went to a window on the side of the house and tried to look inside, but so many flies were buzzing around the window that he backed away. Johnson had his wife contact the sheriff's department.

Gregory Laskowski, a criminalist with the Kern County Regional Criminalistics Laboratory, responded to the Merck home to investigate. The home had been "ransacked." Chairs were overturned, and drawers had been pulled out and their contents strewn about. Items were out of place; the television was in the service porch area. The receiver was missing from the wall phone, and the phone cords and wires were pulled loose. Lamp cords had been severed. On the shelf near the kitchen window, Laskowski found an open pocketknife.

Laskowski made his way to one of the bedrooms, where he found Clifford Merck's body lying across the bed, his head under a pillow that had a bullet hole in it. Clifford had been shot in the head twice. An orange throw pillow, which also had a bullet hole in it, was on the bed. In Laskowski's opinion, the purpose of shooting into a pillow was to muffle the sound. Clifford's ankles and wrists were bound with electrical cords, and his blood had drained onto the bedroom floor.

The same day, Quentin Nerida, a fingerprint technician with the Kern County Sheriff's Department Technical Investigations unit, went to the Merck crime scene to lift latent fingerprints. Working his way through the house, Nerida arrived at a bedroom used as a sewing room. When he opened the closet doors, Alma's body fell out. Alma had been strangled. Her hands were bound with a lamp cord, and a telephone cord with the receiver still attached was wrapped around her neck and mouth.

Dr. Armand Dollinger, a forensic pathologist in the Kern County coroner's office, examined the Mercks' bodies on September 5, 1984. Both bodies were in an advanced state of decomposition, suggesting the Mercks had been dead for several days. Clifford had died from two penetrating gunshot wounds. One bullet had entered slightly above and in front of his left ear, traveled through his head, and terminated in the scalp above his right ear, perforating and lacerating his brain. Another bullet had entered the base of his neck on the left side, traveled up and toward the front, and terminated in his spinal canal, lacerating his spinal cord. His death was probably nearly instantaneous.

Alma's wrists were bound behind her back with electrical cord, and her ankles were also bound. A telephone cord was wound over her chin and then tightly around her neck. She had died from asphyxiation due to strangulation by ligature. Her death probably occurred about four to five minutes after the cord was tightened around her neck.

More than 40 latent fingerprints were lifted from the Merck home. When family members cleaned out the house, they discovered that several Social Security checks were missing.

About a month after the murders, Bakersfield police received information about alleged drug activity taking place at the Caravan Inn. On October 14, several officers raided two adjoining rooms at the Caravan Inn and arrested five people, including Danny Phinney and Robert Lutts. In a trash can in one of the rooms, police found a loaded Colt .25-caliber automatic pistol. The initials "C" and "M" or "W" were etched inside the gun's grips. From Phinney's van, the police seized a coin purse, jewelry, watches, a loaded .38-caliber revolver, and a large quantity of methamphetamine packaged for sale. Phinney initially denied knowing anything about the origins of the Colt .25-caliber pistol.

Laskowski compared bullets test-fired from the Colt pistol seized in the raid with the bullets recovered from the body of Clifford Merck. He concluded the gun had not fired the bullets.

In November 1984, Kern County Sheriff's Department technical investigator Jerry Roper compared the latent fingerprints recovered from the Merck crime scene with the rolled prints of several known suspects, including defendant, but found no match.[4] At trial, Roper could not recall if anyone had doublechecked his work. In January 1985, the latent prints lifted from the scene were compared with the rolled prints of Phinney and Lutts. Again, no match was found.[5]

Meanwhile, Phinney, a drug addict who suffered from bipolar disorder and had several misdemeanor drug-related convictions, was in protective custody following his arrest. Before his arrest Phinney had been using primarily "street speed" (methamphetamine), but he also had used LSD, mescaline, peyote, amphetamines, and barbiturates. While in jail, Phinney read a newspaper article about a "secret witness" program seeking information about the

---

[4] There was considerable testimony concerning Roper's competency, or lack thereof, in the field of fingerprint comparisons. Thomas Jones, another examiner in the unit who later became the unit supervisor, began to question Roper's competence sometime before 1984, when Roper found no match in a case where Nerida had found a match. Jones reported his concerns to Jerry Grimes, who at that time supervised the unit. At some point, Grimes asked Jones to reexamine all of Roper's cases going back a period of time, and also to doublecheck all of Roper's future work. Jones found no additional problems. Roper left the technical investigations unit in 1987 due to failing eyesight and "personnel" problems.

[5] In 1987, latent print No. 44, which had been lifted from the bottom of a plastic sewing tray found on the dining room table, was run through a computerized fingerprint database, but again no match was found. The Kern County Sheriff's Department had defendant's rolled prints as of 1967.

Merck murders. Someone pointed out the initials of the victims, which triggered in Phinney's mind the memory of the initials on the Colt .25-caliber pistol seized in the raid. Phinney also recognized the street name—McClean Street—because he had seen it before. Concerned that his connection to the gun might tie him to the murders, Phinney decided to talk to the police.

Phinney gave a statement to Detective John Diederich of the Kern County Sheriff's Department on December 21, 1984. The statement was tape-recorded and transcribed. Phinney told Diederich that sometime after Labor Day in September 1984 he had met defendant at an auto parts store in Bakersfield and then gone with him to defendant's brother's house on Pearl Street. At the house, defendant showed Phinney a bag of coins, including a 1922 silver dollar; some costume jewelry; two government checks in the name of Merck or Myrick on McClean Street with a total value of about $600; and a carved leather billfold with a driver's license, medical cards, and a Social Security card inside. The year of birth on the driver's license was 1911 or 1914. Phinney also saw a Shafter High School class ring, plastic pearls, a necklace,[6] and two jewelry boxes—one green, the other with a dancing figurine on top.[7]

During the interview, Detective Diederich showed Phinney the Colt .25-caliber pistol seized in the raid. Phinney said he had heard that defendant had sold the gun to Lutts, who had tried to file the initials off. Phinney recalled that defendant had said, regarding the gun, "Whatever happens, don't get caught with it," and "eat it; throw it away or whatever, but don't get caught with it."

Craig Fraley was the Kern County Sheriff's Department detective in charge of the Merck case from December 1984 through September 1987. In January 1985, Fraley contacted defendant's sister, Catherine Glass. Glass produced a turquoise ring, which she said she had purchased from defendant. That month, Fraley showed the ring to Alma Merck's granddaughter, Terri Jones. At trial, Jones testified that exhibit No. 39, the ring Fraley obtained from Glass, "looked like" her grandmother's ring. During the investigation the ring also was shown to Alma's daughter, Mary Watts, who recognized the ring as her mother's. At trial, Watts testified that exhibit No. 39, the ring obtained from Glass, "look[ed] like" her mother's ring. There appeared to be an "M" scratched into the underside of the ring.

---

[6] Phinney said the name "Dolly" or "Dotty" was inscribed on the necklace. Alma's daughter, Betty Turner, and granddaughter, Terri Jones, testified that a woman named Daisy had lived with the Mercks from 1980 until she died, about a year before the Mercks were killed. Alma told Betty that Daisy had given Alma some of her jewelry.

[7] Phinney said the figurine on top of the jewelry box was shaped like a swan. Betty Turner, on the other hand, testified that the figurine on her mother's jewelry box was shaped like a ballerina.

Also in January 1985, Fraley interviewed Ronnie Woodin, a friend of defendant's since childhood. Woodin gave Fraley a metal cigarette lighter with a kachina or rain god design on it, which he said he had purchased from defendant for $5 sometime between the 10th and 13th of the previous September. Woodin also said defendant had a bag of things he was trying to sell, including costume jewelry. Woodin told Fraley that when he asked defendant where he had gotten the lighter, defendant said "never mind" or something similar. At trial Woodin confirmed that he had purchased the lighter from defendant. Fraley showed the lighter to Terri Jones's husband Jerry Jones on January 30, 1985. Jones said he had seen Clifford Merck use the lighter many times.

The investigation of the Merck murders languished until mid-1994, when James Christopherson was promoted from patrolman to detective in the robbery/homicide unit of the Kern County Sheriff's Department. Christopherson had secured the Merck crime scene and searched for witnesses in 1984, but otherwise had not been involved in the investigation. After obtaining permission to reopen the investigation, in May 1994 Christopherson asked the technical investigations unit to recompare all of the latent fingerprints lifted from the Merck murder scene with the rolled prints of seven known suspects, including defendant and his brother Gerald. Supervisor Thomas Jones assigned the initial comparison to Sharon Pierce. Pierce concluded a latent print lifted from the inside of the back service porch door above the doorknob (latent print No. 10) matched defendant's left thumbprint, and a latent print lifted from the bottom of a plastic sewing tray that had been lying on a table in the dining room area (latent print No. 44) matched defendant's left middle fingerprint. Per department policy, Pierce brought all of the latent prints, and the rolled prints of all of the suspects she had compared with them, to Jones and had him recheck her work. Jones independently determined that latent prints Nos. 10 and 44 matched the rolled prints from defendant's left thumb and left middle finger, respectively. In July of 1994, Jones brought defendant's rolled prints and the cards with latent prints Nos. 10 and 44 to the Department of Justice in Sacramento for verification of the match. Martin Collins, the latent print supervisor there, confirmed that the latent prints matched defendant's rolled prints. Another examiner in the office agreed.[8]

Detective Christopherson interviewed defendant on August 8, 1994. Defendant consistently denied any involvement in the Merck murders, even after learning that his fingerprints had been found at the crime scene.

---

[8] Collins testified that one of the prints matched defendant's left middle finger and the other matched his right thumb. Pierce and Jones, however, testified that the latent prints matched defendant's left middle finger and *left* thumb. This discrepancy was not cleared up at trial.

Detective Christopherson reinterviewed Phinney on August 23, 1994. During this interview, Phinney revealed for the first time that he had acted as a go-between for the transfer of the Colt .25-caliber automatic pistol from defendant to Lutts. He also revealed for the first time that, after taking the gun apart and seeing the initials on the inside, Lutts had attempted to alter the rifling by putting things down the barrel. Told about the possible alteration of the rifling, in April 1996 criminalist Laskowski made a mold of the inside of the gun's barrel and compared it to the bullets removed from Clifford Merck's body. This time, Laskowski concluded the gun had fired the bullets that killed Clifford Merck.

Robert Lutts, who in 1984 sold drugs—mostly methamphetamine—to support his own drug habit and had been convicted of felonies including robbery and possession of drugs for sale, testified that he believed he had obtained the Colt .25-caliber pistol seized in the October 1984 raid on the Caravan Inn from defendant through Phinney, as payment for drugs. He acknowledged having taken the gun apart and having seen the initials on the grips, but denied having tried to alter the barrel's rifling.

Mitzi Cowan, who in 1984 was defendant's brother Gerald's girlfriend and later married Gerald, testified that sometime between the first and fifth of September 1984, defendant and his girlfriend, Gerry Tags, came to the apartment that Mitzi shared with Gerald. Defendant had a box full of clothes and some other items, such as jewelry. Mitzi remembered in particular an older silver watch and a necklace with a heart-shaped watch on it. Gerald put the necklace in his pocket. Later that day he threw it into a vacant field.

Former Shafter Police Lieutenant John Porter testified that he had interviewed Emma Foreman, the mother of defendant's girlfriend Gerry Tags, in January 1990. Foreman told Porter that defendant had admitted beating to death an old couple he had found in a bedroom in Bakersfield.

b. *The killing of Jewell Francis Russell*

Jewell Francis Russell, also known as "Shafter Bobby," lived in Shafter, about 25 miles from the Mercks' home in Bakersfield. In September 1984, Russell was about 55 years old. He carried his money in his front pocket, folded neatly in half, with the smallest bills on the outside. His daughter Mitzi was Gerald Cowan's girlfriend.

About 9:30 p.m. on September 7, 1984, Russell's son Danny was driving by his father's house and noticed that all the lights and the television were on. This seemed "not right" to him, so he decided to investigate. He entered the side door, which was unlocked. In the kitchen, he saw blood on the floor

and blood leading into the next room. In the living room there was more blood leading to the hall area. The house was hot and smelled bad, and the television was on "full blast." Danny left and returned with family members, and the police were summoned.

Paul Petersen, a sergeant and watch commander in the Shafter Police Department, responded to the scene. Entering the house through the kitchen door, Petersen noticed bloodstains on the floor, what appeared to be dried blood spatters, and drag marks leading from the kitchen to the rug area. In the living room, Petersen noticed shoes, cowboy boots, socks, a guitar, a stained towel, and dried blood on the rug. Following the strong odor of what he believed to be a deceased person to the northeast bedroom, he found a body under the bed. He called the coroner's office and summoned a technical investigations team.

Jerry Grimes, the supervisor of the Kern County Sheriff's Department Technical Investigations unit, arrived to investigate. In the bedroom, he found drawers opened and their contents lying about. Investigators moved the bed, revealing Russell's body lying prone with the head resting on the right cheek. The pockets of Russell's pants were turned inside out. Russell's throat had been slit on the right side and he had been severely beaten; bruising in the facial area appeared to match the stock of a shotgun. Petersen later seized from the house a knife and sheath, a cigarette butt, a golf club and a shotgun.

A postmortem examination of Russell's body revealed numerous bruises around the face and a bruise on the chest wall, apparently inflicted using a blunt object such as a fist or a shoe. A large slashing incised wound on the right side of the neck from the midline to the back had severed the sternocleidomastoid muscle, jugular vein, carotid sheath and artery, and everything down to the spine, trachea, and larynx. There was also a superficial incised wound on the left side of the neck. Russell died from exsanguination—he bled to death. The wound to his neck probably rendered him unconsciousness almost immediately, and he died in less than 10 minutes.

Defendant's girlfriend in 1984, Gerry Tags, died before trial, so her 1994 preliminary examination testimony was read to the jury. Tags testified that she had lived with defendant for three to four years, ending in 1986. Defendant was using "crank" (methamphetamine) every day and did not have a steady job. Tags also used methamphetamine on a daily basis if she could get it. Sometimes the drug made her stay awake for several days at a time. She worked as a prostitute, giving the money she earned to defendant. She had stopped using drugs about six or seven months before her testimony because she was being treated for cancer.

Tags was acquainted with Russell because his son Danny was the father of her child. She had seen Russell many times at the pool hall carrying a large amount of money in his pocket.

The night before Tags learned that Russell had been killed, Tags and defendant were playing cards with defendant's brother Gerald and his girlfriend Mitzi, who was Russell's daughter (and who later married Gerald), at Mitzi's apartment. Tags and defendant got into an argument because defendant wanted Tags to go out and "make some money" so defendant could buy drugs, but Tags did not want to go. Tags allowed defendant to use her car; defendant did not say where he was going. She then went upstairs and went to sleep. A while later, she was awakened by Gerald's voice yelling. Gerald (who apparently had left the apartment at some point) had returned by himself. Defendant returned separately around daybreak wearing different clothes than he had worn when he left the night before. Defendant and Gerald were arguing. Defendant and Tags then left Mitzi's apartment. Tags did not question defendant because she feared he would beat her.

A week or two later, Tags saw, in the trunk of her car, the clothes defendant had been wearing the night he left Mitzi's apartment after arguing with Tags. There appeared to be blood on defendant's beige pants. A knife Tags had seen at Russell's house was wrapped in defendant's pants and shirt. When defendant saw Tags looking at the clothes, he said "Bitch, don't you touch anything of mine."

After Russell's funeral, Tags, defendant, and Gerald drove to Oklahoma and Florida on a two- or three-week trip. One night in Oklahoma, Tags asked defendant if he had killed Russell. Defendant responded, "Yeah bitch, and if you say anything, I'll cut your throat, just like I did his."

At trial Mitzi Cowan gave an account of the early-September card-playing evening and subsequent events that was similar to Tags's account, but with additional details. Her testimony is discussed in greater detail below in part II.C.8.

Tags's mother, Emma Foreman, testified that sometime after Russell was killed, defendant and Tags were at Foreman's house. They were arguing because Tags was resisting defendant's demand that she go out to prostitute herself. According to Foreman, defendant said to Tags, "if you don't go out, I'll cut your damn throat," and "I'll do you like I did motherfucking Bobby." One time Foreman saw some bloody clothes in the trunk of Tags's car.

Tags's stepuncle Roy Davidson—a heroin abuser with a felony conviction for forgery—worked for Russell for 12 years. Davidson claimed to have seen

a knife and some bloody boots in defendant's car sometime in September of 1984. Defendant also had a roll of bills, some jewelry, and a man's watch that Davidson recognized as Russell's. A few days later, defendant said something like he had "done away with Bob" or "Bob won't be around no more."

### 2. *The defense case*

Ruth Scott worked for two companies that manufactured Native American jewelry and components. From 1976 to 1981 her company manufactured about 50,000 reusable cigarette lighter cases decorated with a kachina or rain god figure, some of which were sold in California. One or two competitors made similar cases. The lighter case Detective Fraley had obtained from Ronnie Woodin was similar to the lighter cases her company manufactured. Scott's company also manufactured component parts for rings similar to the ring Detective Fraley had obtained from Catherine Glass. The ring was a low-priced "tourist item," and Scott had seen thousands of them. Scott testified that the marking scratched on the back of the ring appeared to be a "3" placed there by the wholesaler, indicating the price paid for the ring.

Damon Gene Taylor had managed a discount cigarette store in Bakersfield since early 1984. His store sold lighter cases similar to the case Detective Fraley obtained from Ronnie Woodin. Such cases were very common; Taylor ordered 50 to 100 such cases every week and sold them for $1.50 each. Other cigarette and jewelry stores also sold the cases.

Bakersfield Police Officer Kevin Clerico, who had participated in the raid at the Caravan Inn on October 14, 1984, testified that, upon his arrest, Phinney said that the guns seized in the raid belonged to Lutts, that most of Lutts's property was stolen from others, and that he had no further information concerning the guns.

Christopher Hillis, a Kern County District Attorney's Office investigator, interviewed Gerry Tags on June 18, 1986. In that interview, Tags made several statements that were inconsistent with her testimony at the preliminary examination. Lieutenant John Porter was recalled and testified that when he interviewed Emma Foreman in January 1990, she said that defendant told her about the old couple "about a month before or after [Russell] was killed." Detective Fraley was recalled and testified that when he interviewed Foreman in February 1985, she said she hated defendant "with a purple passion." Although Fraley had worked on the Merck and Russell cases since December 1984, he first came into contact with Roy Davidson in October 1986 at the jail. Davidson, a drug abuser, offered to "get people to talk" if Fraley would help him get out of jail.

Dr. David Bird, a clinical psychologist with experience researching and treating drug abuse, testified that long-term use of methamphetamine damages the user's memory, perception, language comprehension, and visual motor control. Continued use over a period of years can result in lost memories of days or weeks. The user may confuse actual experiences with things he or she read or heard about, and may stay awake for days at a time. The user also may hallucinate and record the hallucinations as memories, and may become paranoid regarding a person the user hates. Dr. Bird also said that about six months after a person stops using methamphetamine, that person will experience an acute brain damage syndrome that lasts another six months to one year. Even after recovery, the person's memory of the period of drug abuse remains jumbled. According to Dr. Bird, the transcript of Gerry Tags's preliminary examination testimony showed signs of prolonged methamphetamine abuse, including lack of comprehension, faulty recall, suggestibility, contaminated memory, and mixing reality with her imagination.

Dr. Bird further testified that heroin, an opiate, is primarily a pain analgesic but also brings on euphoria. Heroin affects the ability to perceive and recollect because the user is focused on what is happening inwardly. After the euphoria subsides, the user is uneasy and begins looking for the next dose. Dr. Bird said the cessation of heavy heroin use causes very strong biological withdrawal symptoms beginning one to 12 hours after the last dose. An addict will "do anything" to get more of the drug, including lying, cheating, and stealing.

### 3. *The verdicts*

The jury found defendant guilty of the Merck murders but could not agree on the charge involving Russell. The trial court declared a mistrial as to the Russell count.

### C. *Penalty phase*

#### 1. *The prosecution's case*

Alma's daughter, Betty Turner, and two of Alma's granddaughters, Terri Jones and Shelley Denise Cox, testified about the impact of the Mercks' deaths upon them and their families. James Foster testified about an incident in October 1985 when defendant broke into his home, threatened him with a gun, bound his hands and feet and those of his coworker Jessie Cruz, and stole numerous items before leaving. A neighbor of defendant, Betty Jean Abney, testified about an incident in 1993 in which defendant had allegedly picked up his girlfriend's young son Robert by the hair and thrown him to the ground. The testimony of these witnesses is discussed in more detail below in parts II.D.1., II.D.4. and II.D.7.

Certified court records of defendant's 1970 robbery conviction were admitted into evidence. The parties stipulated that defendant perpetrated the offenses involving James Foster and Jessie Cruz.

### 2. *The defense case*

Defendant's aunt, Selma Yates, and her son, Leroy Cowan, testified about the abuse defendant suffered as a child at the hands of his father, Wes. According to Yates and Leroy, Wes, like his father before him, was an alcoholic who was violent when drunk. Defendant's mother, Betty, had eight children. Because Wes spent much of his money on alcohol, there often was not enough food in the house. Wes beat defendant for no reason, and beat Betty when she was pregnant. Once when both defendant and Leroy were present, Yates had to hit Wes over the head with a rolling pin to get him to stop beating Betty. While the police were dragging Wes away, he threatened to kill everyone when he got out of jail. When Leroy stayed at defendant's house, the boys all slept in the same bed. After a night of drinking, Wes would wake up the boys, jerk them out of bed and beat them. Several times Wes mistook Leroy for defendant and when he realized his mistake, he tossed Leroy aside and grabbed defendant. Once Wes locked defendant and Leroy in a car for an entire afternoon. Wes was arrested several times for abusing his family.

Both Yates and Leroy testified about a time when Yates's family, who lived in Richmond, went to live with Betty and her family in Bakersfield. When Leroy attended school with defendant, defendant's grades and behavior improved so much that the teachers asked Leroy to stay. Yates, however, would not allow Leroy to stay because of the drinking and violence in Betty's house. This greatly disappointed defendant. Later, when defendant was a teenager, Wes took defendant to bars and started him drinking.

Yates testified the defendant she knew was not the type who would murder two people. Yates did not believe in the death sentence except in extreme cases. Leroy did not believe defendant should be put to death because he had to have been on drugs or alcohol to commit the murders and because he did not get a fair shake in life.

Defendant's girlfriend, Brenda H., first met defendant in 1993, and she and her five children lived with him for about eight months until he was arrested. At that time, defendant was supporting the family with his Supplemental Security Income money. When Brenda H. first met defendant, they both were involved with drugs. Together they decided to quit, and they both were getting off drugs when defendant was arrested. Brenda H. went into drug rehabilitation and got a job. Brenda H. had been off drugs for close to a year when she testified.

Brenda H. testified she did not see the incident in April 1993 in which defendant had allegedly picked up her son Robert by the hair, but afterwards Robert was not physically hurt. Brenda H. further testified that defendant never hurt her and that he treated her children as if they were his own. He was kind to them, helped them with schoolwork, played guitar and sang to them, and took them camping and fishing and to watch fireworks on the Fourth of July. Brenda H. testified she loved defendant and would be "devastated" if he was sentenced to death.

Three of Brenda H.'s children, Robert, Michael and Melody, testified about their relationships with defendant. Their testimony is described in further detail below in part II.D.7.

### 3. *Rebuttal*

Michael Rascoe, the Kern County deputy sheriff who investigated defendant's alleged abuse of Robert H. on April 9, 1993, testified about statements Robert and Michael H. made to him regarding the incident. His testimony is discussed in greater detail below in part II.D.7.

## II. Discussion

### A. *Prearrest Delay*

Defendant contends the nearly 10-year delay between the Merck killings in September 1984 and his arrest in August 1994 prejudiced his ability to defend against the murder charges, violating his rights to a fair trial and to due process of law under the state and federal Constitutions.[9] As we shall explain, we find no constitutional violation.

### 1. *Factual background*

Defendant first moved to dismiss the complaint in August 1994, arguing the 10-year delay between the murders and his arrest prejudiced him because of his own faded memory and that of critical defense witnesses. In support, defendant's attorney, Michael Sprague, declared in pertinent part, "Due to the passage of time, the defendant does not [know], and is unable to recall, where he was, who he was with, or where he was living, or located at the time of the . . . homicides."

An evidentiary hearing on defendant's motion was held concurrently with the preliminary examination in September 1994. At the hearing, criminalist

---

[9] Because the jury did not return a verdict on the charge involving Russell, defendant confines his claim of prejudice to the Merck charges. We limit our discussion accordingly.

Nerida, Detective Diederich, Detective Fraley, investigator Christopher Hillis, and Detective Christopherson each testified about his respective role in the investigation and the evidence uncovered along the way. The testimony of these witnesses at the hearing largely anticipated that presented at trial regarding the course of the Merck homicide investigation. (See, *ante*, at pp. 416–421.) Thus, their testimony revealed that by early 1985, law enforcement had gathered evidence linking several items of the Mercks' property with defendant, including Clifford's lighter, wallet, identification, and Colt .25-caliber pistol, as well as Alma's turquoise ring and the couple's Social Security checks. However, fingerprint comparisons, including a comparison of the latent prints lifted at the crime scene with defendant's rolled prints by sheriff's department criminalist Jerry Roper in November 1984, and a 1987 comparison of several of the latent prints with prints in a computerized fingerprint database, were negative.

Detective Fraley was assigned to investigate the Merck case from December 1984 through September 1987. He testified that in February 1985 defendant called him and offered to discuss the case. Fraley declined defendant's offer, however, because he "was still looking at the circumstances surrounding the homicide and right at that point in time I was not prepared to take him on, so to speak, from an investigator's point of view."

In late 1985 or early 1986 Detective Fraley presented the Merck case to the district attorney's office. After reviewing the file, two deputy district attorneys told Fraley that all of the evidence was circumstantial and that they could not issue a complaint without evidence linking defendant directly to the murders. Similarly, Deputy District Attorney Barton Hegeler told Christopher Hillis, the district attorney's investigator who worked on the Merck case in 1986, that there was not enough evidence against defendant to go to a jury.

Upon his transfer to a different department in September 1987, Detective Fraley gave the Merck case file to his supervisor for reassignment. At that time, he did not believe he had probable cause to arrest defendant. He had done little work on the case in the preceding few months because his leads had dried up.

When Detective Christopherson reopened the Merck investigation in 1994, no detective was assigned to the case and the Kern County Sheriff's Department had done no active investigation since 1987. In May 1994, Christopherson asked the technical investigations unit to recompare the latent prints from the Merck crime scene with the rolled prints of defendant, his brother and one other suspect. Criminalist Sharon Pierce found that latent print No. 10 matched defendant's left thumbprint and latent print No. 44

matched his left middle fingerprint. Christopherson then presented the case to the district attorney, who decided there was sufficient evidence to arrest and charge defendant.

The defense called Jerry Roper, who testified that he had no independent recollection of the fingerprint comparisons he performed in the Merck case in 1984 and could not presently recreate them because his eyesight had deteriorated over the years.

At the conclusion of the hearing, the court denied the motion to dismiss, explaining, "I don't find any deliberate acts by law enforcement or the agencies not to bring this case to trial or to push forward with it as soon as they could. It would appear there was an inadvertent failure to detect a critical fingerprint analysis. It appears that even as late as '86, '87 there were other people seriously considered as suspects in the case that were being investigated at the time before then. And also . . . the fingerprint connect[ing defendant] with the case certainly added [a] substantial amount to the body of evidence against the defendant[]."

Shortly after his arraignment in superior court in September 1994, defendant moved to dismiss the information based on prejudicial prearrest delay. As sources of prejudice, he identified his own faded memory and that of crucial witnesses, as well as Roper's present inability to explain the basis for his 1984 conclusion that defendant's rolled prints did not match the latent prints from the Merck crime scene. In support, defendant submitted, among other evidence, his own sworn declaration that he had "no present memory due to the lapse of time as to his whereabouts or activities between 9-1-84 to 9-10-84." Defendant further asserted that during the 10 years between the crimes and his arrest, the Kern County Sheriff's Department had lost several items of evidence taken from the Mercks' service porch area and living room. He argued the loss prejudiced him because he could not now test the items for fingerprints.

At an evidentiary hearing the following January, William Thompson, the property control officer for the Kern County Sheriff's Department, testified that according to his records, as of July 1985 property from another case had been placed on the shelf where the missing items from the Merck case had been located, and that property "was of sufficient amount that the other [(Merck)] property would have had to have been missing at that time." The trial court denied defendant's motion without explanation.

Defendant renewed his motion to dismiss for prearrest delay several additional times, including in January 1996 when he joined codefendant Gerald Cowan's motion; in February 1996 during the conditional examination

of Ronnie Woodin; in March 1996 when he filed supplemental motions; and during the trial testimony of prosecution witness Mitzi Cowan. Among the issues raised was the destruction of evidence seized in the October 1984 raid at the Caravan Inn during which Danny Phinney and Robert Lutts were arrested. Each of these motions was unsuccessful.

### 2. *Discussion*

■ The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 [78 Cal.Rptr.3d 69, 185 P.3d 49] (*Nelson*); *People v. Morris* (1988) 46 Cal.3d 1, 37 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527]; see also *United States v. Lovasco* (1977) 431 U.S. 783, 789–792 [52 L.Ed.2d 752, 97 S.Ct. 2044]; *United States v. Marion* (1971) 404 U.S. 307, 324–325 [30 L.Ed.2d 468, 92 S.Ct. 455].) Such prearrest or precharging delay does not implicate the defendant's state and federal speedy trial rights (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15), as those rights do not attach until a defendant has been arrested or a charging document has been filed. (*Nelson, supra*, 43 Cal.4th at p. 1250.)

■ When, as here, a defendant does not complain of delay after his arrest and charging, but only of delay between the crimes and his arrest, he is "not without recourse if the delay is unjustified and prejudicial. '[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.' [Citation.] Accordingly, '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' [Citation.]" (*Nelson, supra*, 43 Cal.4th at p. 1250.)

Prejudice may be shown by " 'loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 107 [109 Cal.Rptr.2d 31, 26 P.3d 357], quoting *People v. Morris, supra*, 46 Cal.3d at p. 37.) And although the federal constitutional standard for what constitutes

sufficient justification for delay is unclear (*Nelson, supra*, 43 Cal.4th at pp. 1251–1254), we have noted that "the law under the California Constitution is at least as favorable for defendant in this regard" as federal law (*id.* at p. 1251). Accordingly, as in *Nelson*, we apply California law here.

Under the California standard, "negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. This does not mean, however, that whether the delay was purposeful or negligent is irrelevant." (*Nelson, supra*, 43 Cal.4th at p. 1255.) Rather, "whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id.* at p. 1256.) The justification for the delay is strong when there is "investigative delay, nothing else." (*Ibid.*)

We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay (*People v. Morris, supra*, 46 Cal.3d at p. 38), and defer to any underlying factual findings if substantial evidence supports them (cf. *People v. Hill* (1984) 37 Cal.3d 491, 499 [209 Cal.Rptr. 323, 691 P.2d 989] [concerning right to speedy trial]). Because defendant last renewed his motion to dismiss during Mitzi Cowan's trial testimony, we will consider all of the evidence that was before the court up to that time, including the evidence presented at the preliminary examination, the various hearings on defendant's motions and supplemental motions, and at trial.

Defendant's showing of prejudice is "relatively weak." (See *Nelson, supra*, 43 Cal.4th at p. 1256.) Defendant first claims prejudice due to Jerry Roper's inability, after 10 years, to recall the differences he had found in 1984 between defendant's rolled fingerprints and the latent prints recovered from the Merck crime scene, or to recompare the prints due to his failing eyesight. Because of the delay, defendant argues, Roper was unable to rebut the implications, raised by other witnesses and exploited by the prosecutor, that he was incompetent. But from 1994 through the time of trial in 1996, both the latent prints and defendant's rolled prints were still in existence and available for examination by defense experts; if the prints did not match, the defense could have presented its own expert to so testify. Thus, this case is fundamentally unlike *People v. Hartman* (1985) 170 Cal.App.3d 572 [216 Cal.Rptr. 641], on which defendant relies. There, both the testimony of the coroners who had examined the victim's body immediately after his death and ascribed the death to natural causes (and who had since died), and the victim's body itself, which had decomposed beyond the point of useful testing, were unavailable at the time of trial. (*Id.* at p. 580.) Here, by contrast,

while Roper's testimony was no longer very useful to the defense, the prints themselves were readily available for retesting.

Defendant argues that an expert hired and paid by the defense would have been less persuasive to a jury than the Kern County Sheriff's Department's own technician. But if there were differences between defendant's rolled prints and the latent prints, any expert should have been able to point them out to the jury. Accordingly, any prejudice defendant suffered from the unavailability of Roper's explanatory testimony was minimal.

Defendant next argues the delay prejudiced him because of his own lost memory; by 1994, he was unable to recall where he was or what he was doing during the first weeks of September 1984 and could not identify alibi witnesses or explain how he came into possession of the Mercks' property. But defendant was aware by at least February 1985, when he offered to talk to Detective Fraley, that he was a suspect in the Merck murders. He therefore had an incentive to record any exculpatory information he had regarding his whereabouts, the property, or the identity of alibi witnesses.[10] On the other hand, if by early 1985 defendant had already lost the ability to recall his whereabouts in September of the previous year—whether due to drug use or some other cause (see *People v. Butler* (1995) 36 Cal.App.4th 455, 464 [42 Cal.Rptr.2d 279])—any claim that he would have been able to construct an alibi defense had the prosecution commenced sooner is speculative. (See *People v. Morris, supra,* 46 Cal.3d at p. 38.) In any event, in light of the strong evidence of defendant's guilt and the public interest in bringing him to trial, his "bare statement" of inability to recall "realistically cannot be considered more than minimal prejudice." (*People v. Vanderburg* (1973) 32 Cal.App.3d 526, 533 [108 Cal.Rptr. 104], italics omitted.)

Defendant next argues that by the time of his arrest in 1994, the memories of witnesses had faded regarding his alleged possession of the Mercks' property, depriving him of the ability to effectively cross-examine these witnesses. For example, at the preliminary examination and at trial, Alma's son Robert Johnson could not completely describe certain items allegedly stolen from the Mercks. But Johnson testified at the preliminary examination that his ability to describe the property had been no better in 1984 when he

---

[10] At oral argument, defense counsel argued nothing in the record shows that, at the time he offered to speak to Fraley, defendant was aware of the Mercks' identity or the date or location of the murders. To the contrary, Gerry Tags testified that Detective Fraley discussed both the Merck and Russell cases when he interviewed her after her return from Oklahoma. Fraley testified it was his interview with Tags that prompted defendant to call him to offer to talk. Moreover, Tags testified that defendant responded in the negative when she asked him, "did you do the two old people on McClean Street?" Thus, the record suggests that defendant knew exactly which murders he was suspected of committing and, at a minimum, where they occurred.

spoke to law enforcement officers. Defendant further points out that his sister Catherine Glass could not determine if the ring shown to her at the preliminary examination and at trial was the same ring she had given to Detective Fraley and identified as coming from defendant. But contemporaneous police reports documented Glass's conversations with Fraley, Glass confirmed at trial that she told Fraley the truth, and Fraley testified that the ring Glass gave him was the ring produced at trial. Thus, Glass's ability to identify the ring at trial was not critical to the prosecution's case. (Cf. *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 506 [149 Cal.Rptr. 597, 585 P.2d 219] [prejudice from fading witness memories due to delay is diminished where contemporaneous police reports exist that may be introduced into evidence or used to refresh the witnesses' recollection].)

Defendant also complains about Jerry Jones's inability to identify the lighter shown to him at trial as Clifford's, and Ronnie Woodin's failure to positively identify the lighter shown to him at trial as the one defendant had sold to him. Again, however, contemporaneous police reports documented Detective Fraley's 1985 conversations with these witnesses, Fraley testified the lighter produced at trial was the one Woodin had given him, and both Woodin and Jones testified that they had told Fraley the truth. Again, the witnesses' ability to identify the items at trial was not critical.

Defendant further complains about the faded memories of Phinney and Lutts at trial regarding the origins of the Colt .25-caliber pistol seized in the October 1984 raid on the Caravan Inn. Defendant claims he was deprived of the ability to cross-examine these witnesses to show that they did not obtain the gun from him. But Phinney's December 21, 1984, interview with Detective Diederich, in which he identified defendant as the source of the gun, was tape-recorded and transcribed. Thus, Phinney's ability at trial to independently recall what had happened in 1984 was not critical to the prosecution's case. Moreover, although Lutts refused to talk to police after his arrest in 1984, his testimony about the gun was cumulative. Again, any prejudice due to the faded memories of these witnesses was minimal.

Defendant next claims the delay prejudiced him because, when Emma Foreman was interviewed by Lieutenant Porter in January 1990, she could not recall whether defendant had confessed to killing an elderly couple in Bakersfield a month after Russell was murdered, or a month before the murder. Defendant argues that if he confessed a month before Russell was killed, he could not have been referring to the Mercks. But even if defendant had confessed to killing some other elderly couple in Bakersfield, that would not mean he did not kill the Mercks as well. Moreover, Foreman's testimony was "not of crucial significance" to the prosecution's case. (*Scherling v. Superior Court, supra,* 22 Cal.3d at p. 506.) The case rested primarily on the

fingerprint and ballistics evidence coupled with defendant's possession of items of the Mercks' property. Foreman's testimony added little to the strong body of evidence implicating defendant in the murders.

Defendant further claims the delay prejudiced him because during the time between the crimes and his arrest, law enforcement lost material evidence—including jewelry boxes, a radio, purses, and cut pieces of lamp cord—taken from the Mercks' service porch and living room after the murders. Defendant argues he was deprived of the ability to test those items for fingerprints. But the trial court reasonably could have concluded, based on the testimony of Officer Thompson, the property control officer, that the property had been missing as of July 1985. Thus, a more prompt prosecution would not have benefited defendant unless it was initiated in early 1985. Moreover, even if some other suspect's fingerprints were on the items, defendant still would have been linked to the murders because his own fingerprints were found at the crime scene. Accordingly, any prejudice flowing from the loss of these items was minimal.

Defendant finally points to the property seized in the October 1984 raid on the Caravan Inn in which Danny Phinney and Robert Lutts were arrested, which the Bakersfield Police Department destroyed around 1991. Defendant contends he lost the ability to determine whether any of the property had been stolen from the Mercks, which would have supported the defense theory that Lutts and Phinney committed the murders. But none of that property matched the Merck family's descriptions of property that was missing from the Mercks' home after the murders.[11] Accordingly, the possibility that defendant could have shown that any of the destroyed property had belonged to the Mercks seems remote. Moreover, defense counsel was able to exploit the destruction of this evidence by pointing out, in closing argument, that it had never been examined to determine if it came from the Mercks' home. Again, any prejudice from the loss of this evidence was minimal.

Against defendant's weak showing of prejudice, the prosecution's justification for the delay was strong. The delay was "investigative delay, nothing else." (*Nelson, supra*, 43 Cal.4th at p. 1256.) Here, as in *Nelson*, although "[t]he police may have had some basis to suspect defendant of the crime shortly after it was committed . . . law enforcement agencies did not fully solve the case" until 1994, when criminalist Sharon Pierce recompared the latent fingerprints from the Merck murder scene with defendant's rolled

---

[11] The only items from the Merck home that possibly could have been correlated with items seized in the raid were an onyx ring and a birthstone ring that had belonged to Alma; several rings with their stones removed were recovered in the raid.

prints and found a match. (*Ibid.*) Once in possession of evidence tying defendant to the Merck crime scene, the prosecution promptly charged him with the murders.

■ Defendant argues the prosecution had enough evidence to arrest him in early 1985, including Phinney's statements linking him to Clifford's gun, as well as Clifford's lighter and Alma's ring, which witnesses said they had obtained from defendant. But as we said in *Nelson*, "[a] court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges. 'The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with the prosecutor's decision as to when to seek an indictment. . . . Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.' " (*Nelson, supra*, 43 Cal.4th at p. 1256, quoting *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 914–915 [55 Cal.Rptr.2d 404]; see *United States v. Lovasco, supra*, 431 U.S. at pp. 790–796.) Indeed, " '[a] prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.' " (*People v. Nelson, supra*, 43 Cal.4th at p. 1256.) Here, the evidence law enforcement possessed in 1985 was all circumstantial and connected defendant only to the Mercks' property, not to the Merck crime scene. The prosecution was justified in waiting until it had evidence connecting defendant to the crime scene before arresting him and charging him with murder.

Defendant further argues that Detective Fraley could have gained direct evidence linking him to the murders (and also could have allowed defendant to preserve his version of events) by accepting defendant's offer in February 1985 to discuss the case. But as we explained in *Nelson*, "[a] court may not find negligence by second-guessing how the state allocates its resources or *how law enforcement agencies could have investigated a given case*. . . . It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or *had done things a bit differently* they would have solved the case sooner." (*Nelson, supra*, 43 Cal.4th at pp. 1256–1257, italics added.) Here, Fraley testified that he declined to interview defendant in February 1985 because he did not yet have enough information about the crimes to be able to detect if defendant was lying. Fraley's tactical decision to put off interviewing defendant until he had more information was quintessentially the type of law enforcement decision that courts should not second-guess.

Defendant next contends that in light of questions about Roper's competence that arose in 1984, the Merck case latent prints should have been

reexamined sooner. He argues there is no explanation for why the Merck case was not included in Thomas Jones's reexamination of Roper's work that took place sometime before 1987. (See fn. 4, *ante*.) But the record is unclear as to whether the Merck case comparisons were not included in the recheck, or were included but found not to be in error. Neither Jerry Grimes, who supervised the technical investigations unit at that time, nor Jones, who performed the reexamination, could pinpoint the precise span of time it included. Grimes could confirm only that Jones found no additional problems. In any event, defendant's argument ignores that the department did doublecheck Roper's work in a different way—several of the latent prints from the Merck case were compared with prints in a computerized fingerprint database, with negative results.

Defendant also argues it was negligent not to doublecheck Roper's work in light of Nerida's testimony that in 1984 it was the technical investigations unit's policy to have two people sign off on every fingerprint comparison. But both Grimes and Roper testified that there was no such policy for fingerprint comparisons that the initial examiner concluded did not match. Thus, substantial evidence supports the conclusion that there was no blanket doublechecking policy in 1984. In any event, defendant's argument amounts to the very type of Monday morning quarterbacking that we condemned in *Nelson*.

The same can be said for defendant's claim that the Merck case should have been reassigned after Detective Fraley left the robbery-homicide unit in September 1987, rather than being left dormant. The case was not dormant: Detective Christopherson testified that the supervisor of the unit was responsible for the case after Fraley left. Again, we will not second-guess the department's decision to allocate its resources in this manner. (See *Nelson, supra*, 43 Cal.4th at pp. 1256–1257.)

In sum, the investigation of the Merck murders was not perfect; no investigation is. Like the trial court, however, we find no evidence that law enforcement or the prosecution deliberately delayed the investigation in order to gain a tactical advantage over defendant. Nor do we find evidence of negligence. Rather, at worst the Kern County Sheriff's Department simply erred when it failed to determine before 1994 that defendant's fingerprints matched the Merck scene latent prints. That being the case, balancing defendant's weak showing of prejudice against the strong justification for the delay (see *Nelson, supra*, 43 Cal.4th at p. 1257), we find no due process violation. Accordingly, the trial court did not abuse its discretion when it denied defendant's many motions to dismiss due to prearrest delay.

B. *Jury Selection Issues*

1. *Exclusion of prospective jurors for cause*

■ Defendant asserts the trial court erroneously excused for cause two prospective jurors based on their views about the death penalty, violating his right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution. (See *Morgan v. Illinois* (1992) 504 U.S. 719, 726–728 [119 L.Ed.2d 492, 112 S.Ct. 2222]; *Wainwright v. Witt* (1985) 469 U.S. 412, 422–424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Williams* (1997) 16 Cal.4th 635, 666–667 [66 Cal.Rptr.2d 573, 941 P.2d 752].) "To achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath. [Citations.]" (*People v. Blair* (2005) 36 Cal.4th 686, 741 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

" ' "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." ' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) " ' "[O]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." [Citations.]' " (*Ibid.*; accord, *People v. Lewis* (2008) 43 Cal.4th 415, 483 [75 Cal.Rptr.3d 588, 181 P.3d 947].) "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2224]; accord, *Wainwright v. Witt, supra*, 469 U.S. at p. 426.) Moreover, "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.' " (*Uttecht v. Brown, supra*, 551 U.S. at p. 7 [127 S.Ct. at p. 2223], quoting *Wainwright v. Witt, supra*, at p. 434; accord, *People v. Lewis, supra*, 43 Cal.4th at p. 483.)

Here, substantial evidence supports the trial court's conclusion that Prospective Jurors Nos. 041853 and 045969 held views that would prevent or substantially impair their ability to perform their duties as jurors.

a. *Prospective Juror No. 041853*

On her questionnaire,[12] Prospective Juror No. 041853 described her feelings about the death penalty as follows: "It never really bothered me before yesterday, when I heard the judge mention it and pictured myself in the jury as one who handed such a verdict in. I really don't feel it's my right to decide weather [*sic*] or not somebody dies. It would bother me the rest of my life." She noted that in the past she had held a different view of the death penalty, writing: "Like I said I was pretty much OK with it but I never gave it deep thought until yesterday. I don't feel it's the right thing. Life and death should be left in God's hands not ours." She next wrote that she believed the death penalty was imposed too often, explaining: "Along with downright guilty people who have received it there have been innocent ones as well and how those jurors live with theirselves [*sic*] I'll never know." She also indicated she felt the death penalty was wrong for religious reasons, expounding: "I am not a really religious person to the point of going to church every Sunday but I do believe in God and I've never seen or heard him say, we can take his place for the day and sentence someone to their death." Finally, when asked to select a statement which described her attitude toward serving as a juror on a death penalty case, she chose "I could never vote to impose the death penalty in any case no matter what the facts and the circumstances of the case."

On voir dire by the court, Prospective Juror No. 041853 affirmed that her views regarding the death penalty would not cause her to refuse to vote for a verdict of guilty. However, when asked if such views would prevent her from finding a special circumstance true even if it was proved beyond a reasonable doubt, she answered, "I—do I have to answer yes or no?" Prompted to explain, she said "I don't know what I would do to tell you the truth. I don't like the idea of it but, on the other hand, I don't like the other end of it either, you know, as far as the crime or whatever, so I don't know." Asked for further clarification, she added: "I just personally wouldn't want to be the one to hand that judgment down." The court then asked, "Now if I understand you . . . your view is this . . . . You are not opposed to the death penalty, you just don't want to be in a position where you have to make that decision." She responded, "Basically, yes."

Upon questioning by defense counsel, Prospective Juror No. 041853 affirmed that she was not opposed to the death penalty, but she did not want to be the one who makes the decision. Upon further questioning, however,

---

[12] Each prospective juror who survived screening for hardship and familiarity with the case filled out a 20-page questionnaire. Individual sequestered voir dire was then conducted. At the beginning of the voir dire, the court instructed the prospective jurors regarding the phases of a death penalty case and the nature and purpose of the death qualification process.

she twice indicated that she could impose the death penalty, albeit "with sadness and reluctance." She then affirmed that she "might be able to impose the death penalty in the appropriate case depending on the facts and circumstances."

The prosecutor then asked Prospective Juror No. 041853 what had changed since she filled out her questionnaire. Prospective Juror No. 041853 explained that the questions regarding the death penalty had caught her off guard, and that she felt "conflicted inside" because she previously had been in favor of the death penalty. Asked if she was still conflicted, she said "Yeah, and I am getting more onto the religious side lately, and I just—it is hard. I am going through a lot." The prosecutor reassured Prospective Juror No. 041853 that there was no right answer, but asked her to think "very carefully" about whether she realistically could impose the death penalty. The following colloquy then occurred:

"Q [by the prosecutor]: No one is going to drag you into making you—to make you say that, but what I want to know is if you really can do it. When you think about it, think very carefully about it. [¶] Can you write down, 'I vote for death,' and then can you come back out here and face the defendant and say, 'I voted for death'?

"A: Again, without saying yes or no, just if I can picture these crimes and the people, what they do, I say, 'yes.' It is going to have to be presented in such a way that it is—that's terrible and—

"Q: All murder is terrible [Prospective Juror No. 041853]. I mean there is no murder that's pleasant, and there's never a time—

"A: And I had to deal with that in my life and—

"Q: The way you feel, is it going to make it more difficult for me? I am going to be standing up and presenting certain evidence to you and arguing that this defendant should die and with your feelings, is my task going to be more difficult than, say, as [defense counsel's] task who is going to argue that the defendant should live because of your feelings, because of your religious beliefs?

"A: I don't really want to—

"Q: If you can't and don't want to make that decision, if you cannot make that decision, this is the time to say so. There is nothing wrong with it, and there are people before you who have made it, and there will be people after you that has [*sic*] said that very same thing. [¶] There are other people who

without any feeling at all can say, 'Yes, I can do it every time,' but it is up to you to make the decision. You have to tell us.

"A: I don't want to sit through this and see all that—

"Q: You don't think you could handle that?

"A: I have seen—"

At that point, the court interjected "Counsel, I have seen enough on this." The court then excused Prospective Juror No. 041853.

After Prospective Juror No. 041853 had left, the court stated that it wanted to "fill out the record a little bit" regarding her excusal. The court explained, "Toward the end of the questioning by [the prosecutor], [Prospective Juror No. 041853] was breaking down. She was crying. During the questioning [Prospective Juror No. 041853's] head would go back and forth from shoulder to shoulder, she would cover her mouth when she answered questions by [the prosecutor], she was obviously—she's obviously given conflicting answers, she has been very candid that she is in conflict over this. [¶] She is going through some kind of personal change which is leading her toward a more religious view of her life, which it sounded to me that she's having real problems coming to terms with the responsibilities of a juror in a case such as this. [¶] For all of these reasons and each of them, I concluded she was inappropriate—I concluded I guess sua sponte that she was an inappropriate juror on this case." Defense counsel objected to the excusal "because of the nature of the case."

Substantial evidence supports the trial court's conclusion that Prospective Juror No. 041853's views regarding capital punishment would prevent or substantially impair the performance of her duties as a juror. Several of her questionnaire responses indicated strongly held religious opposition to the death penalty, and several times during voir dire she very clearly indicated that, because of her religious views, she did not want to have to make the decision whether to sentence someone to death. Based on these statements, the trial court determined that Prospective Juror No. 041853 was going through a personal religious change and was having trouble coming to terms with the responsibilities of a juror in a capital case. A prospective juror's "great reluctance in undertaking her duties," coupled with her demeanor, may justify the conclusion that the juror would be substantially impaired. (*People v. Bunyard* (2009) 45 Cal.4th 836, 846 [89 Cal.Rptr.3d 264, 200 P.3d 879].)

Moreover, the trial court was careful to note that the excusal was based in part on Prospective Juror No. 041853's demeanor, including crying, shaking

her head from side to side, and covering her mouth when responding to the prosecutor's questions. Deference to the trial court is particularly appropriate in these circumstances. (See *Wainwright v. Witt, supra*, 469 U.S. at p. 426 ["deference must be paid to the trial judge who sees and hears the juror"].) As we have explained, "appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." (*People v. Stewart* (2004) 33 Cal.4th 425, 451 [15 Cal.Rptr.3d 656, 93 P.3d 271].)

Defendant argues in effect that the prosecutor caused Prospective Juror No. 041853's tears by questioning her aggressively and cutting off her responses. Although defendant's interpretation of the record is plausible, there is another equally plausible interpretation: Prospective Juror No. 041853's inability to finish her answers to the prosecutor's questions may well have been due to a preexisting state of great emotional conflict. We note in this regard that Prospective Juror No. 041853 indicated on her questionnaire that someone close to her had been murdered. Under these circumstances, we defer to the trial court's implied determination that the questioning was fair and did not cause the substantial impairment.

Defendant argues that Prospective Juror No. 041853's voir dire responses suggested she could serve on the jury and impose the death penalty. But Prospective Juror No. 041853's "assurances that [s]he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from [her] other statements that in fact [s]he would be substantially impaired in this case." (*Uttecht v. Brown, supra*, 551 U.S. at p. 18.) Defendant asserts the trial court incorrectly concluded Prospective Juror No. 041853's answers were conflicting. We disagree. On her questionnaire, and during voir dire by the court, Prospective Juror No. 041853 said she did not want to have to decide whether defendant should suffer the death penalty—and indeed could never vote to impose the death penalty—because determining punishment was for God alone. Later, during questioning by defense counsel and the prosecutor, Prospective Juror No. 041853 said she could impose the death penalty, albeit reluctantly, if the facts were "terrible." The trial court was in the best position to determine which of these two conflicting versions represented her true state of mind. (*People v. Stewart, supra*, 33 Cal.4th at p. 451; *People v. Jenkins, supra*, 22 Cal.4th at p. 987; see also *Wainwright v. Witt, supra*, 469 U.S. at p. 426.)

b. *Prospective Juror No. 045969*

On her questionnaire, Prospective Juror No. 045969 wrote she felt that the death penalty is "good, if the jury is 110% sure without a doubt that the

defendant is guilty of the crime." Regarding the frequency with which the death penalty is imposed, she wrote "I feel that its [sic] not done too often or to[o] seldom. I[f] the evidence is there and theres [sic] no doubt then the punishment should fit the crime." She indicated no "religious, moral or ethical" opposition to the death penalty and described her attitude toward serving as a death penalty juror as follows: "I might be able to impose the death penalty in an appropriate case depending on the facts and circumstances."

During voir dire by the court, Prospective Juror No. 045969 indicated her views regarding the death penalty would not cause her to refuse to vote for a verdict of guilty or for the truth of the special circumstances, and would not cause her to vote automatically for or against the death penalty if the case reached a penalty phase. When questioned by defense counsel, she indicated she was not opposed to the death penalty and that she could vote for it "If there is no doubt in my mind whatsoever." The prosecutor then took up the questioning, and the following colloquy occurred:

"Q: That is the main point I need to talk to you about. I'm only required by law to prove guilt beyond a reasonable doubt. Are you going to require more of me than the law requires? You said, 'If there was no doubt'?

"A: If you prove to me that there is no doubt that you know he did it.

"Q: If I prove it beyond a reasonable doubt—there is doubt in almost everything, but you are saying no doubt, which leads me to believe that you expect me to do more than the law requires. You expect me to wash away all doubt completely. I believe, in your questionnaire, you said '110 percent'?

"A: That's right.

"Q: If I can't do that, then you would not vote for the death penalty; is that correct?

"A: No, I guess it is—I have to hear it.

"Q: Let's get back to the doubt part, because I can't prove anything to where there is no doubt. Because . . . in everything there is always some doubt, so if you expect me to prove it beyond a reasonable doubt to a 110 percent no doubt, then I can't do that, and therefore you could never vote for the death penalty. [¶] If what you said in your questionnaire is correct, that's how you would feel?

"A: That's true. I think it is impossible that you could prove it to me under [sic] 110 percent."

The prosecutor then challenged Prospective Juror No. 045969 for cause, and the court took up the questioning:

"Q: You are going to require the prosecution to prove completely the appropriateness of death as the proper punishment?

"A: Yes.

"Q: That is not what the law provides. You understand that?

"A: Yes.

"Q: And even though that is not what the law provides, that's what you would require [the prosecutor] to do?

"A: Yes."

The court then used a different tactic, explaining that a capital case proceeds in two phases and that at the penalty phase neither party bears the burden of proof; rather, the jurors choose what they feel is the appropriate penalty based on the facts in the case. Following this explanation, Prospective Juror No. 045969 stated that she could impose the death penalty if she felt it was an appropriate verdict, that she also could impose a verdict of life without possibility of parole, and that her choice would depend on the facts and circumstances.

Defense counsel opposed the challenge to Prospective Juror No. 045969. The court indicated its tentative décision was to grant the challenge. When neither party had anything to add, the court excused Prospective Juror No. 045969 without explanation.

Substantial evidence supports the trial court's conclusion that Prospective Juror No. 045969 held views about capital punishment that would prevent or substantially impair the performance of her duties as a juror. On her questionnaire, and repeatedly during questioning by defense counsel, the prosecutor, and the court, Prospective Juror No. 045969 indicated that she would not even consider imposing the death penalty unless she had "no doubt whatsoever" and defendant's guilt had been proved "110%." Setting aside for the moment the circumstance that guilt could never be proved to that level of certainty—as Prospective Juror No. 045969 herself seemed to acknowledge— substantial evidence supports the conclusion that her statements on the subject of doubt indicated an unwillingness to consider all of the aggravating and mitigating factors at play in the case and to engage in the weighing process required at the penalty phase.

As .we have explained, a prospective juror must be willing to " ' "conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." ' " (*People v. Jenkins, supra*, 22 Cal.4th at p. 987.) As part of that conscientious consideration, jurors are required to consider and weigh all of the aggravating and mitigating factors supported by the evidence in the case. (See § 190.3.) Here, Prospective Juror No. 045969 indicated that rather than weighing all of the aggravating and mitigating evidence to determine the appropriate penalty, she would not even consider the death ·penalty unless guilt had been proved beyond all doubt. Certainly, jurors are entitled to consider ·any lingering doubt they may have about the defendant's guilt as one of the many factors to be weighed at the penalty phase. (See *People v. Medina* (1995) 11 Cal.4th 694, 743 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Hawkins* (1995) 10 Cal.4th 920, 966–967 [42 Cal.Rptr.2d 636, 897 P.2d 574].) Moreover, a juror's "concern regarding the risk of error in the criminal justice process" is not in itself disqualifying. (*People v. Stewart, supra*, 33 Cal.4th at p. 449.) What a juror may not do, however, is set up an artificial barrier to consideration of the death penalty by requiring the presence or absence of any particular factor—here, the absence of any doubt whatsoever—before the penalty will even be entertained. (Cf. *id.* at p. 446 [prospective juror whose predilection to give more weight than average to certain mitigating evidence " 'would actually preclude him from engaging in the weighing process' " may be excluded for cause (italics omitted)].) Here, the trial court reasonably could have concluded that Prospective Juror No. 045969 would set up such a barrier. Accordingly, the court was justified in excusing her for cause.

A separate basis for excluding Prospective Juror No. 045969 for cause was her apparent unwillingness to follow the law and the trial court's instructions. In response to the trial court's questions regarding whether she would require the prosecution to "prove completely the appropriateness of death as the proper punishment," Prospective Juror No. 045969 responded that she would, even when the trial court explained that her view was "not what the law provides." As the court later recognized, its question was rather imprecise; under California law, neither the prosecution nor the defense bears the burden of proof at the penalty phase. Nonetheless, Prospective Juror No. 045969's insistence on following her own view of the law, even after the trial court informed her that her view was incorrect, independently justified the trial court's conclusion that her ability to perform the duties of a juror "in accordance with the court's instructions and the juror's oath" was impaired. (*People v. Blair, supra*, 36 Cal.4th at p. 741.)

Defendant points out that Prospective Juror No. 045969 at one point indicated that she would not require 110 percent proof of guilt before considering the death penalty. In response to the prosecutor's question whether she would require such proof, she responded, "No, I guess it's—I

would have to hear it." Moreover, after the trial court explained that a capital case proceeds in two phases and that there is no burden of proof at the penalty phase, Prospective Juror No. 045969 stated that she would consider imposing the death penalty in this case if the facts warranted it. However, these assurances do not overcome the reasonable inferences from her other statements that she would impose her own view of the law and would fail to engage in the weighing process in the absence of "110 percent" proof of guilt. (Cf. *Uttecht v. Brown, supra,* 551 U.S. at p. 18; *People v. Martinez* (2009) 47 Cal.4th 399, 431–432 [97 Cal.Rptr.3d 732, 213 P.3d 77] [when prospective juror has made statements that support exclusion for cause, the fact that the juror also made statements that might have warranted retaining her on the jury does not mean no substantial evidence supports the trial court's ruling].) Accordingly, the trial court did not err in excusing Prospective Juror No. 045969 for cause.

### 2. *Alleged improper exercise of peremptory challenges*

During jury selection, defendant made two motions under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], contesting the prosecutor's use of peremptory challenges to remove three African-American prospective jurors from the panel. As to each motion, the trial court expressly found no prima facie case had been established, but allowed the prosecutor to place her reasons for each challenge on the record. The jury that tried defendant included no African-American jurors. Defendant now contends that the prosecutor's use of peremptory challenges to remove African-Americans from the jury violated his rights under the Fourteenth Amendment to the United States Constitution and article I, section 16 of the California Constitution. (See *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People v. Wheeler, supra,* 22 Cal.3d 258.) We conclude no violation occurred.

#### a. *Facts*

Following the exercise of challenges for cause, 60 prospective jurors remained in the jury venire, four of whom were African-American. Twelve of the 60 were randomly selected to sit in the jury box. Prospective Juror No. 045921, an African-American man, was among the 12 initially selected. The court and counsel for both parties questioned the 12 prospective jurors, and the parties commenced exercising peremptory challenges. After the prosecution and the defense each had exercised one peremptory challenge, Prospective Juror No. 042519, an African-American woman, was called to the jury box. The prosecutor used her next peremptory challenge to excuse Prospective Juror No. 042519. After the defense had used one more challenge, the prosecutor used her third peremptory challenge to excuse Prospective Juror No. 045921.

After each side had exercised five peremptory challenges, defendant made his first *Wheeler* motion.[13] Defense counsel pointed out that the prosecutor had dismissed the only two African-American prospective jurors who had been called to the jury box. The prosecutor countered that other African-Americans remained among the prospective jurors not yet called. The court stated it was not "satisfied" that a prima facie case had been established, but invited the prosecutor to "make whatever record you wish to make." The prosecutor explained that Prospective Juror No. 042519 had stated on her questionnaire that "she's Islamic, that she does not sit in judgment, however since the questionnaire she changed her mind. Because of that, I feel that there is a very good chance that she could, between now and the time that the case is over, change her mind back and say that she cannot or does not sit in judgment on anyone. [¶] She was also arrested for welfare fraud, and I have feelings that she would not be a fair juror to the People." Prospective Juror No. 045921, the prosecutor explained, "on his questionnaire wrote down he does not believe in the death penalty but he could vote for it." The prosecutor concluded, "It had nothing to do with either's race. It has to do with their feelings on the death penalty. I do not feel that this is subject to Wheeler."

When the selection process resumed, the prosecutor accepted the jury after exercising a total of 15 peremptory challenges. Defendant, however, exercised a challenge. After the prosecutor and the defense had each challenged one more prospective juror, Prospective Juror No. 045787, an African-American woman, was called to the jury box. The prosecutor used her next challenge to excuse Prospective Juror No. 045787. Following voir dire of the replacement, both sides accepted the panel, and the jury was sworn. Two alternate jurors were chosen and sworn shortly after each side had exercised one more peremptory challenge.

After the jurors had been released for the day, defendant renewed his *Wheeler* motion. Defendant pointed out that Prospective Juror No. 045787 was African-American, and noted that the prosecution had challenged all three African-American prospective jurors who had been called to sit on the jury. The court again stated it was "not prepared to find a prima facie case," noting that one African-American prospective juror had not been called. Nonetheless, the court again invited the prosecutor to "make a record . . . for purposes of review."

The prosecutor explained she had excused Prospective Juror No. 045787 because, "[o]n her questionnaire and during the time that she was interviewed, [Prospective Juror No. 045787] said that the police were unkind to

---

[13] Although defendant cited only *People v. Wheeler, supra,* 22 Cal.3d 258, in his motion, both the *Wheeler* issue and the parallel issue under *Batson v. Kentucky, supra,* 476 U.S. 79, were properly preserved for appeal. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

her brother. She knows three people that were falsely accused of crimes, and in the questionnaire, she said that she could not sit in judgment. She was not God. And then when she got in the courtroom she could sit in judgment, . . . but I cannot imagine that this woman would continue with one decision that she could keep for any length of time, because in a period of a week, she changed her mind from not being able to sit in judgment and not being God, to being able to sit in judgment of her fellow man." The prosecutor also noted that there was another African-American woman in the audience whom she had "no intention of kicking." After the trial court ascertained defense counsel had nothing to add, the *Wheeler* motion was not discussed again.

b. *Discussion*

"It is well settled that '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 898 [89 Cal.Rptr.3d 286, 200 P.3d 898]; see also *Batson v. Kentucky, supra*, 476 U.S. 79; *People v. Wheeler, supra*, 22 Cal.3d 258.)

When a defendant asserts at trial that the prosecution's use of peremptory strikes violates the federal Constitution, the following procedures and standards apply. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted; see also *Snyder v. Louisiana* (2008) 552 U.S. 472, 476–477 [170 L.Ed.2d 175, 128 S.Ct. 1203, 1207]; *Miller-El v. Dretke* (2005) 545 U.S. 231, 239 [162 L.Ed.2d 196, 125 S.Ct. 2317].) The identical three-step procedure applies when the challenge is brought under the California Constitution. (*People v. Salcido* (2008) 44 Cal.4th 93, 136 [79 Cal.Rptr.3d 54, 186 P.3d 437].)

Here, we assume without deciding that defendant established a prima facie case by pointing out that the prosecutor used three of the 18 peremptory

challenges she exercised to strike all of the African-American prospective jurors called to the jury box, resulting in no African-Americans serving on defendant's jury. (See *People v. Salcido, supra*, 44 Cal.4th at p. 137; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1106 [63 Cal.Rptr.3d 297, 163 P.3d 4] [assuming prima facie case established where prosecutor used five of 15 peremptory .challenges to excuse the only African-Americans called to the box], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]; see also *Johnson v. California, supra*, 545 U.S. at pp. 164, 173 [inference of discrimination, sufficient to satisfy *Batson*'s prima facie standard, arose where prosecutor in interracial murder case used three of 12 peremptory challenges to remove all eligible African-American prospective jurors from a pool of 43, resulting in an all-White jury].) Because the prosecutor explained her dismissals at the court's invitation, we proceed to the second and third steps of the *Batson/Wheeler* analysis. (See *People v. Salcido, supra*, 44 Cal.4th at p. 137; *People v. Zambrano, supra*, 41 Cal.4th at p. 1106.) We conclude the prosecutor's stated nondiscriminatory reasons for excusing Prospective Jurors Nos. 045921, 042519, and 045787 were "amply supported." (*People v. Zambrano, supra*, 41 Cal.4th at p. 1106.)

Preliminarily, we note that " '[T]he critical question in determining whether [a party] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.' (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–339 [154 L.Ed.2d 931, 123 S.Ct. 1029].) The credibility of a prosecutor's stated reasons [for exercising a peremptory challenge] 'can be measured by, among other factors . . . how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' (*Id.* at p. 339.)" (*People v. Hamilton, supra*, 45 Cal.4th at p. 900.)

■ Defendant contends the prosecutor's reasons for excusing Prospective Juror No. 045921 were not plausible, and that her pretextual explanation for her challenge to Prospective Juror No. 045921 calls into doubt the legitimacy and credibility of her proffered reasons for excusing Prospective Jurors Nos. 042519 and 045787 as well. We disagree. The prosecutor excused Prospective Juror No. 045921 because he wrote on his questionnaire that he did not believe in. the death penalty. The prosecutor's reason was both credible and based on a permissible race-neutral factor. On his questionnaire, when asked to describe his feelings about the death penalty, Prospective Juror No. 045921 wrote flatly, "I don't believe in it." Although he also indicated that he might be able to vote to impose the death penalty in an appropriate case, the prosecutor reasonably could have believed that he would be reluctant to impose it because he did not believe in it. We previously have recognized that a prospective juror's scruples regarding the death penalty "are reasonably related to trial strategy (see *Miller-El v. Cockrell, supra*, 537 U.S.

at p. 339) and are a legitimate race-neutral reason for exercising a peremptory challenge." (*People v. Lewis, supra,* 43 Cal.4th at p. 472; accord, *People v. Salcido, supra,* 44 Cal.4th at pp. 139–140.)

Defendant argues Prospective Juror No. 045921's attitude toward the death penalty was not unfavorable to the prosecution. Prospective Juror No. 045921 wrote on his questionnaire that he had served as a military police officer in the Air Force, had no complaints about the criminal justice system, and did not know anyone who had been falsely accused of a crime. Further, Prospective Juror No. 045921 had himself been, or knew someone else who had been, a crime victim. Prospective Juror No. 045921 also wrote he did not feel the death penalty was wrong for any "religious, moral or ethical" reason and had "no belief" as to whether the death penalty was imposed too often or too seldom. But none of these responses was "inherently in conflict with" (*People v. Lewis, supra,* 43 Cal.4th at p. 474) the prosecutor's assessment that Prospective Juror No. 045921 might be reluctant to vote for the death penalty because he did not "believe in it."

Defendant also points out that during voir dire, Prospective Juror No. 045921 said that although he did not believe in the death penalty, he could impose it if the law required it because "if I'm going to participate in the system, you have to play by all of the rules." However, after the prosecutor explained that "the law does not tell you how to vote . . . . [¶] The law says you listen to everything and then you make the choice yourself," Prospective Juror No. 045921 began to express concern about the risk of error in the trial process. For example, he said, "I need more to go along with the death [penalty] because my thought is we all make mistakes, and if you go to the death penalty, I'm not willing to put my representation [*sic*] and say this is absolute. It has to be. And then somewhere down the line something comes up, and you know what? We didn't know that at the time. It is too late then and to me, that is a waste." When asked whether he would be more inclined to vote for life without the possibility of parole "because some day there might be a mistake," he commented, "you have to be sure enough that I'm willing to put somebody's life in danger." Asked the same question again, he responded "yes." On this record, the prosecutor reasonably could have believed that Prospective Juror No. 045921 would not be a favorable juror for the prosecution in this case, in which all the evidence of guilt was circumstantial.

Because substantial evidence supports the conclusion that the prosecutor's reason for excusing Prospective Juror No. 045921 was credible and race neutral, the legitimacy of the prosecutor's reasons for excusing Prospective Jurors Nos. 042519 and 045787 is not called into doubt. Nonetheless, having examined the prosecutor's justifications for those excusals, we find them amply supported as well.

As noted above, the prosecutor stated that she excused Prospective Juror No. 042519 in part because she had changed her mind about whether she could sit in judgment of another person and in part because she had been arrested for welfare fraud. The record supports the credibility of these reasons. On her questionnaire, when asked whether she had any "moral or religious beliefs" that would affect her "ability to sit in judgment of another person as a trial juror," she wrote, "My religion is that of Islam. I don't sit in judgment of others." On voir dire, however, Prospective Juror No. 042519 stated she could imagine herself voting for the death penalty as a juror. Prospective Juror No. 042519 also repudiated other statements she had made in her questionnaire, including that she did not believe in the death penalty, that the death penalty was wrong, and that she could never vote for the death penalty regardless of the facts of the case. When asked why she had changed her mind, she explained, "I got to thinking about so many things going on that if a person—if I done something, I should be punished and that's the way I feel about life. If I am guilty, why not punish me because everybody should know right from wrong." Under the circumstances, the prosecutor reasonably could have been concerned that Prospective Juror No. 042519 was subject to changing her mind and, when pressed, would revert to the views she stated in her questionnaire.

■ Moreover, on her questionnaire, Prospective Juror No. 042519 wrote that she had been arrested for welfare fraud. A prospective juror's negative experience with the criminal justice system, including arrest, is a legitimate, race-neutral reason for excusing the juror. (*People v. Salcido, supra*, 44 Cal.4th at p. 140; *People v. Panah* (2005) 35 Cal.4th 395, 442 [25 Cal.Rptr.3d 672, 107 P.3d 790].)

As noted above, the prosecutor said she excused Prospective Juror No. 045787 because she indicated that police had been unkind to her brother; she knew people who had been falsely accused of crimes; and, like Prospective Juror No. 042519, she had changed her mind about whether she could sit in judgment. The record supports these reasons. On her questionnaire, when asked to describe her feelings about the way law enforcement handled the arrest of someone close to her, Prospective Juror No. 045787 wrote "Police— unkind." She also wrote that she believed her ex-husband, brother and son all had been falsely accused of crimes. Finally, on her questionnaire, in response to a question whether she had "any moral or religious beliefs that would affect you[r] ability to sit in judgment of another person as a trial juror," she wrote "I'm not God."

When questioned on voir dire, Prospective Juror No. 045787 consistently indicated that although it was possible that she could vote to impose the death penalty, it would be very difficult for her to do so. In response to a question

from the court, she said, "[C]ertain people are put here to do certain things, and judging another person is not mine." She then clarified that she was willing to decide whether someone was telling the truth, but was "uncomfortable" with "telling somebody that we have to take your life." After the court had fully explained the trial process, she conceded it was "possible" she could vote for the death penalty, but repeated it would be "hard" to "tell[] someone that I have to take your life." Finally, when the prosecutor asked Prospective Juror No. 045787 about the "I'm not God" statement on her questionnaire, she explained, "It depends on the circumstances, or whatever, but I still feel like God is the one that is supposed to judge. He is the judge . . . [¶] . . . [therefore] when it comes to taking somebody's life, it would be hard." The record thus provides ample support for the prosecutor's concern that Prospective Juror No. 045787 would not be a favorable juror for the prosecution.

Defendant contends that the prosecutor's failure to question Prospective Jurors Nos. 042519 and 045787 about the matters later used to justify her challenges for cause demonstrates that the reasons were pretextual. (See *Miller-El v. Dretke, supra,* 545 U.S. at pp. 246, 250, fn. 8 [a party's failure to engage in meaningful voir dire on a topic the party says is important can suggest the stated reason is pretextual].) Here, although the prosecutor did not question Prospective Jurors Nos. 042519 and 045787 about their negative experiences with the justice system, she did engage them extensively on the topic that apparently concerned her most: their ability, because of their religious views, to sit in judgment of others and to impose the death penalty. The prosecutor even unsuccessfully challenged Prospective Juror No. 045787 for cause. Under the circumstances, the prosecutor's failure to question the prospective jurors about each and every area of articulated concern does not undermine the conclusion that her stated race-neutral reasons for excusing these prospective jurors were genuine and not pretextual.[14]

### C. Guilt Phase Issues

#### 1. Alleged judicial bias and related errors

During the noon recess on the second day of the prosecution's guilt phase case-in-chief, the trial judge, Judge Stephen P. Gildner, discovered that two upcoming prosecution witnesses were his close friends. Judge Gildner did not

---

[14] Defendant does not ask us to compare the responses of the stricken prospective jurors to those of the jurors and prospective jurors whom the prosecution accepted. Accordingly, we will not do so on our own motion. (See *People v. Lenix* (2008) 44 Cal.4th 602, 622 [80 Cal.Rptr.3d 98, 187 P.3d 946] ["evidence of comparative juror analysis must be considered . . . for the first time on appeal *if relied upon by the defendant* . . ." and the record is adequate to permit comparison (italics added)].)

immediately disqualify himself, however. Rather, he continued to preside throughout that afternoon; the following morning he recused himself and transferred the case to another judge. Defendant contends that Judge Gildner's continuing to preside over the case after he became aware of facts requiring his disqualification violated state statutory law as well as defendant's due process right to an impartial judge under the state and federal Constitutions. Defendant further contends that the substitution of another judge who was not familiar with the trial testimony already presented violated state law and defendant's rights to due process of law, trial by jury, and a reliable penalty determination under the Sixth, Eighth and Fourteenth Amendments to the federal Constitution. For the reasons explained below, we reject each of defendant's claims.

### a. *Factual background*

Danny Phinney testified on May 15, 1996, the second day of the prosecution's guilt phase case-in-chief. At the end of the lunch recess that day, Judge Gildner informed the parties that he had just realized that two upcoming prosecution witnesses, Jerry and Terri Jones, were close family friends. Although he had seen their names on the witness list, he had not realized that they were his friends until he met them in the hallway during the recess. Moreover, the Joneses were not just "casual family friends," but rather "their older son and my older son are very close personal friends, have been since about fourth grade." The judge acknowledged learning during a brief conversation with them that Terri Jones was related to Alma Merck, and noted that he might possibly be called upon to judge their credibility in the future. After stating he was "not sure what my obligations are beyond this point," the judge called a brief recess to allow counsel to confer with defendant.

Following the recess, Judge Gildner confirmed that the Joneses were close family friends whom he had known for at least 10 years. Defense counsel then announced that although he believed the judge would make every effort to be fair, defendant had instructed him to move for a mistrial. Upon questioning from Judge Gildner, the prosecutor confirmed that the Joneses would testify regarding items of the Mercks' property that defendant allegedly had possessed. Defense counsel added that the Joneses also were potential penalty phase witnesses, and Judge Gildner acknowledged that if the jury returned a death penalty verdict, he would be required to assess their credibility in ruling on the automatic motion to modify the verdict under section 190.4, subdivision (e). At the conclusion of this discussion, the judge stated he was "not going to precipitously rule," but would call another 25-minute recess to think about the matter.

Following the second recess, Judge Gildner expressed his opinion that he was "not required to do anything other than preside over the trial" because he

had been, and would continue to be, fair to both sides. However, because the situation implicated the "appearance of justice and fairness," he would continue to assess the situation through the end of the day. He explained, "I am unwilling at this point to grant the motion for a mistrial but it is chiefly because I am trying to buy some time, to be frank with you, to think about this a little bit more." He further explained that "if the motion for a mistrial should be granted at this moment, it should be granted for the same reasons at a later moment," that he could not think of a matter that might arise that afternoon that would prejudice either side, and that he was "extremely reluctant to disrupt" the cross-examination of Phinney, who was "clearly hostile yesterday when he was ordered back" for continued testimony.

Defendant objected to any further proceedings before Judge Gildner, who acknowledged a continuing objection. After stating he wanted to think about whether he could "set aside my personal feelings" in the matter, and ascertaining that the Joneses would not be testifying that day, the judge directed that the trial continue.

That afternoon, the cross-examination of Danny Phinney was completed, with Judge Gildner ruling on various objections by both the defense and the prosecution. The parties and Judge Gildner then reconvened to discuss the mistrial motion. The judge noted that a new California Code of Judicial Ethics had been approved a month earlier, which required a judge to disqualify himself or herself whenever required by law or when "the judge's impartiality might reasonably be questioned." He further noted that then section 170.1, former subdivision (a)(6)(C) (now subd. (a)(6)(A)(iii)) of the Code of Civil Procedure required disqualification if " 'a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial.' " The judge stated in light of these provisions, he intended to recuse himself; however, he was unwilling to declare a mistrial because only the appearance of bias was at issue and because defendant refused to waive any right he might have to claim that double jeopardy barred a retrial. After discharging the jury for the day, the judge repeated that "given that [judicial] canon and given the [Code of Civil Procedure] and given the present circumstances of this case and the possibility that I may have to assess the credibility of people who appear to be central to the prosecution's case, a recusal may be appropriate. It may even be required."

The following morning, May 16, 1996, the parties again convened outside the jury's presence, and Judge Gildner again expressed his concern that absent defendant's express consent to a mistrial, double jeopardy might bar a retrial. He therefore denied the motion for a mistrial "without prejudice," recused himself, and transferred the case to Judge Lee P. Felice.

b. *Discussion*

Defendant contends that once Judge Gildner realized that his close friends Jerry and Terri Jones were both prospective witnesses and relatives of one of the victims, he should have refrained from presiding over the trial for the remainder of the afternoon of May 15, 1996. He asserts Judge Gildner should have either recused himself immediately or, if he needed more time to determine whether to recuse himself, continued the trial while he considered the issue. Defendant argues that Judge Gildner's continuing to preside over the trial while he was aware of facts that might require his recusal violated state statutory law as well as defendant's right to an impartial judge under the due process clauses of the state and federal Constitutions.

If defendant is entitled to relief under state statutory law, there will be no need to address his federal constitutional claim. Accordingly, we address his statutory claim first. Defendant argues that by continuing to preside over Phinney's cross-examination and ruling on the motion for mistrial after grounds for his disqualification arose, Judge Gildner failed to comply with Code of Civil Procedure section 170.3, subdivision (a)(1). That subdivision provides that when "a judge determines himself or herself to be disqualified, the judge shall notify the presiding judge of the court of his or her recusal and shall not further participate in the proceeding, except as provided in [Code of Civil Procedure section] 170.4, unless his or her disqualification is waived by the parties as provided in subdivision (b)." When the issue is properly raised, Code of Civil Procedure section 170.3, subdivision (a)(1), invalidates actions taken by a judge after voluntary disqualification other than those permitted by Code of Civil Procedure section 170.4, unless the disqualification is waived.[15] (See *Geldermann, Inc. v. Bruner* (1991) 229 Cal.App.3d 662, 665–666 [280 Cal.Rptr. 264] [judgment based on statement of decision issued by judge who had voluntarily disqualified himself after presiding over nonjury trial and issuing tentative decision must be reversed].)

Here, there was no waiver; defendant objected to Judge Gildner's continuing to preside over the case after learning facts that might require disqualification, and he moved for a mistrial. Nonetheless, Judge Gildner did not violate Code of Civil Procedure section 170.3, subdivision (a)(1), when he continued to preside over Phinney's cross-examination. By its terms, the statute requires a judge to cease participating in the proceeding only after the judge "determines himself or herself to be disqualified." Here, Judge Gildner did not

---

[15] Code of Civil Procedure section 170.4 permits a disqualified judge to take a limited number of actions not implicated here.

"determine[]" himself to be disqualified until after Danny Phinney's cross-examination was completed, when he stated, "[h]aving considered the mandate which falls upon me . . . as approved by the California Supreme Court and then having considered [Code of Civil Procedure section 170.1, former subdivision (a)(6)(C)], I think it is appropriate to recuse myself." Up until that time, the judge expressed concern about the situation, but he did not decide his recusal was required until he discovered the applicable judicial canon and code section. After determining to recuse himself, Judge Gildner did not further participate in the proceedings except to rule on defendant's mistrial motion and refer the case to Judge Felice.

Defendant does not argue that Judge Gildner was not authorized to refer the case to Judge Felice. Nor could he, because Code of Civil Procedure section 170.4, subdivision (a)(2), expressly permitted Judge Gildner to "[r]equest any other judge agreed upon by the parties to sit and act in his or her place." Defendant does complain that the statute did not permit Judge Gildner to rule on the mistrial motion. However, defendant did not object to Judge Gildner's ruling on the motion or ask Judge Felice to reconsider Judge Gildner's ruling, even though Judge Gildner denied the motion "without prejudice." To the contrary, defendant affirmatively sought a ruling from Judge Gildner. Accordingly, defendant forfeited any claim that Code of Civil Procedure section 170.3, subdivision (a)(1), prohibited Judge Gildner from ruling on the mistrial motion. In any event, because as we explain below (see, *post*, at pp. 458–459), a mistrial was not required, any statutory violation did not prejudice defendant. (See *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243] [error of state law requires reversal only if it is reasonably probable the jury would have returned a different verdict absent the error].)

██ Because defendant is not entitled to relief on his claimed statutory violation, we turn to his federal constitutional claim. A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge. (*Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. ___, ___ [173 L.Ed.2d 1208, 129 S.Ct. 2252, 2259] (*Caperton*); *People v. Kipp* (2001) 26 Cal.4th 1100, 1140 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Indeed, "[i]t is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.' " (*Caperton, supra,* 556 U.S. at p. ___ [129 S.Ct. at p. 2259], quoting *In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 75 S.Ct. 623].)

██ Defendant argues that his federal due process right to an impartial judge was violated when Judge Gildner continued to preside over his case after learning facts that might require his disqualification. As we understand it, defendant reasons as follows: Judge Gildner recused himself under Code of Civil Procedure section 170.1, former subdivision (a)(6)(C)

(now subd. (a)(6)(A)(iii)), which requires disqualification if, "[f]or any reason . . . a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." The doubt about Judge Gildner's ability to be impartial arose when he first learned that his friends the Joneses were both potential witnesses and relatives of victim Alma Merck. We have said former subdivision (a)(6)(C) of Code Civil Procedure section 170.1 "appears to codify [federal] due process grounds for challenging the impartiality of a judge." (*People v. Brown* (1993) 6 Cal.4th 322, 334 [24 Cal.Rptr.2d 710, 862 P.2d 710], citing *In re Murchison, supra*, 349 U.S. at p. 136, and *Tumey v. Ohio* (1927) 273 U.S. 510, 533 [71 L.Ed. 749, 47 S.Ct. 437]; see also *People v. Brown, supra*, 6 Cal.4th at p. 336 [Code Civ. Proc., § 170.1, former subd. (a)(6)(C) "is drafted broadly enough to include 'due process' grounds of relief for judicial bias"].) Accordingly, because there was a doubt about Judge Gildner's ability to be impartial at the time he presided over Danny Phinney's cross-examination, and because such a doubt constitutes a "due process ground[] for challenging the impartiality of a judge" (*People v. Brown, supra*, 6 Cal.4th at p. 334), defendant's federal due process right to an impartial judge was violated.

■ We recently rejected a similar claim in *People v. Freeman* (2010) 47 Cal.4th 993 [103 Cal.Rptr.3d 723, 222 P.3d 177]. There, the defendant was tried before a judge who had previously disqualified himself based on an appearance of bias—his friendship with a judge whom the defendant was rumored to have been stalking—but who later was reassigned to the defendant's case after the stalking rumors proved unfounded. On appeal, the defendant argued that her trial before the previously disqualified judge violated her due process right to an impartial judge. We rejected the claim, relying upon the United States Supreme Court's recent decision in *Caperton, supra*, 556 U.S. ___ [129 S.Ct. 2252]. As we explained, Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii) provides "an explicit ground for judicial disqualification" based on "a public perception of partiality, that is, the appearance of bias." (*People v. Freeman, supra*, 47 Cal.4th at p. 1001.) *Caperton*, however, clarified that the due process clause operates more narrowly: "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' ([*Caperton, supra*,] 556 U.S. at p. ___ [129 S.Ct. at p. 2259].) Where only the appearance of bias is at issue, a litigant's recourse is to seek disqualification under state disqualification statutes: 'Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution.' ([*Id.*] at p. ___ [129 S.Ct. at p. 2267].) Finally, the court

emphasized that only the most 'extreme facts' would justify judicial disqualification based on the due process clause. (*Id.* at pp. ___, ___ [129 S.Ct. at pp. 2265, 2266].)" (*People v. Freeman, supra,* 47 Cal.4th at p. 996.)

Turning to the facts before us, we concluded in *Freeman* that the defendant's case did not implicate any of the concerns—such as "pecuniary interest, enmeshment in contempt proceedings, or the amount and timing of campaign contributions"—that had motivated the high court's decisions finding that due process required judicial disqualification. (*People v. Freeman, supra,* 47 Cal.4th at p. 1006.) Further, the circumstances were not so extreme as to warrant a finding of a probability of actual bias. "At most, [the judge's] decision to accept reassignment of defendant's case may have violated the judicial disqualification statutes that limit the actions that may be taken by a disqualified judge. [Citations.] But, without more, this does not constitute the kind of showing that would justify a finding that defendant's due process rights were violated." (*Ibid.*)

Similarly here, it does not necessarily follow that due process was violated when Judge Gildner presided over the trial for a brief period after learning of facts that he later concluded gave rise to an appearance of bias sufficient to warrant his recusal under Code of Civil Procedure section 170.1, former subdivision (a)(6)(C), because such statutes " 'provide more protection than due process requires.' " (*People v. Freeman, supra,* 47 Cal.4th at p. 1005, quoting *Caperton, supra,* 556 U.S. at p. ___ [129 S.Ct. at p. 2267].) Nor would any possible violation of the statutes that limit the actions a disqualified judge may take, without more, amount to a due process violation. (*People v. Freeman, supra,* 47 Cal.4th at p. 1006.) Rather, defendant must make the "heightened showing of a probability, rather than the mere appearance, of actual bias to prevail." (*Ibid.*) This he cannot do. As the high court explained in *Caperton*, a constitutionally intolerable probability of actual bias exists only when the circumstances " 'would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused.' " (*Caperton, supra,* 556 U.S. at p. ___ [129 S.Ct. at p. 2260], quoting *Tumey v. Ohio, supra,* 273 U.S. at p. 532.) This inquiry is an objective one, based on whether " 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden . . . .' " (*Caperton, supra,* 556 U.S. at p. ___ [129 S.Ct. at p. 2263], quoting *Withrow v. Larkin* (1975) 421 U.S. 35, 47 [43 L.Ed.2d 712, 95 S.Ct. 1456].)

Defendant's showing falls short. Defendant argues there was a risk of bias because Judge Gildner would be reluctant to disbelieve his friends when

ruling on motions contesting the sufficiency of the evidence of guilt or the propriety of a death sentence. But Judge Gildner recused himself before the Joneses testified and did not rule on any such motions; there was no such risk of bias during the brief period he presided over Danny Phinney's testimony while knowing the Joneses would be witnesses later.

Defendant also argues there was a risk of bias because Judge Gildner was aware that Alma Merck was a relative of his friends the Joneses, who had been greatly saddened by her death. But these facts are not so extreme or extraordinary that they would tempt " 'the average .... judge . . . not to hold the balance nice, clear and true between the State and the accused.' " (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2260].) On this point, *Richardson v. Quarterman* (5th Cir. 2008) 537 F.3d 466, is instructive. There, the wife of the judge in a murder case was a friend of the victim. The Fifth Circuit determined that the judge "did not face a significant temptation to be biased against Richardson. He did not stand to gain personally or professionally if Richardson were sentenced more harshly by the jury. It may have pleased his wife or her friends and acquaintances . . . if Richardson received a harsh sentence, but this is not the type of 'possible temptation' that would lead the average judge 'not to hold the balance nice, clear and true.' " (*Richardson v. Quarterman, supra*, 537 F.3d at p. 476.) Similarly here, while it might have pleased the Joneses if Judge Gildner had ruled solely in favor of the prosecution on objections during Danny Phinney's cross-examination—which, we note, he did not do—such a temptation was too remote and insubstantial to violate the due process clause. (See also *People v. Williams, supra*, 16 Cal.4th at pp. 651–653 [no due process violation established when the nephew of the judge's son-in-law was both a witness and the grandson of the victim in a murder case].)

In sum, neither defendant's rights under Code of Civil Procedure section 170.3, subdivision (a)(1), nor his federal due process right to an impartial judge were violated when Judge Gildner continued to preside over a brief period of the trial after learning that his close friends the Joneses were both upcoming witnesses and relatives of Alma Merck.[16]

Defendant next argues that Judge Gildner erred when he denied defendant's motion for a mistrial and instead transferred the case to Judge Felice, who presided over the remainder of the trial. Defendant contends the federal Constitution's due process and jury trial guarantees require the same judge to preside over all stages of a criminal trial. (See *Freeman v. U.S.* (2d Cir. 1915) 227 F. 732; *Randel v. Beto* (5th Cir. 1965) 354 F.2d 496, 500.)

---

[16] Because defendant identifies no analytical difference between his federal and state constitutional claims, we deny the latter for the same reasons as the former.

 As defendant acknowledges, we have rejected this precise contention. (*People v. Espinoza* (1992) 3 Cal.4th 806, 829 [12 Cal.Rptr.2d 682, 838 P.2d 204]; see also *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1211–1212 [275 Cal.Rptr. 729, 800 P.2d 1159].) As we explained in *Espinoza*, section 1053, which provides for the substitution of a new judge when the original judge in a criminal trial is unable to proceed, is not unconstitutional.[17] This rule is now settled law. (E.g., *People v. Halvorsen* (2007) 42 Cal.4th 379, 427–428 [64 Cal.Rptr.3d 721, 165 P.3d 512]; *People v. Lewis* (2004) 33 Cal.4th 214, 225–226 [14 Cal.Rptr.3d 566, 91 P.3d 928]; *People v. Burgener* (2003) 29 Cal.4th 833, 892 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Moreda* (2004) 118 Cal.App.4th 507, 515–517 [13 Cal.Rptr.3d 154].) Accordingly, we decline defendant's invitation to revisit this issue. Because substitution of another judge was permissible once Judge Gildner had disqualified himself, the court did not abuse its discretion when it denied defendant's motion for a mistrial, to the extent the motion was based on this ground. (See *People v. Price* (1991) 1 Cal.4th 324, 428 [3 Cal.Rptr.2d 106, 821 P.2d 610] [abuse of discretion standard applies to review of denial of mistrial motion]; *People v. Lucero* (2000) 23 Cal.4th 692, 713 [97 Cal.Rptr.2d 871, 3 P.3d 248] [mistrial should be granted only if the defendant will suffer prejudice that is " ' "incurable by admonition or instruction" ' "].)

Defendant argues nonetheless that he was entitled to a substitute judge who had thoroughly familiarized himself with the prior proceedings, and that Judge Felice had not done so. For example, on May 20, 1996, the first day Judge Felice presided over the trial, he acknowledged during a hearing on the admissibility of Danny Phinney's prior statements to police that he was "not as swift on the uptake, if you will, [as] if I had been here during the trial," and later noted he had reviewed only "certain portions" of Phinney's trial testimony. Defendant argues that without reviewing the entire transcript of the prior proceedings, including the testimony of the eight witnesses who testified before Judge Gildner recused himself, Judge Felice could not exercise his discretion in an informed manner when ruling on the admissibility of Danny Phinney's prior statements and Gerry Tags's preliminary examination testimony; nor could he properly rule on defendant's automatic motion to modify the penalty verdict under section 190.4, subdivision (e).

Defendant relies on *People v. Espinoza, supra*, 3 Cal.4th at pages 829–830. There, the defendant contended that a substitute judge who had not personally heard all of the guilt phase testimony could not fully exercise independent

---

[17] Section 1053 provides in pertinent part, "If after the commencement of the trial of a criminal action or proceeding in any court the judge or justice presiding at the trial shall die, become ill, or for any other reason be unable to proceed with the trial, any other judge or justice of the court in which the trial is proceeding may proceed with and finish the trial . . . ."

judgment when ruling on an automatic motion to modify the penalty verdict under section 190.4, subdivision (e); therefore, the denial of the motion was inherently unreliable under the federal Constitution's Eighth Amendment. We rejected the contention, noting that the substitute judge had reviewed the transcripts of the trial proceedings before his substitution. (*Espinoza, supra,* 3 Cal.4th at pp. 829–830.) Defendant also relies on rules from other jurisdictions requiring a substitute judge to certify that he or she is familiar with the trial record before proceeding. (E.g., Fed. Rules Crim.Proc., rule 25(a), 18 U.S.C.; Iowa Ct. Rules, Rules of Crim. Proc., rule 2.19(7)(b)(1); Md. Rules, rule 4-361(b); *Hood v. State* (Ct.App. 1994) 334 Md. 52 [637 A.2d 1208].)

Preliminarily, we note that section 1053 imposes no requirement that a substitute judge certify his or her familiarity with the record, and defendant points to no other California statute or rule of court that does so. The authorities from other jurisdictions are inapplicable.

In any event, defendant forfeited any claim of error based on Judge Felice's lack of familiarity with the record by failing to object on that ground at trial. (Cf. *People v. Halvorsen, supra,* 42 Cal.4th at p. 427 [by failing to object at trial, defendant forfeited his claim that, because the record did not reflect that the original judge was unable to proceed, substitution of judges violated § 1053].) In fact, at the outset of the hearing regarding the admissibility of Phinney's prior statements, Judge Felice proposed taking a 15-minute recess to read the transcript of Phinney's trial testimony, but defendant's counsel rejected that proposal and offered instead to "go through the transcript page by page and delineate for you the basis of my argument." Had counsel objected, the matter could have been continued to give Judge Felice time to read the entire transcript. (See *People v. Halvorsen, supra,* 42 Cal.4th at p. 429 [had defense counsel objected, record would reflect reasons why original judge was unable to proceed, or original judge would have presided].) Nor did defendant object to Judge Felice ruling on the automatic motion to modify the penalty verdict on the ground that the judge was unfamiliar with the record.

Were we to reach the merits, we would conclude that any error in Judge Felice's not having read the entire trial transcript before ruling on the admissibility of Phinney's prior statements and Tags's testimony was harmless. (Cf. *People v. Halvorsen, supra,* 42 Cal.4th at p. 429 [harmless error analysis applies to claim of improper substitution of a judge under § 1053].) Judge Felice had presided over some pretrial proceedings in this case before becoming ill and transferring the matter to Judge Gildner for trial. (See *Cowan v. Superior Court, supra,* 14 Cal.4th 367.) Accordingly, he was familiar with defendant and with some of the issues in the case. Further,

Judge Felice had a copy of the transcript of Phinney's trial testimony before him during the hearing on Phinney's prior statements, and he read the relevant portions as they were pointed out by counsel. He proceeded in the same manner during the hearing on Tags's testimony. Thus, Judge Felice was familiar enough with the pertinent portions of the record to exercise his discretion in an informed manner. Defendant complains that ruling on the admissibility of Phinney's prior statements required Judge Felice to assess the credibility of Phinney's trial testimony without having seen him testify, but defendant fails to explain how reading the transcript would have aided the judge in that task. Moreover, if there was any error in Judge Felice's rulings on the admissibility of Phinney's and Tags's testimony, defendant would be entitled to relief on that ground. (See pts. II.C.3. & II.C.7., *post.*)

Finally, defendant makes no showing that Judge Felice had not thoroughly familiarized himself with the trial record by the time he considered defendant's automatic motion to modify the penalty verdict under section 190.4, subdivision (e). During the hearing on the admissibility of Phinney's statements, Judge Felice announced his intention to use the time before trial began in the mornings to read the daily transcripts and "try to catch up with where you folks are at." In the absence of any evidence to the contrary, we presume Judge Felice did exactly what he said he was going to do.[18] For all of these reasons, defendant is not entitled to relief based on the midtrial substitution of Judge Felice for Judge Gildner.

### 2. *Alleged improper admission of Emma Foreman's hearsay statement*

On direct examination, Emma Foreman, the mother of defendant's former girlfriend, Gerry Tags, testified in pertinent part as follows:

"Q: Did [defendant] ever say anything to you about murdering anybody?

"A: Not specifically to me, but I overheard the conversation between him and Gerry, my daughter.

"Q: What did he say to Gerry about murdering anybody?

"A: He kept on telling her that if she didn't do what he wanted her to do, he would cut her motherfucking throat.

"Q: Did he ever mention any elderly people that had he [*sic*] harmed?

---

[18] Defendant also argues that without reading the trial transcript Judge Felice was unprepared to rule on other substantive issues that arose during the trial, but he does not identify any particular issue. We therefore decline to consider the matter.

"A: Well, one time he did.

"Q: Did he say that to you or to your daughter?

"A: It was to my daughter.

"Q: What did he say then?

"A: He said that he would—he said he would cut her motherfucking throat."

Over defendant's objection, Officer Porter then testified that in January 1990, Foreman told him that defendant had admitted to her that he had "killed an old couple in Bakersfield" whom he "found . . . in a bedroom, and . . . beat . . . to death."

Defendant contends Foreman's statement to Porter was inadmissible hearsay because it was not inconsistent with her trial testimony, and that its admission into evidence violated state hearsay rules as well as his federal constitutional rights. We review the trial court's rulings on the admission of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 724 [94 Cal.Rptr.2d 396, 996 P.2d 46].) We find no abuse of discretion here.

 "A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770."[19] (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219 [14 Cal.Rptr.2d 702, 842 P.2d 1].) "The 'fundamental requirement' of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony." (*Ibid.*) " 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement . . . .' " (*Ibid.*, quoting *People v. Green* (1971) 3 Cal.3d 981, 988 [92 Cal.Rptr. 494, 479 P.2d 998].)

Here, the trial court properly found that Foreman's statement to Porter was inconsistent with her trial testimony in two ways. First, it was inconsistent regarding to whom defendant purportedly spoke about killing an elderly

---

[19] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 in turn provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

couple: in her statement to Porter, Foreman said defendant spoke to her, while in her trial testimony, Foreman said she overheard defendant speaking with her daughter, Gerry Tags. Second, it was inconsistent as to what defendant purportedly said: in her statement to Porter, Foreman said defendant admitted killing an elderly couple he had found in a bedroom, while in her trial testimony Foreman reported that defendant said only that he would cut Tags's throat.

Defendant argues Foreman's response at trial was not inconsistent, but rather was merely nonresponsive. However, a witness's deliberate evasion of questioning can constitute an implied denial that amounts to inconsistency, rendering a prior statement admissible under Evidence Code section 1235. (*People v. Johnson, supra*, 3 Cal.4th at pp. 1219–1220; *People v. Green, supra*, 3 Cal.3d at pp. 988–989.) Normally, the question of evasiveness arises when a witness claims memory loss about the subject of the questioning. (E.g., *People v. Ervin* (2000) 22 Cal.4th 48, 84–85 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Johnson, supra*, 3 Cal.4th at pp. 1219–1220; *People v. Green, supra*, 3 Cal.3d at pp. 988–989.) Answering questions in a deliberately nonresponsive manner, however, also can rise to the level of evasion. Here, the trial court reasonably could have concluded that Foreman was being deliberately evasive when she twice answered questions about what defendant had purportedly said about "murdering anybody" or harming an elderly couple in a nonresponsive manner. Under the circumstances, her nonresponsive answers could be deemed an implied denial that defendant had admitted killing an elderly couple.

Defendant argues that admitting Porter's testimony about Foreman's hearsay statements violated his rights to confront the witnesses against him and to due process of law under the Sixth and Fourteenth Amendments to the federal Constitution. Assuming these claims are preserved for review (see *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765]; *People v. Yeoman, supra*, 31 Cal.4th at p. 117), they lack merit. The Sixth Amendment's confrontation clause does not prohibit admitting into evidence "testimonial" hearsay statements against a defendant if the declarant appears for cross-examination at trial. (*Crawford v. Washington* (2004) 541 U.S. 36, 59 & fn. 9 [158 L.Ed.2d 177, 124 S.Ct. 1354].) Here, although Foreman testified before Porter did and was not asked about her statements to him, she was released subject to recall. Accordingly, defendant was free to recall and cross-examine her about the discrepancy between her trial testimony and her statements to Porter. No Sixth Amendment violation occurred.

For similar reasons, admitting Porter's testimony did not render the trial fundamentally unfair. (See *People v. Partida, supra*, 37 Cal.4th at p. 439 [the admission of evidence results in a due process violation only if it renders the

trial fundamentally unfair].) Here, Porter's testimony was properly admitted under state law, and defendant was free to confront the evidence if he so chose. Furthermore, Porter's testimony was only a small part of the prosecution's case; the prosecutor did not even mention the testimony in her guilt phase summation. Finally, Foreman admitted telling Detective Fraley that she hated defendant "with a purple passion." The jury thus was well aware that Foreman may have had reason to fabricate statements by defendant. We find no error or unfairness.[20]

### 3. *Alleged improper admission of Danny Phinney's hearsay statements*

On direct examination during the prosecution's guilt phase case-in-chief, Danny Phinney testified that on a date and time that he could not independently recall, he met defendant at an auto parts store. Defendant owed Phinney money. Phinney went to defendant's brother's house, where he looked at some items, including two jewelry boxes, jewelry, coins, a tooled leather wallet containing a driver's license bearing the name Mirck or Merck and a birth date in the early 1900's, and two Social Security checks with the name Merck on them. Phinney testified that he "would not have remembered any of" these facts had he "not seen the paperwork"—i.e., a transcript of an interview he had given police in December 1984 about the events described above. However, he remembered "out of my mind" that a 1922 silver dollar was among the coins he saw at the house.

Over defendant's hearsay objection, Detective Diederich testified that he interviewed Phinney on December 21, 1984, while Phinney was in custody

---

[20] With respect to this and many other claims raised on appeal, defendant urges that the error or misconduct he is asserting infringed on various federal constitutional rights to a fair and reliable trial. In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (for example, failure to declare a doubt concerning defendant's competence, failure to instruct the jury sua sponte, or erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as erroneous for the reasons actually presented to that court, had the additional legal consequence of violating the federal Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (See *People v. Partida, supra,* 37 Cal.4th at pp. 433–439; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman, supra,* 31 Cal.4th at p. 117.)

"On the merits, no separate constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. DePriest* (2007) 42 Cal.4th 1, 19, fn. 6 [63 Cal.Rptr.3d 896, 163 P.3d 896].)

following his arrest in October. The interview was tape-recorded and transcribed. During the interview, Phinney stated that the meeting with defendant at the auto parts store occurred during the first week of September 1984. Phinney also described various items of property he had seen at defendant's brother's house, including coins (one bearing the date 1922), costume jewelry, two government-type checks totaling about $600 made out to someone named Merck with an address on McClean Street, and a leather wallet with a driver's license and some other cards inside. After the interview, Phinney pointed out for Diederich the house in which he had seen the items.

Defendant contends Phinney's December 1984 statement to Diederich was hearsay inadmissible under any exception. The trial court held a lengthy hearing and concluded the statement was admissible in part as a prior inconsistent statement (Evid. Code, § 1235), in part as a prior consistent statement (*id.*, § 1236), and alternatively as a past recollection recorded (*id.*, § 1237). Because we conclude the statement was admissible on the latter ground, we do not address the first two.

Evidence Code section 1237 permits evidence of a witness's past statement "if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) [w]as made at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory; [¶] (2) [w]as made . . . (ii) by some other person for the purpose of recording the witness'[s] statement at the time it was made; [¶] (3) [i]s offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) [i]s offered after the writing is authenticated as an accurate record of the statement." (Evid. Code, § 1237, subd. (a).) Here, Phinney testified he "had no idea" of when his meeting with defendant at the auto parts store occurred, and that he "would not have remembered any" of what he had seen at defendant's brother's house, other than a 1922 silver dollar, but for having read a transcript of his December 1984 interview with police. He also testified he could not remember what he told officers during the December 1984 interview. Accordingly, the first requirement of the statute is met: Phinney had insufficient independent recollection to testify "fully and accurately" about the events in 1984.

Defendant contends nonetheless that Phinney's December 1984 statement was inadmissible because it was not made at a time when the facts recorded were fresh in Phinney's memory. (Evid. Code, § 1237, subd. (a)(1).) Defendant notes the interview with Diederich took place over three months after Phinney's meeting with defendant supposedly occurred. But defendant did not argue below that the three-month lapse rendered the statement inadmissible; he may not do so now. (Evid. Code, § 353; see *People v. Miller* (1996)

46 Cal.App.4th 412, 422 [53 Cal.Rptr.2d 773], disapproved on other grounds in *People v. Cortez* (1998) 18 Cal.4th 1223, 1240 [77 Cal.Rptr.2d 733, 960 P.2d 537].) In any event, the argument lacks merit. Defendant points to no authority for the proposition that such a lapse of time between the events recorded and the time of the recording renders a past statement inadmissible under Evidence Code section 1237, and we are aware of none. (Cf. *People v. Miller, supra*, 46 Cal.App.4th at p. 422 [recorded statement made at least three weeks after recorded events occurred was admissible under Evid. Code, § 1237].) Indeed, federal courts have admitted statements made after even greater lapses of time under the federal counterpart to section 1237, Federal Rules of Evidence, rule 803(5) (28 U.S.C.).[21] (*U.S. v. Patterson* (9th Cir. 1982) 678 F.2d 774, 778–779 [10 months]; *U.S. v. Williams* (6th Cir. 1978) 571 F.2d 344, 348–350 [six months]; *U.S. v. Senak* (7th Cir. 1975) 527 F.2d 129, 139–142 [three years].) These courts reasoned that district courts should have the flexibility to consider all pertinent circumstances in determining whether the matter was fresh in the witness's memory when the statement was made. (*U.S. v. Patterson, supra*, 678 F.2d at p. 779.) We see no reason why a similar approach should not govern under Evidence Code section 1237. Here, Phinney's statement to Diederich describing the items he saw and when he saw them was fairly detailed, and he had sufficient recollection to lead Diederich to the house in which he had seen the items. Accordingly, there was a sufficient basis for concluding the events were reasonably fresh in Phinney's mind at the time he spoke to Diederich.

Defendant next argues the trial court abused its discretion in admitting the statement because Phinney could not reliably vouch for its truthfulness, as Evidence Code section 1237, subdivision (a)(3) requires. We disagree. Phinney repeatedly testified that he told Diederich the truth to the best of his ability. Defendant points out that Phinney admitted that his memory in 1984 was "jumbled" and "scrambled" because of the drugs he had been taking; that he sometimes suffered from delusions; that he had talked to Diederich only to "exonerate [him]self" from his association with the Colt .25-caliber pistol and to give the officers enough information so that he could get out of jail; and that he had seen a newspaper article about the Merck murders before he spoke to Diederich. Phinney further admitted that he might have lied to Diederich about his personal involvement in the trade of the Colt .25-caliber pistol between defendant and Lutts. But by the time Phinney spoke to Diederich he had been in custody for over two months, and Diederich testified that Phinney did not appear delusional or to be on drugs or going

---

[21] That rule permits the admission into evidence of "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable [him] to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in [his] memory and to reflect that knowledge correctly." (Fed. Rules Evid., rule 803(5), 28 U.S.C.)

through withdrawal. Phinney admitted he spoke with the officers because he wanted to get out of jail, but pointed out that he had to give the officers "enough fact to be substantiated." Furthermore, the only subject about which Phinney said he might have lied was his involvement in the gun transaction, which was not the subject of the portion of Phinney's statement the prosecution sought to introduce, and when confronted with the inconsistency between his 1984 and 1994 statements on the subject Phinney forthrightly admitted he might have lied in 1984. Finally, defense counsel thoroughly cross-examined Phinney about his multiple motives and opportunity to lie to Diederich, and a copy of a newspaper article Phinney might have read was admitted into evidence. The jury no doubt considered all of these factors in deciding the weight to be accorded to Phinney's 1984 statement. Under the circumstances, we cannot say that the trial court abused its discretion in determining the statement was sufficiently reliable to be admitted under section 1237. (Cf. *People v. Cummings* (1993) 4 Cal.4th 1233, 1293–1294 [18 Cal.Rptr.2d 796, 850 P.2d 1] [statement admissible under Evid. Code, § 1237 despite witness's delusions and drug problems at time of trial, where witness had sufficient recall of the events surrounding the statement that the trial court could conclude it was reliable]; *U.S. v. Edwards* (9th Cir. 1976) 539 F.2d 689, 691–692 [witness's statement to police admissible under rule 803(5) of Fed. Rules of Evid., 28 U.S.C., notwithstanding witness's admission that he was drunk when he made the statement].)

Defendant next asserts that because Judge Felice did not personally observe Phinney's testimony, he was not in a position to rule on the reliability of Phinney's assurance that he had told Diederich the truth. As we have explained, "whether an adequate foundation for admission" of a statement under Evidence Code section 1237 has been established turns on whether the declarant's "testimony that [the] statement was true was reliable," and the trial court who hears the declarant's testimony has "the best opportunity" to assess its credibility. (*People v. Cummings, supra*, 4 Cal.4th at pp. 1293–1294.) But we have never held that the judge who heard the declarant's testimony is the only judge who may assess its credibility, particularly where, as here, that judge is no longer available. Here, Judge Felice read the relevant portions of Phinney's testimony and entertained extensive argument regarding the statement's trustworthiness. Based on Phinney's testimony that he had told Diederich the truth, Judge Felice ruled the statement would be admissible, but only assuming Diederich could testify that Phinney did not appear delusional or intoxicated at the time he made the statement. Diederich did so testify. Again, we cannot say that the trial court abused its discretion.

Defendant finally contends that admitting Phinney's statement to Diederich pursuant to Evidence Code section 1237 violated his rights to confront and cross-examine witnesses under the Sixth Amendment to the

federal Constitution. As defendant acknowledges, we have in the past rejected this precise contention. (*People v. Cummings, supra*, 4 Cal.4th at p. 1292, fn. 32; see also *People v. Miller, supra*, 46 Cal.App.4th at p. 424.) Defendant urges us to reconsider *Cummings* in light of *Crawford v. Washington, supra*, 541 U.S. 36, but that case does not aid him. As the high court there explained, admitting a witness's testimonial hearsay statement does not violate the Sixth Amendment where, as here, the witness appears at trial and is subject to cross-examination about the statement. (*Crawford, supra*, at pp. 59–60, fn. 9; see also *California v. Green* (1970) 399 U.S. 149, 162 [26 L.Ed.2d 489, 90 S.Ct. 1930].) Defendant contends there can be no constitutionally effective cross-examination when the witness cannot recall the facts related in the hearsay statement. (See *People v. Simmons* (1981) 123 Cal.App.3d 677 [177 Cal.Rptr. 17] [finding a confrontation clause violation due to witness's memory lapse]; but cf. *California v. Green, supra*, 399 U.S. at pp. 168–170 [leaving question open].) But the high court has squarely rejected that contention, concluding that "when a hearsay declarant is present at trial and subject to unrestricted cross-examination," "the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness'[s] demeanor satisfy the constitutional requirements," notwithstanding the witness's claimed memory loss about the facts related in the hearsay statement. (*United States v. Owens* (1988) 484 U.S. 554, 559–560 [98 L.Ed.2d 951, 108 S.Ct. 838].) Nothing in *Crawford* casts doubt on the continuing vitality of *Owens*.

Here, as in *Cummings*, Phinney was cross-examined extensively about his drug use, mental illness, multiple motives to lie, and other factors potentially affecting his truthfulness at the time he made his 1984 statement. (Cf. *People v. Cummings, supra*, 4 Cal.4th at p. 1292, fn. 32.) The weight of these factors, and their effect on the statement's credibility, were for the jury to decide. We find no constitutional violation.

4. *Alleged improper admission of expert ballistics testimony*

During jury selection, at a hearing outside the presence of prospective jurors, the prosecutor made known that criminalist Gregory Laskowski had very recently concluded that the Colt .25-caliber pistol recovered in the October 1984 raid on the Caravan Inn had fired the bullets recovered from Clifford Merck's body. Laskowski briefly testified that, after learning the previous week from Detective Christopherson that the barrel of the gun had been tampered with, he had made a mold of the barrel using a casting compound, compared the mold with the bullets taken from Clifford's body, and concluded the bullets had been fired from that gun.

Later during trial, defendant moved under *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240], to exclude Laskowski's

testimony about the comparison and his conclusions.[22] As relevant here, the *Kelly* rule provides that the "admissibility of expert testimony based on 'a new scientific technique' requires proof of its reliability—i.e., that the technique is ' "sufficiently established to have gained general acceptance in the particular field to which it belongs." ' " (*People v. Venegas* (1998) 18 Cal.4th 47, 76 [74 Cal.Rptr.2d 262, 954 P.2d 525], quoting *People v. Kelly, supra*, 17 Cal.3d at p. 30; accord, *Nelson, supra*, 43 Cal.4th at p. 1257.)

At an Evidence Code section 402 hearing,[23] Laskowski testified that in 1984 he had excluded the Colt pistol as the source of the bullets recovered from Clifford's body based on a comparison of those bullets with test-fired bullets. A few weeks before trial, however, Detective Christopherson had informed him that the inside of the barrel had been altered. Laskowski reexamined the gun and determined that the land impressions near the crown of the barrel had been damaged to such an extent that comparison with test-fired bullets was impossible. Laskowski therefore made a cast of the interior of the barrel using Mikrosil, a silicone rubber compound routinely used in the casting of tool marks. He then compared the markings on the cast that had been recorded from the inside of the barrel with the two bullets recovered from Clifford's body, and determined the bullets had been fired from the Colt pistol.

On cross-examination, Laskowski admitted that neither he nor any other ballistics expert he was aware of had ever testified in court regarding ballistics comparisons using Mikrosil casting. However, at least a dozen or more experts he had spoken with told him that the method was "acceptable." Moreover, he explained, the technique was not new, because "the recording of tool marks with an elastomeric material has been done," and firearms examination was essentially a subset of tool mark comparison.

Defendant called no witnesses. Based on Laskowski's testimony, the court ruled the method Laskowski had used to compare the gun barrel with the bullets recovered from Clifford's body was not a new scientific technique and therefore was not subject to the *Kelly* test. The court explained, "What we're dealing with here is simply—is an old procedure that has been employed for

---

[22] Defendant's motion included a reference to *Frye v. U.S.* (D.C. Cir. 1923) 293 Fed. 1013, which we relied upon for the rule announced in the *Kelly* decision. Because the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469, 113 S.Ct. 2786], ruled that the Federal Rules of Evidence (28 U.S.C.) superseded *Frye*, we refer here solely to *Kelly*. (See *People v. Bolden* (2002) 29 Cal.4th 515, 545 [127 Cal.Rptr.2d 802, 58 P.3d 931]; *People v. Leahy* (1994) 8 Cal.4th 587, 598–604 [34 Cal.Rptr.2d 663, 882 P.2d 321].)

[23] Subdivision (b) of that section provides in pertinent part that the "court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury." (Evid. Code, § 402, subd. (b).)

years in terms of identifying . . . a firearm as being that which fired a slug, that has been with us for years and a little bit different technique, possibly, but the basic science, if you will, is the same, it is not a new technique and new process."

Defendant contends the trial court's ruling was erroneous. We disagree. *Kelly* applies only to " 'that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*People v. Leahy, supra,* 8 Cal.4th at p. 605, quoting *People v. Stoll* (1989) 49 Cal.3d 1136, 1156 [265 Cal.Rptr. 111, 783 P.2d 698].) Here, defendant does not claim that either the technique of ballistics comparisons or the technique of identifying tool marks using molds made of elastic material is new. Laskowski simply combined these two existing techniques to compare the Colt pistol's barrel with the bullets recovered from Clifford's body. As Laskowski testified, "the recording of tool marks with an elastomeric material has been done" and "firearms examination is essentially a tool mark type of examination when one looks at impressed or striated materials, marks, and that is not a new technique."

Moreover, neither technique is "so foreign to everyday experience as to be unusually difficult for laypersons to evaluate." (*People v. Venegas, supra,* 18 Cal.4th at p. 81 [contrasting DNA evidence, which requires validation under *Kelly,* with "fingerprint, shoe track, bite mark, or ballistic comparisons, which jurors essentially can see for themselves"].) As we have explained, the *Kelly* rule "is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not." (*People v. Webb* (1993) 6 Cal.4th 494, 524 [24 Cal.Rptr.2d 779, 862 P.2d 779]; see also *People v. Leahy, supra,* 8 Cal.4th at p. 606 [*Kelly* applies only to techniques that " 'appear[] *in both name and description* to provide some definitive truth which the expert need only accurately recognize and relay to the jury.' "].) Thus, in *People v. Webb, supra,* 6 Cal.4th 494, we held that expert testimony regarding a fingerprint match based on a laser-derived image of a latent fingerprint was not subject to the *Kelly* test. (*Webb, supra,* 6 Cal.4th at pp. 523–524.) There, an expert witness explained in detail how he had derived the image and compared it to the defendant's known fingerprint. Slides and photographs of each stage of the chemical and laser process were introduced, and the expert explained the points of similarity he found. There was "no dispute" that the method produced the image "without tampering or alteration." (*Id.* at p. 524.) We concluded, "[w]here, as here, a procedure isolates physical evidence whose existence, appearance, nature, and meaning are obvious to the senses of a layperson, the reliability of the process in producing that result is equally apparent and need not be debated under" the *Kelly* rule. (*Webb,* at p. 524.)

Similarly, here, the procedure Laskowski used merely "isolate[d] physical evidence"—specifically, the pattern of lands and grooves and associated imperfections on the inside of the Colt pistol's barrel, as well as the corresponding markings on the recovered bullets—"whose . . . appearance, nature, and meaning [were] obvious to the senses" of the lay jurors. (*People v. Webb, supra*, 6 Cal.4th at p. 524.) At the Evidence Code section 402 hearing and at trial, Laskowski explained in detail the process he had used to create the barrel cast and compare it to the bullets recovered from Clifford Merck's body. Laskowski showed photographs of the gun, the barrel cast, the test-fired bullets and the recovered bullets to the jury and identified the points of similarity he found between the cast and the recovered bullets. Although there was some dispute about whether the method Laskowski used produced a cast of the barrel "without tampering or alteration" due to possible bubbling or shrinkage of the Mikrosil, that possibility was fully explored on cross-examination and the jury had the opportunity to weigh its effect on the validity of Laskowski's conclusions. Thus, here too there was no need to debate the reliability of the method under the standards of *Kelly*. (*People v. Webb, supra*, 6 Cal.4th at p. 524; see also *People v. Clark* (1993) 5 Cal.4th 950, 1017–1019 [22 Cal.Rptr.2d 689, 857 P.2d 1099] ["blood-spatter" evidence not subject to *Kelly* because it is common knowledge that inferences can be drawn from spatter patterns of blood expelled from the human body], disapproved on other grounds in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22; *People v. Stoll, supra*, 49 Cal.3d 1136, 1157 ["absent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly/Frye*"].)

Defendant contends that although the science of ballistics is not new, the accepted technique involves comparison of a test-fired bullet with bullets recovered from a crime scene. He contends there are critical differences between the identification of stationary impressions of tool marks using casts or molds, and the identification of marks produced by the dynamic forces acting on a bullet as it is propelled through the barrel of a gun. He argues that by combining tool mark comparison technique with ballistics comparison technique, Laskowski created a new technique, the reliability of which should have been proved under the *Kelly* standards.

Defendant did not raise this argument in the trial court, and that court had no opportunity to evaluate it. In any event, the difference between static tool mark comparison and dynamic ballistics comparison was not a matter so beyond common understanding that lay jurors could not give it proper weight in evaluating Laskowski's opinion. Defendant could have raised this issue on cross-examination, or he could have presented his own expert to contest Laskowski's findings before the jury. He did neither. We conclude there was no error.

### 5. Alleged error in excluding defendant's "consciousness of innocence" evidence

Before calling Detective Fraley to the stand, the defense sought to introduce evidence that on February 14, 1985, defendant had telephoned Fraley and offered to "come down right now" and speak to him about the Merck case. Defense counsel argued the evidence showed "lack of consciousness of guilt" and either was not hearsay, or was hearsay admissible under the state-of-mind exception. The court, however, excluded the evidence on the ground that it was not probative of defendant's state of mind at the time of the killings and therefore was not relevant.

Defendant renews his argument that the proffered evidence was nonhearsay circumstantial evidence of his mental state and was relevant to show consciousness of innocence. Alternatively, he argues that even if the evidence was hearsay, it was admissible under the hearsay exception for evidence offered to prove the declarant's state of mind when that state of mind is "itself an issue in the action." (See Evid. Code, § 1250.)

■ We agree that defendant's offer to speak with Detective Fraley was not hearsay. Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless subject to an exception, hearsay evidence is inadmissible. (*Id.*, subd. (b).) Here, defendant's offer to talk to Detective Fraley was not hearsay but "simply verbal conduct" consisting of a proposal to perform an act, and therefore was "neither inherently true nor false." (*People v. Curl* (2009) 46 Cal.4th 339, 362 [93 Cal.Rptr.3d 537, 207 P.3d 2].) Furthermore, the statement was "offered for the nonhearsay purpose of demonstrating consciousness of" innocence. (*Ibid.*) Accordingly, sections 1200 and 1250 of the Evidence Code are inapplicable.

■ Nonetheless, we conclude the trial court did not abuse its discretion by excluding the evidence that defendant had offered to talk to Detective Fraley. In a line of cases dating back over a century, this court has held that evidence that the defendant did not flee from a crime scene is inadmissible to show consciousness of innocence, even though such evidence has "*some* 'tendency in reason' to prove this fact." (*People v. Green* (1980) 27 Cal.3d 1, 39, fn. 25 [164 Cal.Rptr. 1, 609 P.2d 468]; see *People v. Montgomery* (1879) 53 Cal. 576; see also *People v. Doran* (1972) 24 Cal.App.3d 316, 321 [100 Cal.Rptr. 886].)[24] As we explained in *People v. Green*, the inferences arising

---

[24] *People v. Green, supra,* 27 Cal.3d 1, was overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239 [83 Cal.Rptr.2d 533, 973 P.2d 512] and *People v. Hall* (1986) 41 Cal.3d 826, 834, footnote 3 [226 Cal.Rptr. 112, 718 P.2d 99]. *People v. Doran, supra,* 24

from evidence of the absence of flight are ambiguous because "there are plausible reasons why a guilty person might also refrain from flight," such as fear of recapture or confidence that flight will be unnecessary because there is no strong proof of guilt. (*People v. Green, supra,* 27 Cal.3d at p. 37, citing *People v. Montgomery, supra,* 53 Cal. at pp. 577–578.) Moreover, such evidence also creates a "substantial danger 'of confusing the issues, or of misleading the jury.' " (*People v. Green, supra,* 27 Cal.3d at p. 38, quoting Evid. Code, § 352.) Because "the absence of flight is so ambiguous, [and] so laden with conflicting interpretations . . . in all cases the scales tip so heavily against admission of evidence of absence of flight that it must be excluded as a matter of law." (*People v. Green, supra,* 27 Cal.3d at p. 39, fn. omitted.)

By parity of reasoning, other consciousness of innocence evidence, such as defendant's offer here, although relevant, properly may be excluded on the ground that its slight probative value is outweighed by the risk of confusing the issues. (Accord, *People v. Harvey* (1984) 163 Cal.App.3d 90, 115 [208 Cal.Rptr. 910].) Indeed, there are numerous plausible reasons why a guilty person might offer to talk to the police. (*Ibid.* ["Just as there are numerous reasons why a guilty defendant would not flee, there are also numerous reasons why he would appear to be cooperative with the police."].) He may desire to appear innocent, or he may desire to lie to the police to deflect suspicion from himself or to present a false alibi. Against such slight probative value, the risk of confusing the issues or of delaying the trial is strong, since if the evidence were admitted, the prosecution would have to be given the opportunity to explain the circumstances surrounding the defendant's offer and to present evidence negating an inference of innocence. (See *People v. Green, supra,* 27 Cal.3d at pp. 38–39, fn. 4 [discussing similar concerns regarding absence-of-flight evidence].) Accordingly, the trial court did not abuse its discretion by excluding evidence of defendant's offer to speak to Fraley.[25]

 Defendant argues nonetheless that the exclusion of the evidence of his offer to speak to Detective Fraley violated his federal constitutional right to present a defense. But the trial court's ruling "did not constitute a refusal to allow defendant to present a defense, but merely rejected certain evidence concerning the defense." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [65 Cal.Rptr.2d 145, 939 P.2d 259]; see *People v. Jones* (1998) 17 Cal.4th 279, 305 [70 Cal.Rptr.2d 793, 949 P.2d 890].) Although the evidence of defendant's offer to speak to Fraley was excluded, defendant was not otherwise

Cal.App.3d 316, was disapproved on other grounds in *People v. Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905] and *Evans v. Superior Court* (1974) 11 Cal.3d 617 [114 Cal.Rptr. 121, 522 P.2d 681].

[25] Although our analysis differs from that of the trial court, " 'we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

precluded from presenting his defense through admissible testimony and evidence. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 363–364 [97 Cal.Rptr.3d 412, 212 P.3d 692].) Defendant also contends the disparate treatment afforded consciousness-of-guilt and consciousness-of-innocence evidence under California law independently offends notions of due process and fairness. (See *Wardius v. Oregon* (1973) 412 U.S. 470, 476 [37 L.Ed.2d 82, 93 S.Ct. 2208] [due process mandates reciprocal discovery rights in criminal cases].) We note at the outset, however, that when it comes to evidence of an accused's contacts with law enforcement, the federal Constitution places strict limits on the prosecution's ability to exploit any lack of cooperation, at least after the accused has been given the warnings required under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]. (See *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] [prosecutor violated due process by cross-examining defendants regarding their postarrest silence]; see also *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] [prosecutor's comment on defendant's failure to testify violates self-incrimination clause of 5th Amend.].) To the extent evidence of a defendant's prearrest lack of cooperation would be admissible, moreover, the defendant would be entitled to explain any such evidence the prosecution offered. (*People v. Green, supra*, 27 Cal.3d at p. 40, fn. 26.) Accordingly, we perceive no unfairness in refusing to allow defendant to present evidence of his offer to talk to the police. (Cf. *People v. Williams* (1997) 55 Cal.App.4th 648, 653 [64 Cal.Rptr.2d 203] ["[s]ince flight and the absence of flight are not on similar logical or legal footings, the due process notions of fairness and parity . . . are inapplicable"].)

Finally, even assuming error, it was harmless under any standard. The proffered evidence, although relevant to consciousness of innocence, was "less than compelling . . . since, if [defendant] had been involved in [the Mercks'] murder, it can be assumed he would have lied to a police detective questioning him about it." (*People v. Curl, supra*, 46 Cal.4th at p. 362.) The ambiguous nature of the evidence thus counsels against any finding that its exclusion affected the verdicts.

### 6. *Alleged error in admitting photographs of the victims*

Over defendant's objection, the trial court admitted into evidence at the guilt phase 10 graphic photographs of the Merck crime scene and the bodies of the Mercks as they were found, including closeup views of the bound arms and legs of the victims—the flesh discolored and bloated due to decomposition—and a closeup view of the back of Alma's head with a telephone cord wrapped around her neck. The trial court also admitted a single, somewhat blurry, full-length photograph of Alma taken when she was alive, wearing a ring on one of her fingers.

Defendant contends the trial court abused its discretion by admitting these photographs because their prejudicial effect outweighed their probative value. (Evid. Code, § 352.) Evidence Code section 352 permits the trial court, in its discretion, to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." As we have explained, " ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" ' [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative [citation]. A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." (*People v. Gurule* (2002) 28 Cal.4th 557, 624 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

We find no abuse of discretion in the admission of the postmortem photographs of the Mercks. Defendant was charged with first degree, premeditated murder. The challenged photographs showed how the victims had been restrained before they were killed, as well as the manner of the killings themselves—gunshots to the head, and strangulation. They thus were relevant to establish that the perpetrator intended to kill and that the killing was premeditated and deliberate. The photographs also clarified the testimony of Laskowski, Nerida and the coroner regarding the victims' restraints and wounds, and the locations and positions in which their bodies were found. (*People v. Box* (2000) 23 Cal.4th 1153, 1199 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Scheid* (1997) 16 Cal.4th 1, 18 [65 Cal.Rptr.2d 348, 939 P.2d 748].)

Nor did the prejudicial effect of these photographs "clearly outweigh[]" their probative value (*People v. Gurule, supra,* 28 Cal.4th at p. 624). Evidence is prejudicial within the meaning of Evidence Code section 352 if it " 'uniquely tends to evoke an emotional bias against a party as an individual' " (*People v. Scheid, supra,* 16 Cal.4th at p. 19, quoting *People v. Garceau* (1993) 6 Cal.4th 140, 178 [24 Cal.Rptr.2d 664, 862 P.2d 664]) or if it would cause the jury to " ' "prejudg[e]" a person or cause on the basis of extraneous factors' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958 [17 Cal.Rptr.2d 122, 846 P.2d 704]). We have examined the photographs and agree with the trial court that they are not unduly prejudicial. As the trial court noted, the photographs "do not have dismembered parts, these are people not [*sic*] laid out on a slide and cut up to show trajectories or probes inside of organs or body parts." (Cf. *People v. Allen* (1986) 42 Cal.3d 1222, 1258 [232 Cal.Rptr. 849, 729 P.2d 115] [photographs that did not show bodies "grossly disfigured during autopsy" were not unduly prejudicial].) They do not depict the victims' faces; only the back of Alma's head and ear are visible in one photograph, and Clifford's head is hidden by the pillow over it. (See *People v. Davis* (2009) 46 Cal.4th 539, 615 [94 Cal.Rptr.3d 322,

208 P.3d 78]; *People v. Scheid, supra,* 16 Cal.4th at p. 19.) There are no closeup views of Clifford's fatal wounds, and although some blood is visible in the photographs, there are not copious amounts. Moreover, given the time that passed between the murders and the discovery of the bodies, it was inevitable that the photographs would depict some decomposition. In any event, we do not find the photographs unduly gruesome. (See *People v. Davis, supra,* 46 Cal.4th at pp. 558, 615 [photograph of victim's badly decomposed body not gruesome].) For all of these reasons, the trial court reasonably could find that the probative value of these photographs outweighed any potentially prejudicial effect.

■■ Defendant asserts that the manner and cause of the victims' deaths and the intent of the perpetrator were not disputed at trial; rather, the only seriously contested issue was the perpetrator's identity, and the photographs were irrelevant to that question. But defendant's not guilty plea put in issue all of the elements of the charged offenses, including the elements he conceded. (*People v. Steele* (2002) 27 Cal.4th 1230, 1243 [120 Cal.Rptr.2d 432, 47 P.3d 225]; see also *Estelle v. McGuire* (1991) 502 U.S. 62, 69 [116 L.Ed.2d 385, 112 S.Ct. 475] [the "prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element"].) Thus, the prosecution was "still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent." (*People v. Steele, supra,* 27 Cal.4th at p. 1243; see also *People v. Scheid, supra,* 16 Cal.4th at pp. 15–17.) Defendant also contends that the manner of restraint and the cause of death were amply described in oral testimony; therefore the photographs were cumulative. But a prosecutor is not required to rely solely on oral testimony when a visual image would enhance the jury's understanding of the issues. (See *People v. Gurule, supra,* 28 Cal.4th at p. 624 [the "jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case"]; *People v. Scheid, supra,* 16 Cal.4th at pp. 16, 19.)

Defendant argues that the record does not show that the trial court discharged its duty under Evidence Code section 352 to weigh the probative value of each photograph against its individual prejudicial effect. Rather, the court relied on generalities in admitting the photographs "en masse." But defendant has forfeited any claim of error in this respect. Before jury selection began, defendant made a blanket motion to exclude "any and all" postmortem photographs of the victims.[26] After examining all of the photographs the prosecutor wanted to have available to introduce at trial, the trial court properly overruled defendant's pretrial objection to the extent it was

---

[26] In the alternative, defendant requested that the color photographs be converted to black-and-white form. The trial court rejected that request, and defendant does not renew the argument here.

based on relevance, because without knowing what the evidence at trial would be, the court could not conclusively say that any of the photographs would be irrelevant. The court's ruling left open the possibility that, upon proper objection, it might later conclude that any particular photograph was irrelevant. The trial court also properly denied petitioner's motion to exclude the photographs as more prejudicial than probative, because it concluded they had no prejudicial effect in the sense encompassed by Evidence Code section 352, and therefore there was no possibility that their probative value, if any, could be outweighed by any prejudicial effect. Thereafter, defendant did not object to the photographs when they were marked as exhibits during trial; nor did he object when they were moved into evidence. Accordingly, defendant has forfeited any claim that the trial court erred by failing to weigh each photograph's individual probative value against its individual prejudicial effect.

Finally, the trial court did not abuse its discretion by admitting the photograph of Alma Merck while alive. Although the photograph is somewhat grainy, defendant concedes, as he must, that it was relevant to show that Alma had worn a ring similar to the ring recovered from defendant's sister, Catherine Glass. Moreover, defendant fails to persuade us that the photograph, which the trial court described as "grandmotherly," was unduly inflammatory. (See *People v. Davis, supra,* 46 Cal.4th at p. 615 [school portrait of young female victim not "unduly inflammatory"].) Indeed, the "possibility that [the photograph] generated sympathy for the victim[] [was] not enough, by itself, to compel its exclusion" given its relevance. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230 [9 Cal.Rptr.2d 628, 831 P.2d 1210]; but see *People v. Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516] ["marginally relevant" photograph of young victim "probably should have been excluded"].)

Even assuming error, it was harmless under any standard. The jury was well aware from other testimony that the Mercks were a frail elderly couple who spent time with their children and grandchildren. In this respect, the photograph would have generated no more sympathy for the victims than did Alma's children and grandchildren testifying live from the witness stand. (See *People v. Scheid, supra,* 16 Cal.4th at p. 20; *People v. DeSantis, supra,* 2 Cal.4th at p. 1230.) Moreover, there was strong evidence connecting defendant to the Merck murders, including the presence of his fingerprints at the crime scene and his connection to the murder weapon. We are confident the admission of the photograph had no effect on the verdicts finding defendant guilty of the Merck murders.

### 7. Alleged error in admitting Gerry Tags's preliminary examination testimony and related instructional error

Defendant's former girlfriend, Gerry Tags, testified for the prosecution at defendant's preliminary examination. On cross-examination, Tags admitted that she hated defendant. When defendant's counsel asked why, Tags explained she hated defendant because, among "other things," he beat her and forced her to prostitute herself.

On redirect examination the prosecutor asked Tags to elaborate on the "other" reasons she hated defendant, and the following colloquy occurred:

"A. Why is because me havin' it in my own mind that—what I think he has done, you know; and other things too. [¶] And I can't say that he done it because I wasn't there or nothing; but in my own mind, I would—I would always hate him, you know, because—he—man, I tell you, I always hate him.

"Q. What do you think that he did?

"A. Well, he hurt people that shouldn't have been hurted [sic].

"Q. Are you talking about the people in this case?

"A. Yes.

"Q. Does that bother you?

"A. Both of the cases."

At that point defense counsel objected. The magistrate accepted the prosecutor's explanation that the testimony was relevant to Tags's state of mind, but stated it would not be admitted for its truth.

Tags died before trial. Over defendant's objection, the trial court granted the prosecutor's motion to admit, under Evidence Code section 1291, Tags's preliminary examination testimony that she believed defendant had "hurt" the people in "both of the cases."[27] The prosecutor and defendant's counsel shared the task of reading Tags's preliminary examination testimony to the

---

[27] Subdivision (a)(2) of Evidence Code section 1291 provides, "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and . . . [¶] . . . [¶] . . . [t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

jury, with defendant's counsel reading the portion regarding Tags's belief in defendant's guilt. No limiting instruction was given except CALJIC No. 2.09, which instructs the jury generally that evidence admitted for a limited purpose should be restricted to that purpose.

Defendant now argues the trial court abused its discretion in admitting Tags's testimony about her belief in defendant's guilt because the evidence was more prejudicial than probative. (See Evid. Code, § 352.) We disagree. The evidence was relevant to show the reasons Tags hated defendant and therefore was probative of her bias against defendant. Defendant argues it was the fact of Tags's hatred that was relevant; the reasons for her hatred were not. But defendant's counsel opened up this line of inquiry by questioning Tags about her reasons. The prosecutor therefore was entitled to explore the issue fully. (See Evid. Code, § 356.)

Nor was the evidence particularly prejudicial. "Evidence is prejudicial within the meaning of Evidence Code section 352 if it encourages the jury to prejudge defendant's case based upon extraneous or irrelevant considerations." (*People v. Rogers* (2006) 39 Cal.4th 826, 863 [48 Cal.Rptr.3d 1, 141 P.3d 135].) Here, the evidence did not encourage the jury to prejudge defendant's case; rather, it merely invited the jury to infer that Tags hated defendant, and therefore might be biased against him, because she believed he was guilty. Defendant argues the evidence was prejudicial because Tags was the person closest to defendant in 1984; therefore the jury would have assumed she based her belief on facts unknown to the jury. But Tags herself admitted that she couldn't "say that he done it" because she "wasn't there or nothing." Accordingly, the jury may well have concluded that she was expressing no more than an unfounded belief.

■ Defendant claims the trial court erred by failing to instruct the jury regarding the limited purpose for which Tags's testimony about her belief in defendant's guilt was admitted. Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted. (*People v. Smith* (2007) 40 Cal.4th 483, 516 [54 Cal.Rptr.3d 245, 150 P.3d 1224]; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051 [16 Cal.Rptr.3d 880, 94 P.3d 1080]; see Evid. Code, § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (italics added)].) We have recognized a narrow exception to this rule in the " 'occasional extraordinary case' " in which the evidence at issue " 'is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.' " (*People v. Hernandez, supra*, 33 Cal.4th at pp. 1051–1052, quoting *People v. Collie* (1981) 30 Cal.3d 43, 63–64 [177 Cal.Rptr. 458,

634 P.2d 534]; see also *People v. Rogers, supra*, 39 Cal.4th at p. 864.) The exception is inapplicable here because Tags's brief testimony about her belief in defendant's guilt was not a dominant part of the prosecution's case and, as discussed above, was neither highly prejudicial nor minimally relevant. The trial court therefore had no duty to instruct absent a timely request.

Here, defendant requested a limiting instruction at the hearing on the admissibility of Tags's testimony. The trial court agreed, directing that the preliminary examination magistrate's statement limiting the purpose of Tags's testimony about her belief be read to the jury, and stating that it would give "any other limiting instruction" at "the appropriate time." But when defendant's counsel read the challenged portion of Tags's preliminary examination testimony to the jury three days later, he inexplicably failed to include the magistrate's statement limiting the purpose of the evidence. Any error in failing to include the magistrate's statement in the reading therefore must be ascribed to defendant.

Moreover, defense counsel did not remind the court that it had agreed to give a limiting instruction either at the time the testimony was read, or when discussing jury instructions before the case was submitted to the jury. Nor did defense counsel submit any proposed written limiting instruction. "Because defendant[] did not specifically request a limiting instruction at the appropriate time, the court had no sua sponte duty to give one." (*People v. Hernandez, supra*, 33 Cal.4th at p. 1052.)

Finally, even assuming evidentiary or instructional error, defendant was not prejudiced at the guilt phase. As noted, Tags admitted that her belief in defendant's guilt had no factual basis. She also admitted that defendant had told her, contrary to her belief, that he did not kill the Mercks. Under these circumstances, it is unlikely the jury assigned much weight to her testimony about her belief. Moreover, there was strong evidence of defendant's guilt of the Merck murders, including his fingerprints found at the crime scene and his connection to the murder weapon. For these reasons, admission of Tags's testimony about her belief that defendant had "hurt" the Mercks was harmless under any standard.

Defendant argues the error prejudiced him at the penalty phase because the jury had deadlocked nine to three as to his guilt of the Russell murder. Therefore, he reasons, at least three jurors must have believed he was guilty of Russell's murder, and the penalty phase jury instructions permitted those jurors to consider that murder as an aggravating circumstance. Had Tags's testimony about her belief not been admitted, he asserts, those jurors may well have concluded that his guilt of Russell's murder had not been proved beyond a reasonable doubt. But Tags gave much more damaging testimony

about the Russell murder, including that the night before she learned that Russell had been killed, defendant left Gerald and Mitzi's apartment in the early evening and returned in the early morning wearing different clothes; that a week or two later Tags saw the clothes defendant had been wearing when he left the apartment in the trunk of her car, bloodied and wrapped around a knife; and that after Russell's murder Tags, Gerald and defendant took a two-week trip to Oklahoma and Florida, during which defendant admitted killing Russell. Furthermore, Tags was extensively cross-examined about her drug use, lack of recall, and the inconsistencies between her various accounts of the events of September 1984. In light of the whole of Tags's testimony, admission of her statements about her admittedly unfounded belief in defendant's guilt could not have prejudiced defendant under any standard.

8. *Alleged error in admitting Mitzi Cowan's testimony*

Mitzi Cowan, who was Jewell Russell's daughter and in 1984 the girlfriend of defendant's brother Gerald, testified that one day during the first week of September defendant and Gerry Tags came to visit the apartment Mitzi shared with Gerald. About 5:00 p.m., defendant and Gerald left the apartment together. Gerald returned alone about 10:00 p.m. and asked Mitzi if he could use her car; she agreed and gave him the keys. Gerald returned alone again about 1:00 a.m. About two hours later defendant knocked on the door. Gerald rushed downstairs and yelled at defendant, "Where did you go? Where did you go? Why did you leave me?" Defendant was wearing different clothes than those he had on when he left. A few days later, Mitzi learned her father had been killed.

Over defendant's objection and mistrial motion, Mitzi further testified that when Gerald returned alone about 1:00 a.m., he threw "two hundred some odd dollars" on the bed. The money was folded in half. Earlier, Mitzi had testified that her father always carried his money in his front pocket, the bills folded neatly in half.

Defendant argues the trial court abused its discretion by admitting Mitzi's testimony that when Gerald returned at 1:00 a.m., he threw $200 in folded currency on the bed. He contends the evidence was irrelevant in the absence of independent evidence of a conspiracy between defendant and Gerald to kill Russell. (Cf. *People v. Leach* (1975) 15 Cal.3d 419, 430 [124 Cal.Rptr. 752, 541 P.2d 296]; *People v. Herrera* (2000) 83 Cal.App.4th 46, 61 [98 Cal.Rptr.2d 911].) He asserts the testimony prejudiced him because those jurors who believed his guilt of Russell's murder had been proved beyond a reasonable doubt were permitted to consider that murder in aggravation at the penalty phase. He argues that absent Mitzi's testimony about Gerald's possession of the folded currency, which linked the suspicious activities of

defendant and Gerald to the murder of Russell, there would have been fewer or no jurors who believed defendant's guilt of Russell's murder had been proved beyond a reasonable doubt.

■ Defendant confuses the question of relevance with that of the admissibility of hearsay. Under Evidence Code section 1223, evidence of a hearsay "statement" of a coconspirator is inadmissible against the defendant absent " 'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 139 [5 Cal.Rptr.2d 796, 825 P.2d 781], quoting *People v. Leach, supra,* 15 Cal.3d at p. 430; see also Evid. Code, § 1223, subd. (c).) A "statement" for these purposes may include conduct, but only conduct that is "intended . . . as a substitute for oral or written verbal expression." (Evid. Code, § 225; see *People v. Lewis, supra,* 43 Cal.4th at pp. 497–498.) Here, defendant does not argue that Gerald's possession of $200 in folded currency was intended as a substitute for oral or written verbal expression. Nor could he. Gerald's conduct in possessing the currency was simply that: conduct, without any associated expression of meaning.

■ That being the case, the heightened standards for the admission of hearsay do not apply, and defendant points to no other principle of law that would require proof of a conspiracy before evidence of the nonassertive conduct of someone other than the defendant may be admitted into evidence. The only question, then, is whether the evidence was relevant. We recently summarized the applicable principles: "Only relevant evidence is admissible (Evid. Code, §§ 210, 350), and all relevant evidence is admissible unless excluded under the federal or state Constitutions or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d); *People v. Heard* (2003) 31 Cal.4th 946, 972–973 [4 Cal.Rptr.3d 131, 75 P.3d 53] (*Heard*).) The test of relevance is whether the evidence 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].) The trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant evidence. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We review for abuse of discretion a trial court's rulings on the admissibility of evidence. (*Heard*, at pp. 972, 974; *People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].)" (*People v. Benavides* (2005) 35 Cal.4th 69, 90 [24 Cal.Rptr.3d 507, 105 P.3d 1099].)

Here, the trial court did not abuse its discretion when it determined that Mitzi's testimony regarding Gerald's possession of the $200 in folded currency was relevant to the question whether defendant was involved in killing Russell. Because the money was folded in half the way Russell folded

his money, the evidence tended to show that Russell was the person from whom Gerald had obtained the money. Other evidence—including Mitzi's testimony that Gerald and defendant left the apartment together at 5:00 p.m. and that when defendant returned at 3:00 a.m. Gerald was angry with defendant for having left him—tended to show that Gerald and defendant had been involved in some activity together between the hours of 5:00 p.m. and 1:00 a.m., when Gerald had returned alone. Accordingly, the evidence in its totality had some tendency to establish that between those hours, defendant and Gerald had engaged in some activity connected to Russell. We hold the trial court did not abuse its discretion in admitting Mitzi's testimony that Gerald possessed the folded currency.

### D. *Penalty Phase Issues*

#### 1. *Victim impact testimony*

During the prosecution's penalty phase case-in-chief, Alma Merck's granddaughter, Shelley Denise Cox, described how she often thought about what Alma must have gone through before her death, "pleading for her life, the terror, the fear of this evil people or person in the house, and I envision her hearing her husband, my grandfather, being murdered in the other room . . . ." When defendant's counsel objected that the testimony was "very prejudicial and not evidence," the prosecutor interjected, "I believe this is how she feels." The trial court stated, "I think the jury understands that. It is impact-type testimony, and it is not to be considered by the jury. Obviously this witness was not a percipient witness. You may proceed with that understanding."

Defense counsel objected several more times to various aspects of Cox's testimony. Thus, when Cox stated she could not understand "why anyone would brutally murder" her grandparents, defense counsel interjected, "I think it has become argument." Cox then testified that the murders had "affected the entire family . . . our friends and now it has affected you [(the jury)], and you have been a part of this, and this is something that I feel you will never forget either. It is like a disease. It grows and grows and doesn't stop." At that point, defense counsel objected, stating, "There is no question pending. This is speculation and conjecture." The trial court overruled each of these objections. Cox then testified, "I pray for [defendant] because right now I believe his heart is hard and he has no remorse, and he does not realize what he has done. [¶] I pray that his heart softens, because he will feel the pain, and I want him to feel the pain of what he has done, and the guilt, and yes, we're asking for the death penalty, and it is not out of revenge. We're not vengeful people. It is out of justice and fairness. An eye for an eye, tooth for a tooth. He made the choice. He should suffer the consequences, and thank you for listening to me."

As Cox was leaving the witness stand, defense counsel asked to "take something up outside the presence of the jury." The court agreed to take up the issue after the lunch recess. The prosecution's next witness, Alma's daughter, Betty Turner, testified that she "knew Cliff tried to do the best he could to protect my mother that day [of the murder], but he couldn't," that she knew her mother "was terrified that day," and that "they must have gone through pure hell before it was all over with." The trial court overruled defendant's objection that Turner's testimony went "beyond the victim impact."

At the recess, defendant moved for a mistrial on the ground that "the testimony of Denise Cox, and Betty Turner, is way beyond that which is permitted by the Supreme Court a[s] to victim impact testimony." The court denied the motion, but invited defense counsel to propose a limiting instruction. Counsel declined. After the jury had returned its verdict of death for Alma's murder and life without possibility of parole for Clifford's murder, defendant moved for a new trial, arguing the victim impact testimony violated federal and state law on several additional grounds. The trial court denied that motion as well.

■■ Defendant renews his contention that the testimony of Cox and Turner went beyond the scope of permissible victim impact testimony as determined by the United States Supreme Court and therefore violated his Eighth and Fourteenth Amendment rights. (See *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*); *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529].) In *Payne*, the high court clarified that in the penalty phase of a capital case, the admission of evidence about the victim and the impact of the murder on the victim's family and friends does not per se violate the Eighth or Fourteenth Amendment to the federal Constitution. (*Payne, supra*, 501 U.S. at pp. 827, 830, fn. 2; *People v. Dykes* (2009) 46 Cal.4th 731, 781 [95 Cal.Rptr.3d 78, 209 P.3d 1].) However, the admission of such evidence will violate the due process clause of the federal Constitution if it is " 'so unduly prejudicial that it renders the trial fundamentally unfair.' " (*People v. Dykes, supra*, 46 Cal.4th at p. 781, quoting *Payne, supra*, 501 U.S. at p. 825.) Moreover, the scope of constitutionally permissible victim impact testimony does not include "characterizations or opinions about the crime, the defendant, or the appropriate punishment, by the victims' family members or friends." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353]; see *People v. Smith* (2003) 30 Cal.4th 581, 622 [134 Cal.Rptr.2d 1, 68 P.3d 302], citing *Payne, supra*, 501 U.S. at p. 830, fn. 2.)

The Attorney General initially contends that defendant forfeited the constitutional basis of his claims by failing to object on such grounds below. We

disagree. When defendant objected to Turner's testimony on the ground that it "goes beyond the victim impact," he used a well-recognized term commonly understood as referring to the United States Supreme Court's Eighth and Fourteenth Amendment jurisprudence regarding the permissible scope of victim testimony at the penalty phase of a capital case. Further, when defendant later moved for a mistrial, he specifically referred to "that which is permitted by the [United States] Supreme Court a[s] to victim impact testimony." Under these circumstances, defendant made the federal constitutional bases of his motion sufficiently clear to preserve the issue for review.

Nonetheless, defendant's claim fails. Defendant first contends Cox and Turner should not have been permitted to speculate as to what the Mercks had felt and experienced immediately before their deaths. (Cf. Evid. Code, § 702, subd. (a) [a witness must have personal knowledge of the subject matter of his or her testimony].) He asserts such testimony constituted constitutionally impermissible "characterizations or opinions about the crime." (*People v. Pollock, supra*, 32 Cal.4th at p. 1180; see *Payne, supra*, 501 U.S. at p. 830, fn. 2.) But as the trial court concluded, the testimony was admissible not to establish what the Mercks had actually experienced, but to explain what Cox and Turner imagined they had experienced. The latter was relevant to the witnesses' own states of mind and the effect that the murders had upon them personally, and therefore was permissible victim impact testimony. (See *People v. Pollock, supra*, 32 Cal.4th at p. 1182 [testimony by son of murder victims that he imagined his parents must have suffered greatly during their final minutes was admissible to show the harm caused by the killings].) Nor was the testimony so inflammatory or prejudicial as to render the trial fundamentally unfair. (See *People v. Dykes, supra*, 46 Cal.4th at p. 781; *Payne, supra*, 501 U.S. at p. 825.) Rather, that family members of murder victims might imagine the victims' horror would have been obvious to the jurors, and the challenged portions of the testimony were brief and not graphic.

Defendant complains the trial court's explanation to the jury—that the challenged portion of Cox's testimony would be permitted only as "impact-type testimony" because Cox "[o]bviously . . . was not a percipient witness"—was insufficient to convey the limited purpose of the evidence. But defendant refused the trial court's invitation to propose a further limiting instruction; therefore he may not complain on appeal of the court's failure to provide one. (*People v. Carrington* (2009) 47 Cal.4th 145, 197 [97 Cal.Rptr.3d 117, 211 P.3d 617].)

Defendant further contends the trial court erred in permitting Cox to testify that she believed defendant's "heart is hard and he has no remorse," and that the family was asking for the death penalty "out of justice and fairness. An

eye for an eye, a tooth for a tooth." Defendant contends that Cox's reference to defendant's perceived lack of remorse constituted an unconstitutional "characterization[] or opinion[] about . . . the defendant" (*People v. Pollock, supra,* 32 Cal.4th at p. 1180; see *Payne, supra,* 501 U.S. at p. 830, fn. 2) and also fell outside the scope of permissible aggravating evidence under section 190.3 (see *People v. Jones* (2003) 29 Cal.4th 1229, 1265 [131 Cal.Rptr.2d 468, 64 P.3d 762] [evidence of postcrime remorselessness is not an aggravating factor under § 190.3]; *People v. Boyd* (1985) 38 Cal.3d 762, 772–776 [215 Cal.Rptr. 1, 700 P.2d 782]). Defendant further contends that Cox improperly appealed to biblical sources (cf. *People v. Hill* (1998) 17 Cal.4th 800, 836–837 [72 Cal.Rptr.2d 656, 952 P.2d 673] [prosecutor may not invoke biblical teachings]), and improperly voiced the family's "opinion[] about . . . the appropriate punishment" in violation of his constitutional rights (*People v. Pollock, supra,* 32 Cal.4th at p. 1180; see *People v. Smith, supra,* 30 Cal.4th at p. 622; *Payne, supra,* 501 U.S. at p. 830, fn. 2). Defendant did not object to Cox's testimony on any of these grounds below, however, even during the recess when, out of the jury's presence, he moved for a mistrial. Rather, the sole articulated basis of his objection and motion was that the witnesses were improperly narrating and speculating about what had happened to the victims in the minutes before they died.[28] Defendant therefore forfeited his right to complain on appeal that Cox's testimony that she believed defendant lacked remorse and that the family was asking for the death penalty based on the eye-for-an-eye principle was improper. (See *People v. Pollock, supra,* 32 Cal.4th at pp. 1181–1182.) Further, defendant's filing of a motion for new trial did not revive these claims that had not been preserved by a timely and specific objection. (*People v. Dykes, supra,* 46 Cal.4th at p. 794; *People v. Williams* (1997) 16 Cal.4th 153, 254 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

In any event, any error in permitting Cox's testimony about defendant's lack of remorse and the family's desire for the death penalty was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) The challenged portion of Cox's testimony constitutes only a few sentences out of more than 25 pages of reporter's transcript comprising the prosecution's penalty phase case-in-chief. Even in the absence of such testimony, jurors might assume that the family of a murder victim would want the murderer to express remorse and to be sentenced to death. Moreover, the strong aggravating evidence included not only the circumstances surrounding the brutal murders of Alma and Clifford

---

[28] At the mistrial hearing, defense counsel argued, "These witnesses were allowed to narrate and speculate as to what did or did not happen with the victims, and I think it is beyond the permissible bounds of victim impact, and there was a lot of speculation as to what happened at the time that the victims were killed, and I could appreciate where they are coming from, but I think it is not admissible, and I make a motion for a mistrial, particularly as to the testimony of Denise Cox and Betty Turner."

Merck during a burglary and robbery, but also evidence that defendant had committed another, similar, burglary and robbery—one that well could have resulted in murders—about a year after the Merck murders. There also was evidence that defendant had picked up his girlfriend's son by the hair and thrown him to the ground, and had been convicted of robbery in 1970. By contrast, defendant's mitigating evidence was not particularly strong. The evidence about defendant's allegedly abusive upbringing came only from an aunt and a cousin; there was no testimony from those closest to defendant, including his mother and siblings. And the testimony of defendant's girlfriend and her children about the children's relationship with defendant might have struck the jurors as somewhat insincere, since they all repeated a similar script.

Defendant argues the difference between the verdicts—death for Alma's murder and life without possibility of parole for Clifford's murder—indicates the victim impact testimony from Alma's relatives was the pivotal factor that influenced the jury to return a verdict of death for Alma only. We disagree. The testimony pertained to the impact of both victims' deaths, and Betty Turner testified that Clifford was as much a family member as Alma was. Rather than reflecting the effect of the impact testimony, the difference in the verdicts most likely reflects the jury's careful consideration of the difference between how Alma and Clifford were killed. The forensic pathologist, Dr. Dollinger, testified that Clifford's death from the gunshot wounds to his head probably was nearly instantaneous. By contrast, Alma may have lived for four to five minutes before succumbing to strangulation. The jurors thus reasonably could have concluded that Alma suffered more than Clifford. Under these circumstances, any error in the admission of Cox's testimony regarding defendant's lack of remorse and the family's desire for a death sentence based on a biblical reference was harmless beyond a reasonable doubt.

### 2. *Failure to give a reasonable doubt instruction with respect to evidence of the Russell murder*

As explained above, at the guilt phase, the trial court declared a mistrial on the Russell count because the jury could not reach a verdict. The final vote was nine to three, although the trial court did not inquire whether the split favored a guilty verdict or a not guilty verdict. Following the mistrial, defendant moved to impanel a new penalty phase jury, arguing the penalty jury should not include jurors who believed he was guilty of Russell's murder. The court denied the motion.

The penalty phase evidence showed that in 1985 defendant had burglarized the home of James Foster and robbed Foster and his coworker Jessie Cruz.

The evidence also included testimony that in 1993 defendant had picked up his girlfriend's young son, Robert, by the hair and flung him to the ground.

The jurors were instructed that in determining the penalty to be imposed on defendant they should consider "all of the evidence which has been received during any part of this trial." The jurors were further instructed to "consider and take in to [sic] account and be guided by" a list of aggravating and mitigating factors, including "the presence or absence of criminal activity by the defendant other than the crimes for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence, or the express or implied threat to use force or violence." (See § 190.3, factor (b).)

Regarding the evaluation of evidence of other criminal activity, the jurors were instructed, without objection from defendant, pursuant to a modified version of CALJIC No. 8.87 (1989 rev.): "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts. One, residential burglary, two, residential robbery, and three, child abuse, which involved the express or implied use of force or violence or the threat of force or violence. Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal acts. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance. [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."

Neither the prosecutor nor defense counsel mentioned the Russell murder during penalty phase opening statements or closing arguments. However, during deliberations on the afternoon of June 13, 1996, the jurors requested a readback of the testimony of Dr. Dollinger, the forensic pathologist who had examined the bodies of the Mercks and Russell. The readback commenced the following morning. Defendant objected to the readback of any testimony about victim Russell, arguing such testimony would be irrelevant and prejudicial, given the mistrial on the Russell charge. After some discussion, the court sent a note to the jurors asking if they wished the readback to include testimony about Russell. When the jurors responded in the affirmative, defendant moved for a mistrial. The court denied the motion, reasoning that those jurors who believed defendant's guilt of Russell's murder had been proved beyond a reasonable doubt were permitted to consider that murder as an aggravating factor in the penalty phase. The testimony was reread. That

afternoon, the jury returned its verdicts of death for the murder of Alma Merck and life without the possibility of parole for the murder of Clifford Merck.

Defendant contends the trial court had a duty to instruct on its own motion that the jurors could not consider evidence of the Russell murder in aggravation unless they were convinced beyond a reasonable doubt that defendant had committed that murder. He asserts the instruction regarding other criminal activity was erroneous because it failed to identify the Russell murder as criminal activity that could be considered only if proved beyond a reasonable doubt.

 Section 190.3, factor (b), permits the jury to consider in aggravation violent criminal activity by the defendant other than the crimes of which he or she has been convicted in the capital trial, regardless of whether such activity led to a conviction, but precludes consideration of crimes for which the defendant has been prosecuted and acquitted. (*People v. Benavides, supra,* 35 Cal.4th at pp. 112–113; *People v. Douglas* (1990) 50 Cal.3d 468, 526–532 [268 Cal.Rptr. 126, 788 P.2d 640], disapproved on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4 [269 Cal.Rptr. 269, 790 P.2d 676]; *People v. Melton* (1988) 44 Cal.3d 713, 754–756 [244 Cal.Rptr. 867, 750 P.2d 741].) Because evidence of other crimes may be particularly important to a jury considering penalty, state law provides that no juror may consider such evidence unless first convinced of its truth beyond a reasonable doubt. (*People v. Yeoman, supra,* 31 Cal.4th at p. 132; *People v. Robertson* (1982) 33 Cal.3d 21, 54 [188 Cal.Rptr. 77, 655 P.2d 279]; see also *People v. Stanworth* (1969) 71 Cal.2d 820, 840 [80 Cal.Rptr. 49, 457 P.2d 889] [construing pre-1977 version of § 190.3]; *People v. Polk* (1965) 63 Cal.2d 443, 450–451 [47 Cal.Rptr. 1, 406 P.2d 641] [same].) There is no requirement, however, that penalty phase jurors unanimously agree on the existence of aggravating factors that support the imposition of the death penalty, including the existence of other criminal activity under factor (b). (*People v. Lewis, supra,* 43 Cal.4th at p. 533; *People v. Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127], disapproved on other grounds in *People v. Marshall, supra,* 50 Cal.3d at p. 933, fn. 4.) Accordingly, it would have been proper for those jurors who believed defendant's guilt of Russell's murder had been proved beyond a reasonable doubt to consider that murder as an aggravating factor to be weighed against the mitigating evidence in determining the appropriate penalty. (See *People v. Caro* (1988) 46 Cal.3d 1035, 1057–1058 [251 Cal.Rptr. 757, 761 P.2d 680]; *People v. Miranda, supra,* 44 Cal.3d at p. 99.)

 We have long held that the trial court must give a reasonable doubt instruction on its own motion whenever evidence of other crimes is presented

at either the guilt or penalty phases of a capital trial and the evidence is "introduced or referred to as an aggravating factor pursuant to" section 190.3, factor (b). (*People v. Robertson, supra*, 33 Cal.3d at pp. 60–63 (conc. opn. of Broussard, J.); see also *id.* at pp. 53–55 [evidence presented at guilt phase]; *People v. Yeoman, supra*, 31 Cal.4th at p. 132; *People v. Pinholster* (1992) 1 Cal.4th 865, 965–967 [4 Cal.Rptr.2d 765, 824 P.2d 571] [penalty phase]; *People v. Miranda, supra*, 44 Cal.3d at pp. 97–98 [same]; *People v. Stanworth, supra*, 71 Cal.2d at p. 841 [same]; *People v. McClellan* (1969) 71 Cal.2d 793, 806–807 [80 Cal.Rptr. 31, 457 P.2d 871] [guilt phase; construing pre-1977 law]; *People v. Polk, supra*, 63 Cal.2d at pp. 450–451 [penalty phase]; accord, *People v. Champion* (1995) 9 Cal.4th 879, 949 [39 Cal.Rptr.2d 547, 891 P.2d 93] [guilt phase], disapproved on another point in *People v. Ray* (1996) 13 Cal.4th 313, 369, fn. 2 [52 Cal.Rptr.2d 296, 914 P.2d 846] (conc. opn. of George, C. J., joined by a majority of the court).) We have further held that when such evidence is presented at either phase but is neither introduced nor referred to as an aggravating factor under factor (b) at the penalty phase, there is no sua sponte duty to instruct on reasonable doubt.[29] (E.g., *People v. Benavides, supra*, 35 Cal.4th at p. 113 [guilt phase]; *People v. Pinholster, supra*, 1 Cal.4th at p. 967 [same]; *People v. Rich* (1988) 45 Cal.3d 1036, 1121 [248 Cal.Rptr. 510, 755 P.2d 960] [same]; *People v. Williams* (1988) 44 Cal.3d 883, 958–959 [245 Cal.Rptr. 336, 751 P.2d 395] [guilt, sanity and penalty phases]; see also *People v. Cox* (2003) 30 Cal.4th 916, 964 [135 Cal.Rptr.2d 272, 70 P.3d 277] [no sua sponte duty to instruct on reasonable doubt with respect to guilt phase evidence not " 'clearly introduced' " under factor (b), quoting *People v. Maury* (2003) 30 Cal.4th 342, 443 [133 Cal.Rptr.2d 561, 68 P.3d 1]], disapproved on other grounds in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

Here, evidence of the Russell murder was not introduced as an aggravating factor, and neither the prosecutor nor defense counsel referred to it as an aggravating factor during opening statements or closing arguments. The only reference to the Russell murder during the penalty phase occurred when, at the jury's request, testimony about the Russell murder was included in the readback of Dr. Dollinger's testimony. Even were we to conclude, however, that this constituted a reference to the Russell murder as an aggravating factor sufficient to trigger a sua sponte duty to instruct that individual jurors could not consider evidence of that murder in aggravation unless convinced beyond a reasonable doubt of defendant's guilt, any error in failing to give such an instruction was harmless. At the penalty phase of a capital case, the failure to

---

[29] To "avoid potential confusion" over which other crimes the prosecution is relying on as aggravating circumstances in a given case, we have encouraged prosecutors to "request an instruction enumerating the particular other crimes which the jury may consider as aggravating circumstances in determining penalty." (*People v. Robertson, supra*, 33 Cal.3d at p. 55, fn. 19.)

instruct that other criminal acts may not be considered in aggravation unless proved beyond a reasonable doubt is not error of federal constitutional dimension. (*People v. Brown* (1988) 46 Cal.3d 432, 440 [250 Cal.Rptr. 604, 758 P.2d 1135]; *People v. Miranda, supra*, 44 Cal.3d at p. 98.) Any error here was less serious than the failure to give any reasonable doubt instruction at all; here, such an instruction was given, it just was not expressly related to the Russell murder. In any event, whether or not the federal Constitution is implicated, we find no basis for reversal. As we have explained, state law error at the penalty phase of a capital case requires reversal only when there is a "reasonable (i.e., realistic) possibility" the error affected the verdict. (*People v. Brown, supra*, 46 Cal.3d at pp. 447–448.) That standard is "the same, in substance and effect," as the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California, supra*, 386 U.S. at page 24. (*People v. Jones, supra*, 29 Cal.4th at p. 1264, fn. 11; *People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

Any instructional error was harmless under either standard. Defendant contends he was prejudiced because the instructions given permitted even those jurors who did not find his guilt of Russell's murder proved beyond a reasonable doubt to consider that murder as an aggravating factor at the penalty phase. He further posits that the Russell murder very well may have been the deciding factor that tipped the scales in favor of the death penalty for those jurors. We find this scenario unrealistic for several reasons. First, as noted above, the jurors were instructed not to consider as an aggravating factor *any* criminal activity other than residential burglary, residential robbery, and child abuse, and to consider even those acts only if they were proved beyond a reasonable doubt. The direction that only the enumerated criminal acts could be considered in aggravation was reinforced because the court instructed on the elements of burglary, robbery and child abuse but did not instruct on the elements of any other offense. Moreover, the instruction that laid out the aggravating and mitigating factors stated that the jury could consider only criminal activity "other than the crimes for which the defendant has been *tried* in the present proceedings." Defendant had been tried for the Russell murder in the present proceeding; he just had not been convicted.[30] Finally, the jury was told that "the only factors that can be considered by you as aggravating factors are those upon which you have previously been instructed." The instructions as a whole then, reasonably read, excluded the Russell murder from the other criminal activity that could be considered in

---

[30] This instruction was based on the then current version of CALJIC No. 8.85. The present version of CALJIC No. 8.85 contains identical language delineating the scope of section 190.3, factor (b). As we have shown, the pattern instruction is incorrect insofar as it excludes from individual jurors' consideration at the penalty phase evidence of crimes for which defendant was charged and tried in the capital proceeding, but as to which the jury could not reach a verdict. In the future, trial courts should modify CALJIC No. 8.85 by substituting the word "convicted" for the word "tried" in the language describing factor (b).

aggravation. We must presume the jurors followed these instructions, unless the record leads us to believe otherwise. (*People v. Smith, supra,* 40 Cal.4th at p. 517; *People v. Waidla, supra,* 22 Cal.4th at p. 725.)

Here, it is possible, though unlikely, that the trial court's acquiescence in the jurors' request to have Dr. Dollinger's testimony about Russell's autopsy read back during the penalty phase deliberations may have led the jurors to believe (correctly, as noted above) that, contrary to the instructions, they could consider the Russell murder as an aggravating circumstance. Even assuming that was the case, however, we find it extremely unlikely that individual jurors then believed they could consider the Russell murder as an aggravating factor even if it had not been proved beyond a reasonable doubt. Rather, the most logical response to the absence of a specific instruction would have been to conclude that the Russell murder was subject to the same reasonable doubt standard as the other criminal activity included in the instruction based on CALJIC No. 8.87. After all, the trial court's acquiescence in the readback request intimated nothing one way or the other about the standard under which the evidence of Russell's murder was to be judged. Nor would anything in counsel's argument have misled the jurors on this point; as explained, neither the prosecutor nor defense counsel mentioned the Russell murder in summation.

Furthermore, even assuming the jurors misunderstood the applicable standard, we find no realistic possibility that consideration of the Russell murder by those jurors who concluded that murder had not been proved beyond a reasonable doubt would have caused those jurors to vote for the death penalty when they otherwise might not have done so. During the guilt phase deliberations, after the jurors informed the court that they could not agree on defendant's guilt of Russell's murder, the court brought the jurors into the courtroom and asked the foreman and each juror whether he or she felt further deliberations would result in a verdict. After the jurors had responded in the negative and had returned to the jury room, the prosecutor remarked that the jurors "sounded extremely emphatic," and the court commented that the foreman was "pretty adamant about the jurors having basically taken their relative positions." It seems highly unlikely that a juror who "emphatic[ally]" or "adamant[ly]" believed defendant's guilt of Russell's murder had not been proved would then turn around and use that murder as the deciding factor in the penalty calculus.

Moreover, as noted above, the aggravating evidence aside from Russell's murder was voluminous, while the mitigating evidence was not particularly strong. Even defense counsel acknowledged in closing argument, without referring to Russell's murder, that the jurors reasonably might find that the aggravating circumstances outweighed the mitigating circumstances.

Here, the record reflects that the jurors carefully weighed the difference between how Alma and Clifford were murdered in deciding to impose the death penalty for Alma's murder and life without possibility of parole for Clifford's murder. The difference between the verdicts suggests that even those jurors who believed beyond a reasonable doubt that defendant murdered Russell did not use that fact to vote for death. It therefore is even more unlikely that those jurors who had not been willing to vote for guilt on the Russell murder count then used that evidence to vote for death with regard to Alma's murder but not with regard to Clifford's.

For all of these reasons, we conclude there is no reasonable possibility that any instructional error affected the penalty verdict (*People v. Brown, supra*, 46 Cal.3d at pp. 447–448), and that any such error was harmless beyond a reasonable doubt (*Chapman v. California, supra*, 386 U.S. at p. 24).[31]

### 3. *Failure to define reasonable doubt*

At the conclusion of the penalty phase evidence, the trial court instructed the jury using the 1989 version of CALJIC No. 8.84.1 in pertinent part as follows: "You will now be instructed as to all of the law that applies to the penalty phase of this trial. [¶] You must determine what the facts are from the evidence received during the entire trial unless you are instructed to the contrary or otherwise. You must accept and follow the law that I shall state to you. *You are to disregard all other instructions given to you in other phases of this trial.*" The trial court also instructed the jury, as pertinent here, in the language of CALJIC ·No. 8.84, the introductory penalty phase instruction; No. 8.85, the list of aggravating and mitigating factors for the jury's consideration; No. 8.86, requiring proof of a prior conviction beyond a reasonable

---

[31] We also reject defendant's alternative claim that his counsel rendered ineffective assistance by failing to point out the omission of the Russell murder from the reasonable doubt instruction. To establish ineffective assistance of counsel, defendant must show both (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 [156 L.Ed.2d 471, 123 S.Ct. 2527]; *Strickland v. Washington* (1984) 466 U.S. 668, 687–692 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218 [233 Cal.Rptr. 404, 729 P.2d 839].) While generally we do not reach claims of ineffective assistance of counsel on appeal, defendant contends we may do so here because his trial counsel had " 'no conceivable tactical purpose' " for failing to request a correct instruction. (*People v. Hines* (1997) 15 Cal.4th 997, 1065 [64 Cal.Rptr.2d 594, 938 P.2d 388], quoting *People v. Diaz* (1992) 3 Cal.4th 495, 558 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) Even were we to assume counsel's performance was deficient, however, for the reasons set forth above there is no reasonable probability of a different result had counsel requested and received the instruction.

doubt; No. 8.87, requiring proof of other criminal activity beyond a reasonable doubt; No. 8.88, the penalty phase concluding instruction; and defendant's special instruction No. 26.[32] Contrary to the recommendation in the Use Note to CALJIC No. 8.84.1, however, the trial court did not reinstruct the jury with CALJIC No. 2.90, defining reasonable doubt. Defendant asserts that the failure to redefine reasonable doubt violated state law as well as his rights to due process of law and a reliable penalty determination under the Eighth and Fourteenth Amendments to the United States Constitution.

■ The omission was error. As we recently explained in addressing a similar claim, "if a trial court instructs the jury at the penalty phase not to refer to instructions given at the guilt phase, it later must provide the jury with those instructions applicable to the evaluation of evidence at the penalty phase," including CALJIC No. 2.90. (*People v. Lewis, supra*, 43 Cal.4th at p. 535; accord, *People v. Chatman* (2006) 38 Cal.4th 344, 408 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

As in *Lewis*, however, we find the error here harmless under either the state "reasonable possibility" standard for penalty phase error (see *People v. Brown, supra*, 46 Cal.3d at pp. 446–448), or the "harmless beyond a reasonable doubt" standard for federal constitutional error set forth in *Chapman v. California, supra*, 386 U.S. at page 24. (*People v. Lewis, supra*, 43 Cal.4th at p. 535.) Defendant speculates that in the absence of an instruction defining

---

[32] That instruction, an amalgamation of concepts from CALJIC Nos. 1.00, 8.84, 8.84.1, and several cases, stated (somewhat confusingly) in its entirety: "The defendant in this case has been found guilty of murder in the first degree. The allegation was that the murder was committed under special circumstances which have found—which have been found true by you, the jury. [¶] It is the law of this state that the penalty for a defendant found guilty of murder in the first degree with special circumstances shall be death or confinement in state prison for life without the possibility of parole in any case in which the special circumstance charged has been found to be true. [¶] Under the law of this state you must determine, if you can, which of said penalties shall be imposed on the defendant. [¶] During the first phase of the trial, you were given instructions concerning the law applicable to this case. It will not be necessary to repeat at this time most of those instructions, with one notable exception. [¶] That exception is that in this part of the trial the law permits you to be influenced by mercy, sympathy, compassion or pity for the defendant or his family in arriving at a proper penalty in this case. [¶] However, you must not be prejudiced against the defendant. You must not be biased against the defendant on the issue of penalty because he has been arrested for this offense, charged with a crime, or brought to trial. None of these circumstances determines the appropriate penalty and you must not infer or assume from any or all of them that the death penalty is more likely to be appropriate than the punishment of life without the possibility of parole. You must not be influenced by mere conjecture, passion, prejudice, public opinion or public feeling. This means that you may not indulge in prejudice against the defendant arising out of some perception that the public sentiment favors the death penalty in this case or any other case. The law has no preference as to which punishment is appropriate in any particular case. Both the People and the defendant have a right to expect that you will consider all of the evidence, follow the law and exercise your discretion conscientiously, and reach a just verdict."

reasonable doubt, and in light of the instruction to disregard the guilt phase instructions, individual jurors likely applied legally incorrect and possibly inconsistent standards of proof to the evidence of unadjudicated criminal activity. But as defendant acknowledges, the jury was instructed that before it could consider unadjudicated criminal activity as aggravating, it had to find beyond a reasonable doubt that defendant had engaged in that activity. "There is no reasonable possibility the jury would have believed that the reasonable doubt standard it was required to apply at the penalty phase was any different than the standard it had just applied at the guilt phase," under which at least three and possibly nine jurors had found defendant's guilt of the Russell murder had not been proved beyond a reasonable doubt. (*People v. Lewis, supra*, 43 Cal.4th at p. 536; see *People v. Chatman, supra*, 38 Cal.4th at p. 408.) Defendant points out that penalty phase deliberations began six days after guilt phase deliberations ended, and speculates that the jurors may have forgotten the definition within that timeframe. We find that possibility unrealistic, given that the question whether defendant's guilt of Russell's murder had been proved beyond a reasonable doubt evidently was hotly disputed, and the jurors were "emphatic" and "adamant" in their views. (Cf. *People v. Rogers, supra*, 39 Cal.4th at p. 905 [no reasonable possibility jury forgot reasonable doubt instruction given two weeks earlier].)

Moreover, nothing in the record suggests the absence of an instruction defining reasonable doubt caused the jurors to apply a legally incorrect standard or inconsistent standards. Nothing in counsel's closing arguments suggested that anything other than the definition given at the guilt phase applied, and the jurors did not ask any questions or request clarification of the reasonable doubt concept. (See *People v. Lewis, supra*, 43 Cal.4th at p. 535; *People v. Chatman, supra*, 38 Cal.4th at p. 408.)

Finally, defendant stipulated that he committed the offenses against James Foster and Jessie Cruz. Defendant disputed whether he had abused his girlfriend's son, and of course he disputed whether he had killed Russell. (Cf. *People v. Lewis, supra*, 43 Cal.4th at pp. 535–536.) However, in light of the considerations outlined above, the strength of the uncontroverted aggravating evidence, and the relative weakness of the case in mitigation, we find no reasonable possibility that the trial court's failure to redefine reasonable doubt affected the penalty verdict. The error was harmless beyond a reasonable doubt.

### 4. *Alleged error in including both burglary and robbery in instruction regarding other criminal activity*

During the prosecution's penalty phase case-in-chief, James Foster testified that in October 1985 he lived in an apartment in Bakersfield. One day that

month, Foster came home from work around lunchtime to change clothes. A coworker, Jessie Cruz, was with him. When Foster went to the bedroom, he noticed the sliding glass door was open. He turned around and saw defendant coming out of the closet carrying a small handgun. Defendant pointed the gun at Foster and said something like "don't move or I'm going to shoot you." At defendant's direction, Foster then called Cruz into the bedroom. Defendant pointed the gun at both of them and forced them to lie down. He then bound their hands and feet with cords and clothing he found in the room. While Foster was tied up, he heard defendant going through the room, pulling out the phone cords and cocking and uncocking the gun. Foster feared for his life. After about 10 or 15 minutes, defendant left, taking with him a portable personal stereo and other household items.

The prosecution also presented evidence that defendant once picked up his girlfriend's young son by the hair and pushed him to the ground. The prosecution presented no evidence of any other unadjudicated criminal activity by defendant.

As previously noted, the jurors were instructed pursuant to a modified version of CALJIC No. 8.87 that they could consider, as aggravating circumstances, the crimes of residential burglary and residential robbery, if they found beyond a reasonable doubt that defendant had committed those crimes. Defendant now asserts the trial court erred by including both residential burglary and residential robbery in the instruction because both the burglary and the robbery of Foster and Cruz were based on the same act of violence. He contends the instruction should not have included burglary, and argues the error violated his rights under state law and the federal Constitution.

■■■ We perceive no error. The basic principles are well established. Although any prior felony conviction may be considered in aggravation (§ 190.3, factor (c)), evidence of criminal activity for which the defendant has not been convicted may be considered only if it "involved the use or attempted use of force or violence or the express or implied threat to use force or violence" against a person. (§ 190.3, factor (b); see *People v. Boyd* (1985) 38 Cal.3d 762, 776–777 [215 Cal.Rptr. 1, 700 P.2d 782].) Residential burglary is entering a residence with the intent to steal or to commit any other felony. (§§ 459, 460.) Force or violence against a person thus is not an essential element of residential burglary. However, a burglary perpetrated in a violent or threatening manner may be considered under section 190.3, factor (b). (See, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 176 [121 Cal.Rptr.2d 106, 47 P.3d 988] [evidence that defendant, armed with a pipe, attempted to break into victim's hotel room and threatened victim with the pipe was admissible under factor (b)]; see generally *People v. Grant* (1988) 45 Cal.3d

829, 851 [248 Cal.Rptr. 444, 755 P.2d 894] [§ 190.3, factor (b) includes both crimes that are necessarily violent and crimes that were perpetrated in a violent or threatening manner].)

Here, there was no evidence that defendant used force or violence or the threat of force or violence against any person at the time he entered Foster's residence. But defendant concedes, as he must, that evidence of the burglary was properly admitted as part of a course of conduct that included the forceful and violent robbery of Foster and Cruz. (*People v. Cooper* (1991) 53 Cal.3d 771, 840–841 [281 Cal.Rptr. 90, 809 P.2d 865]; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 110 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Defendant also concedes, as he must, that his "burglary of Foster's residence was considered a crime of violence because after entering the residence appellant used a gun to rob the victims." Accordingly, the circumstance that the entry itself was not violent did not compel the trial court to omit instructions on burglary. (See *People v. Clair* (1992) 2 Cal.4th 629, 676–677 [7 Cal.Rptr.2d 564, 828 P.2d 705]; see also *id.* at p. 680 [evidence of burglary was admissible under § 190.3, factor (b) where the jury reasonably could find that defendant was not armed at the time he entered but, after entering, he took up a knife and used it to impliedly threaten anyone who might interfere]; but see *People v. Cooper, supra,* 53 Cal.3d at p. 841 [although evidence of nonviolent crimes committed during the same course of conduct as violent crimes was properly admitted, the trial court erred in instructing the jury on the elements of the nonviolent crimes such as burglary].)

Defendant's argument thus boils down to a claim that the instruction impermissibly allowed the jury to count the burglary and the robbery as two aggravating circumstances even though both crimes arose from only a single act of violence. He explains: "Th[e] use of force by appellant that rendered the burglary a crime of violence [(i.e., his use of a gun to rob the victims)] was the same conduct that was the basis of the residential robbery. In other words, appellant committed one act of violence that resulted in a residential robbery and a residential burglary that involved the use of force. Under these circumstances, appellant's criminal conduct should have been considered as only one aggravating circumstance. The court's instruction, however, indicated to the jury that it should view the residential burglary and residential robbery as separate aggravating circumstances in determining penalty, thus permitting the multiple use of the same act of violence. This double use of both the residential burglary and residential robbery as aggravating circumstances artificially inflated the prosecution's case for the death penalty."[33]

---

[33] The Attorney General argues the claim is forfeited. We disagree. (See § 1259; *People v. Prieto* (2003) 30 Cal.4th 226, 247 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1199 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

Defendant cites no authority that directly supports his argument, and we are aware of none. Certainly, the language of section 190.3, factor (b), does not by its terms prohibit instructions on both a burglary and a robbery that arose out of the same course of conduct and involved the same act of violence. That factor permits the jury to consider as aggravating "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (*Ibid.*) Nothing in this language prohibits the jury from considering separate aggravating circumstances based on separate crimes involving the same acts of violence or threats of violence. Nor does defendant point to evidence of any legislative intent to prohibit such consideration.

 Defendant asserts such double counting of a single act of violence in the penalty calculus violates the principles of section 654, which bars multiple punishment for separate offenses arising out of a single occurrence when all of the offenses were incident to one objective (see *Neal v. State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]), as well as his rights to a reliable penalty determination and due process of law under the Eighth and Fourteenth Amendments to the federal Constitution. Defendant relies on *People v. Melton, supra,* 44 Cal.3d 713, but in that case we rejected a claim similar to defendant's claim here. The defendant in *Melton* was convicted of first degree murder with special circumstances of robbery murder and burglary murder (see § 190.2, subd. (a)(17)(A) & (G)) and sentenced to death. On appeal, the defendant argued that the Eighth Amendment barred the jury from considering the two special circumstances as separate aggravating factors under section 190.3, factor (a), which permits the jury to consider in aggravation "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true," because both the robbery and the burglary arose from a single indivisible course of conduct with a single criminal intent. We rejected the claim, concluding it is "constitutionally legitimate for the state to determine that a death-eligible murderer is more culpable, and thus more deserving of death, if he not only robbed the victim but committed an additional and separate felonious act, burglary, in order to facilitate the robbery and murder. Robbery involves an assaultive invasion of personal integrity; burglary a separate invasion of the sanctity of the home. Society may deem the violation of each of these distinct interests separately relevant to the seriousness of a capital crime." (*People v. Melton, supra,* 44 Cal.3d at p. 767.) We also rejected defendant's claim based on section 654, holding that section "does not preclude a capital penalty jury from considering that the murder was committed in the course of both a robbery and a burglary." (*People v. Melton, supra,* 44 Cal.3d at p. 768; see also *People v. Ervine* (2009) 47 Cal.4th 745, 790–791 [102 Cal.Rptr.3d 786, 220 P.3d 820].)

Similarly here, we perceive no constitutional impediment to the jury's consideration under section 190.3, factor (b) of both a robbery and a burglary that arose out of a single violent act. The purpose of the penalty phase is to enable the jury to make an individualized determination of the appropriate penalty based on the character of the defendant and the circumstances of the crime. (See *People v. Jackson* (2009) 45 Cal.4th 662, 699 [88 Cal.Rptr.3d 558, 199 P.3d 1098].) Just as society may deem the invasion of personal integrity and the invasion of the sanctity of the home separately relevant to the seriousness of a capital crime (see *People v. Melton, supra,* 44 Cal.3d at p. 767), so may it deem the violation of these distinct interests separately relevant to the seriousness of an unadjudicated criminal offense offered in aggravation. Further, that the defendant invaded both of these separate interests in one incident is relevant to an assessment of his character regardless of whether both criminal acts involved the same use of force.

Nor does section 654 prohibit a penalty phase jury from considering separate crimes based on the same act or acts of force or violence. The death penalty statutes "employ principles manifestly at odds with the sentencing rules derived from section 654" and, "[t]o the extent they diverge, section 190.3, the more specific, must prevail over section 654." (*People v. Melton, supra,* 44 Cal.3d at pp. 767–768.) As explained above, nothing in section 190.3, factor (b), prohibits the consideration of multiple criminal acts based on the same act of violence. To the extent section 654 would limit such consideration, section 190.3 rather than section 654 controls.

To the extent defendant argues the trial court erred by failing to instruct the jury not to "double count" the violence underlying the burglary and robbery, his claim lacks merit. In *Melton,* we acknowledged a "theoretical problem" presented by the language of section 190.3, factor (a), which tells the jury to consider both the "circumstances" of the crime and the "special circumstances" found true. We agreed that a jury given no clarifying instructions might conceivably double count any circumstances that were also special circumstances, and we held that, upon the defendant's request, a trial court should instruct the jury not to do so. (*People v. Melton, supra,* 44 Cal.3d at p. 768.) It is doubtful whether the same principles apply here; defendant complains not that the jury might double count the circumstance that defendant committed a burglary or the circumstance that defendant committed a robbery, but rather that it might give undue weight to the violence underlying both criminal acts. In any event, defendant did not request a clarifying instruction; he therefore cannot complain of the trial court's failure to provide one. (*People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

Finally, even assuming instructional error, it was harmless under any standard. "[T]he jury was fully aware of the facts of the [Foster and Cruz

offenses] and could validly consider them in deciding penalty." (*People v. Melton, supra*, at pp. 768–769; accord *People v. Cooper, supra*, 53 Cal.3d at p. 841.) Further, the jury was instructed that "the weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." In light of this instruction, it is unlikely that the jurors, exercising common sense, believed they should " 'weigh' " the violence underlying the burglary and the robbery "twice on the penalty 'scale.' " (*People v. Melton, supra*, at p. 769.) The prosecutor did not exploit any ambiguity in the instructions or ask the jury to double count the violence underlying the two crimes; rather, she simply emphasized that defendant had brutally tied up and callously threatened the victims, for no reason other than to steal a few items. (See *People v. Melton, supra*, 44 Cal.3d at p. 769.) Accordingly, there is no reasonable possibility that any conceivable error affected the penalty verdict (*People v. Brown, supra*, 46 Cal.3d at pp. 447–448), and any error was harmless beyond a reasonable doubt (*Chapman v. California, supra*, 386 U.S. at p. 24).

### 5. *Denial of requested instruction regarding guilty verdict*

Defendant contends the trial court erred in refusing his request to instruct the jurors that they could not consider the guilty verdict and special circumstance findings as aggravating factors. He asserts the error violated his rights under the Eighth and Fourteenth Amendments to the federal Constitution. But we have concluded that such an instruction is "unnecessary in light of the other instructions, and . . . inconsistent with CALJIC No. 8.85, which allows the jurors to consider all the evidence in the case, including the circumstances of the crime and the existence of any special circumstances found true." (*People v. Cook* (2007) 40 Cal.4th 1334, 1363 [58 Cal.Rptr.3d 340, 157 P.3d 950].) As we have explained, CALJIC No. 8.85 does not tell the jury that it may "consider the crime itself, but only the *circumstances* surrounding the crime, as an aggravating circumstance." (*People v. Cook, supra*, at p. 1363, citing *People v. Siripongs* (1988) 45 Cal.3d 548, 581, fn. 11 [247 Cal.Rptr. 729, 754 P.2d 1306].) Accordingly, the jury was not misled, and there was no need for a clarifying instruction. (See *People v. Siripongs*, at p. 581, fn. 11.)

### 6. *Denial of requested instruction on severity of the death penalty*

Defendant contends the trial court erred in refusing his request to instruct the jury that death is the "ultimate" or "most serious penalty that can be imposed," and that life without possibility of parole is a "less serious" or

"less severe" punishment. He asserts the error violated his rights under the Eighth and Fourteenth Amendments to the federal Constitution. We repeatedly have held, however, that there is no legal requirement that penalty phase jurors be instructed that death is the greater punishment, because the penalty trial itself and the jury instructions given, particularly CALJIC No. 8.88, make clear that the state views death as the most extreme penalty. (*People v. Cook, supra*, 40 Cal.4th at p. 1363; *People v. Ochoa, supra*, 19 Cal.4th at pp. 478–479.) We decline to revisit these holdings.

### 7. *Alleged error in admitting Deputy Rascoe's testimony about Michael H.'s statement*

During the prosecution's penalty phase case-in-chief, Betty Jean Abney testified that in 1993 she lived next door to defendant and Brenda H. On April 9 of that year, Abney was across the street at a friend's house when suddenly she saw defendant lift Brenda's young son, Robert, by the hair and throw him to the ground. Abney told her friend to call the police, then crossed the street and yelled at defendant to stop. The police came and arrested defendant.

Brenda H. testified for the defense that in April 1993 her son Robert and some other boys had been jumping onto moving cars. The boys ignored Brenda H.'s order to stop, so she asked defendant to go get them. Brenda H. went into the house, then heard hollering. When she went back outside, her next-door neighbor Betty was yelling and had called the police. Robert had no bruises, scrapes, stiff neck or other problems, but he was upset because the police had taken defendant to jail.

Robert H., who was 12 years old at the time of trial, testified that on the day in question he had tripped over a tree stump while running in the yard, and that defendant had picked him up by the hand and then "got my chin." Defendant did not hurt Robert. Robert also said he had been jumping on a moving van.[34]

Ten-year-old Michael H. testified that he called defendant "Dad" and that defendant treated the children with respect and was not mean. Defendant took them camping and fishing and to the fair. Defendant never hurt Michael, but spanked him if he "sassed" his mom. When he was arrested, defendant was

---

[34] Robert further testified that he called defendant "Dad" because defendant treated him with respect. Defendant took care of him, helped him with schoolwork when he needed it, took him fishing once and camping, and played guitar and sang songs. Defendant never beat him, but spanked him when he got in trouble. He missed defendant, and if defendant were to be killed it would feel like his mother being killed.

making a guitar for Michael and teaching him how to play guitar. Michael said that he loved defendant and would feel sad if he was killed.[35]

In rebuttal, Kern County Deputy Sheriff Michael Rascoe testified that on April 9, 1993, he went to Brenda H.'s house and spoke with Robert, who was about eight or nine years old at the time. Robert told Rascoe that he had been playing with some other children in the front yard, and they had been told to stay off of a van parked outside. Defendant emerged from the house, angry because he thought Robert had been playing on the van. Robert said that defendant grabbed him by the hair, shook him and pushed him backwards to the ground. Rascoe examined Robert but found no injuries, although Robert said his neck hurt.

Over defendant's objection, Rascoe further testified that he also spoke with Michael H., who said that defendant had grabbed Robert by the hair, picked him up off the ground, and thrown him backward causing Robert to fall on his back.

Defendant contends that the trial court erred in admitting Deputy Rascoe's testimony recounting Michael H.'s hearsay statement. He asserts the statement was not admissible under the hearsay exception for prior inconsistent statements because it was not inconsistent with any part of Michael's trial testimony.[36] As previously explained, under Evidence Code sections 1235 and 770, a hearsay statement of a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement. (*People v. Johnson, supra*, 3 Cal.4th at p. 1219.) A statement is inconsistent for this purpose if it has " 'a tendency to contradict or disprove the [witness's trial] testimony or any inference to be deduced from it.' " (*People v. Spencer* (1969) 71 Cal.2d 933, 942 [80 Cal.Rptr. 99, 458 P.2d 43].) Further, " ' "[i]nconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement . . . ." ' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1008 [81 Cal.Rptr.3d 299, 189 P.3d 300].)

The trial court did not abuse its discretion (see *People v. Hovarter, supra*, 44 Cal.4th at pp. 1007–1008) in admitting the evidence. The trial court reasonably could have concluded that Michael's statement to Rascoe that defendant

---

[35] Seven-year-old Melody H. similarly testified that defendant treated the children "good," sang songs to them, and did not hurt them.

[36] Defendant objected to Rascoe's testimony about Michael's statement on the grounds of "lack of foundation" and that there was "no showing that Michael ever saw anything." The trial court apparently understood the objections as encompassing a hearsay objection, for it asked whether Michael was subject to recall, which is one of the prerequisites for admission of a prior inconsistent statement. (See Evid. Code, § 770, subd. (b).) The Attorney General does not contend the hearsay claim was forfeited, and we agree the claim was preserved for review.

had grabbed Robert by the hair, lifted him off the ground, and thrown him backward was inconsistent with Michael's trial testimony that defendant was "kind" and not "mean" and treated "all of us kids" with "respect." A reasonable inference arising from Michael's testimony was that defendant did not mistreat the children. His statement to Rascoe tended to contradict or disprove that broad assertion by showing that defendant had mistreated Robert on at least one occasion. Although Michael was not asked, and did not testify, about the incident on April 9, 1993, or about defendant's treatment of Robert in particular, it is enough that Michael's statement to Rascoe served to dispel the broad inference from Michael's testimony that defendant was kind and respectful and not "mean" to the children.

Defendant contends nonetheless that the admission of Michael's hearsay statement violated his right to confront and cross-examine witnesses under the Sixth Amendment to the federal Constitution. Assuming this claim is preserved for review (see *People v. Partida, supra,* 37 Cal.4th at pp. 433–439; *People v. Yeoman, supra,* 31 Cal.4th at p. 117), it lacks merit. As explained, the confrontation clause does not prohibit the admission into evidence of testimonial hearsay statements against a defendant if the declarant appears for cross-examination at trial. (*Crawford v. Washington, supra,* 541 U.S. at p. 59 & fn. 9.) Here, Michael could have been recalled and cross-examined about his statement to Deputy Rascoe.

Moreover, even assuming error, it was harmless under either the state "reasonable possibility" standard for penalty phase error (see *People v. Brown, supra,* 46 Cal.3d at pp. 446–448), or the "harmless beyond a reasonable doubt" standard for federal constitutional error (see *Chapman v. California, supra,* 386 U.S. at p. 24). Michael H.'s statement to Rascoe was largely cumulative of Robert's statement, and because Robert was the alleged victim, the jury likely assigned more weight to his statement than to Michael's. Furthermore, although the defense disputed Abney's account of the incident, Brenda H.'s testimony revealed that she did not actually see the alleged abuse, and the jury may have been skeptical of Robert's exculpatory testimony, given his relationship to defendant. Although we cannot know whether any juror or jurors concluded beyond a reasonable doubt that defendant had abused Robert, we find no realistic possibility that any juror would have been less inclined to do so absent Rascoe's testimony about Michael's statement. Furthermore, even if the jurors did not believe defendant had abused Robert, the aggravating evidence—including the brutal nature of the Merck murders and the undisputed evidence of defendant's burglary of Foster's home and robbery of Foster and Cruz—was still strong in comparison with the mitigating evidence. For all of these reasons, there is no reasonable possibility of a different result absent the admission of Michael H.'s statement to Rascoe, and any error was harmless beyond a reasonable doubt.

8. *Alleged failure to adequately investigate potential juror misconduct*

Defendant contends the trial court erred by failing to adequately investigate potential juror misconduct, and that the error requires reversal of the penalty judgment. We conclude defendant is not entitled to relief.

The jury began its penalty phase deliberations at 3:35 p.m. on June 12, 1996, and continued deliberating through the day on June 13, 1996. Shortly after the jury resumed deliberations following the readback of Dr. Dollinger's testimony on the morning of June 14, 1996, the jury foreman sent a note indicating that Juror No. 040149 wished to speak with the court. Juror No. 040149 was summoned to the courtroom at 9:30 a.m. With defendant, defense counsel and the prosecutor present, Juror No. 040149 related the following: "I wanted the court to be aware of something that has been eating at me. We have a juror that in the conviction part of it . . . was very adamant in her decisions in all three verdicts and, you know, which is fine, everybody is. Now she is adamant in her verdict now, but she is claiming that she has some kind of second thoughts about her original verdict in the two convictions, and I—yesterday, I don't know exactly when it was, it was on return back to the courthouse, she was sitting right next to two of [defendant's] relatives, his aunt and then another—another person. All I could see is the back of her head. I don't know if she was conversing with them. I did note that they were talking and it was maybe purse room between the three. I don't know if maybe she heard something that she is now, you know, holding up or trying to recant or whatever. I just feel that that needs to be brought to the court's attention."

The court stated that it "appreciated you bringing that to the court's attention" and asked Juror No. 040149 if there was anything else he wished to say. When Juror No. 040149 responded in the negative, the court sent him back to the jury room. After ascertaining that the accused juror was Juror No. 045829, the court inquired whether counsel had "any suggestions." The prosecutor responded in the negative, and defense counsel said "I think that we just have to play it out and see what happens."

Very shortly thereafter, the court received a second note stating that Jurors Nos. 045829 and 024178 wished to speak with the court. Juror No. 045829 was summoned, and the following exchange took place:

"Juror No. 045829: Well, the other juror said I was talking, he thought I was talking to the—

"The court: He didn't say that. He didn't say that. He said that he—he saw you sitting in the hallway, sitting next to some members of the defendant's family. He did not indicate that he saw you talking to anyone, [Juror No. 045829].

"Juror No. 045829: That is what he said in there.

"The court: I don't know what was said in there. I don't want to know what was said in there. I can only tell you that the Court wasn't going to take any further action as a result of anything that was told or spoken to the Court by that juror because there wasn't anything indicated by that juror that would have suggested any impropriety on your part. [¶] Is there anything else that you wanted to speak with the Court about?

"Juror No. 045829: No."

"The court: I don't know what was said in there. I don't want to know what was said in there. I can only tell you that the Court wasn't going to take any further action as a result of anything that was told or spoken to the Court by that juror because there wasn't anything indicated by that juror that would have suggested any impropriety on your part. [¶] Is there anything else that you wanted to speak with the Court about?

After the court sent Juror No. 045829 back to the jury room, Juror No. 024178 was summoned, and the following colloquy occurred:

"Juror No. 024178: Now I just—no, I am fine."

"The court: You're fine?

"Juror No. 024178: Yes."

The court then told Juror No. 024178 that it was available to speak with her if there was "a problem," and sent her back to the jury room.

After Juror No. 024178 had left, the court queried counsel as to whether there were any "comments or objections or anything that you want to put on the record." Defense counsel responded in the negative. About four and one-half hours later, at 2:10 p.m., the jury returned its verdicts of death for the murder of Alma Merck and life without possibility of parole for the murder of Clifford Merck.

■ Defendant argues the trial court erred by failing, sua sponte, to conduct an investigation adequate to determine if Juror No. 045829 had been speaking with defendant's family members or had overheard anything connected with the trial. We recently summarized the law applicable to claims of this type: "Section 1089 provides in part: 'If at any time . . . a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . .' In construing this statute, we have held that ' "[o]nce a trial court is put on

notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." ' [Citations.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 941–942 [105 Cal.Rptr.3d 131, 224 P.3d 877].)

However, " 'not every incident involving a juror's conduct requires or warrants further investigation. "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court." ' (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 [106 Cal.Rptr.2d 313, 21 P.3d 1225], quoting *People v. Ray*[, *supra*,] 13 Cal.4th [at p.] 343 . . . .) ' "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." ' (*Ibid.*)" (*People v. Martinez, supra*, 47 Cal.4th at p. 942.)

The Attorney General asserts defendant forfeited his claim by failing to request additional inquiry. We disagree. The duty to conduct an investigation when the court possesses information that might constitute good cause to remove a juror rests with the trial court whether or not the defense requests an inquiry, and indeed exists even if the defendant objects to such an inquiry. For example, in *People v. Burgener* (1986) 41 Cal.3d 505, 519 [129 Cal.Rptr.2d 747, 62 P.3d 1], we held that the trial court had erred by failing to conduct an investigation after a juror brought it to the court's attention that another juror appeared to be intoxicated during deliberations, even though defense counsel objected to questioning the accused juror or other jurors. We stated that "an inquiry sufficient to determine the facts is required *whenever* the court is put on notice that good cause to discharge a juror may exist." (*Ibid.*, italics added; see also *id.* at p. 520 ["once the court is put on notice of the possibility a juror is subject to improper influences it is *the court's duty* to make whatever inquiry is reasonably necessary to determine if the juror should be discharged . . ." (italics added)].) Other cases are in accord. (*People v. Adcox* (1988) 47 Cal.3d 207, 253 [253 Cal.Rptr. 55, 763 P.2d 906] [cases place the "ultimate responsibility upon the *court* to make [an] inquiry" when the trial court is "alerted to facts suggestive of potential misconduct"]; see also *People v. Ray, supra*, 13 Cal.4th 313, 342–344 [addressing the merits of a claim that the trial court had erred by failing to investigate a juror's relationship with the victim's daughter, even though the defendant had objected to any inquiry]; *People v. Kaurish* (1990) 52 Cal.3d 648, 694 [276 Cal.Rptr. 788, 802 P.2d 278]; *People v. Keenan* (1988) 46 Cal.3d 478, 532 [250 Cal.Rptr. 550, 758 P.2d 1081] ["when a trial court learns during deliberations of a jury-room problem which, if unattended, might later require the granting of a mistrial or new trial motion, the court may and should intervene promptly to nip the problem in the bud"].) Accordingly, because defendant's claim is that the trial court erred by failing, sua sponte, to

conduct an adequate inquiry, no trial court action by the defense was required to preserve the claim. (Cf. *People v. Lewis, supra*, 43 Cal.4th at p. 446, fn. 6.)

■ Accordingly, we turn to the merits. A juror's unauthorized contact with a witness is improper. (*People v. Hardy, supra*, 2 Cal.4th at p. 175; see also § 1122, subd. (a) [jurors should not converse with anyone on any subject connected to the trial].) However, contact between a juror and a witness or between a juror and the defendant's family may be nonprejudicial if the contact was "de minimis" (*People v. Hardy, supra*, 2 Cal.4th at p. 175) or if there is no showing that the contact related to the trial (cf. *People v. Cobb* (1955) 45 Cal.2d 158, 161 [287 P.2d 752] [mere showing that juror had communicated with defendant's relative did not raise a presumption that juror was improperly influenced]; *People v. Woods* (1950) 35 Cal.2d 504, 512 [218 P.2d 981] [mere fact that juror conversed with a witness is insufficient to raise a presumption of prejudice]; but cf. *People v. Ramirez* (1990) 50 Cal.3d 1158, 1175 [270 Cal.Rptr. 286, 791 P.2d 965] [juror's out-of-court comment to two witnesses regarding their testimony was "clearly misconduct"]; *People v. Pierce* (1979) 24 Cal.3d 199, 207–209 [155 Cal.Rptr. 657, 595 P.2d 91] [where juror discussed state of the evidence and prosecutor's tactics with police officer witness, reversal was required]). Further, a juror's "receipt of information about a party or the case that was not part of the evidence received at trial" also is "misconduct" that raises a presumption of prejudice (*People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87]), even if that receipt was passive or involuntary (*In re Hamilton* (1999) 20 Cal.4th 273, 294–295 [84 Cal.Rptr.2d 403, 975 P.2d 600]).

Here, the trial court acted within its discretion when it declined to inquire further into Juror No. 045829's alleged contact with defendant's family members who also were witnesses. At best, the trial court possessed ambiguous information suggesting that Juror No. 045829 may or may not have been talking to defendant's relatives who also were witnesses at the penalty phase. Critically, Juror No. 040149 told the court, "I don't know if she was conversing with *them* [(defendant's aunt and another person)]" but then immediately said "I did note that *they* were talking . . . ." (Italics added.) Under the circumstances, the court reasonably could have construed the "they" in Juror No. 040149's second remark as referring only to defendant's relatives, not to Juror No. 045829. This is especially so since Juror No. 040149 followed that remark with the comment that Juror No. 045829 might have "overheard" something that influenced her. Juror No. 045829's own comments seem to suggest that she was about to deny speaking with the witnesses. Although Juror No. 045829 probably should not have been sitting near defendant's relatives who also were witnesses, the trial court reasonably could have concluded that there were no grounds for believing that Juror No. 045829 had actually been engaged in a conversation with them. Moreover, there was no suggestion, other than Juror No. 040149's speculation, that

anything that Juror No. 045829 said or heard had anything to do with the trial. Accordingly, the court reasonably could have concluded that there were no grounds for believing good cause to excuse Juror No. 045829 might exist. (See *People v. Cobb, supra,* 45 Cal.2d at p. 161 [trial court did not abuse discretion in failing to investigate communication between juror and defendant's relative, where it did not appear that the communication related to the trial].)

■■ Defendant further argues the court should have conducted an inquiry into whether other jurors were coercing Juror No. 045829 into voting for the death penalty. He contends the circumstances, including Juror No. 040149's apparent frustration with Juror No. 045829's "holding up or trying to recant or whatever," suggest other jurors may have been berating Juror No. 045829 in order to coerce her to change her vote. But defendant's assertions about possible coercion are speculative. Further, "jurors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means. To probe as defendant suggests, in the absence of considerably more cogent evidence of coercion, would ' "deprive the jury room of its inherent quality of free expression." ' [Citation.] . . . Moreover, any such inquiry could in itself have risked pressuring the dissenting juror to conform her vote to that of the majority." (*People v. Johnson, supra,* 3 Cal.4th at p. 1255.) Accordingly, the trial court did not err in declining to inquire about possible coercion.

### 9. *Challenges to death penalty statute*

Defendant attacks the constitutionality of California's death penalty statute on a number of grounds. We have in the past rejected each of these contentions. Thus, we have concluded:

Section 190.2 adequately narrows the class of offenders eligible for the death penalty in conformance with Eighth and Fourteenth Amendment requirements. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1429 [58 Cal.Rptr.3d 368, 157 P.3d 973]; *People v. Rogers, supra,* 39 Cal.4th at p. 892.)

Section 190.3, factor (a), which allows the jury to consider the "circumstances of the crime" in determining whether to impose the death penalty, is not unconstitutionally vague, arbitrary or capricious. (See *People v. Leonard, supra,* 40 Cal.4th at p. 1429; accord, *People v. Curl, supra,* 46 Cal.4th at p. 362.)

" 'The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors.' [Citations.] '[N]either the cruel and

unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty. [Citations.]' " (*People v. Rogers, supra*, 39 Cal.4th at p. 893.) Moreover, the statute " 'is not unconstitutional because it does not contain a requirement that the jury be given burden of proof or standard of proof instructions for finding aggravating and mitigating circumstances in reaching a penalty determination.' " (*People v. Curl, supra*, 46 Cal.4th at p. 362.) On the other hand, the trial court is not required to instruct the jury that neither party bears the burden of proof. (*People v. Leonard, supra*, 40 Cal.4th at p. 1429.) Nothing in the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (e.g., *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]) compels a different answer to these questions. (*People v. Curl, supra*, at p. 362; *People v. Rogers, supra*, at p. 893.) Further, "Evidence Code section 520, establishing that a party 'claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue,' does not apply to the normative decision on penalty that is performed by the trier of fact at the penalty phase of a capital trial." (*People v. Dykes, supra*, 46 Cal.4th at p. 814; see *People v. Leonard, supra*, at p. 1429.)

The failure to require intercase proportionality review does not violate due process, equal protection or the Eighth Amendment. (*People v. Curl, supra*, 46 Cal.4th at p. 362; *People v. Lewis, supra*, 43 Cal.4th at p. 538.) The use of unadjudicated criminal activity as an aggravating factor at the penalty phase is not unconstitutional. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 507 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Balderas* (1985) 41 Cal.3d 144, 204–205 & fn. 32 [222 Cal.Rptr. 184, 711 P.2d 480].) And the use of restrictive adjectives such as "extreme," "reasonabl[e] belie[f]," and "impaired" in section 190.3, factors (d), (f), (g) and (h) does not prevent the consideration of constitutionally relevant evidence. (*People v. Rogers, supra*, 39 Cal.4th at pp. 893, 895; see *People v. Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].)

The jury need not be instructed that section 190.3, factors (d), (e), (f), (g), (h) and (j) are relevant only as possible mitigators. (*People v. Leonard, supra*, 40 Cal.4th at p. 1430.) Nor is the trial court required to instruct that the absence of a particular mitigating factor is not aggravating. (*People v. Rogers, supra*, 39 Cal.4th at p. 897.) In any event, the jury here was instructed that "[t]he absence of mitigation does not amount to the presence of aggravation."

The availability of certain procedural protections in noncapital sentencing—such as a burden of proof, written findings, jury unanimity and disparate sentence review—when those same protections are unavailable in capital sentencing, does not signify that California's death penalty statute violates Fourteenth Amendment equal protection principles. (*People v. Leonard, supra*, 40 Cal.4th at p. 1430; *People v. Blair, supra*, 36 Cal.4th at p. 754.)

The death penalty, when applied in accord with state and federal statutory and constitutional requirements, does not violate international law. (*People v. Lewis, supra*, 43 Cal.4th at p. 539.) International norms of human decency do not render the death penalty, applied as a regular form of punishment, violative of the Eighth Amendment. (*People v. Curl, supra*, 46 Cal.4th at pp. 362–363; *People v. Lewis, supra*, 43 Cal.4th at p. 538.)

### E. *Cumulative Error*

Defendant contends that the cumulative impact of all of the errors at his trial caused him substantial prejudice and rendered his trial fundamentally unfair in violation of his Fourteenth Amendment right to due process of law, requiring reversal of the guilt and penalty judgments. (See *People v. Lewis, supra*, 43 Cal.4th at p. 537; *People v. Davis* (2005) 36 Cal.4th 510, 572–573 [31 Cal.Rptr.3d 96, 115 P.3d 417].) We have found no errors with respect to the guilt phase. As for the penalty phase, we have found two errors or assumed errors: the trial court's failure to instruct regarding reasonable doubt with respect to the Russell murder, and its failure to redefine reasonable doubt in its penalty phase instructions. We conclude that even when considered cumulatively, any instructional error was harmless beyond a reasonable doubt (*Chapman v. California, supra*, 386 U.S. at p. 24), and there is no reasonable possibility of a different result at the penalty phase in its absence. (*People v. Brown, supra*, 46 Cal.3d at pp. 467–468.) As we have explained, even if the jurors believed—contrary to their explicit instructions—that they could consider the Russell murder in aggravation, we find it highly unlikely that they would conclude that any standard other than reasonable doubt applied to the consideration of that murder, or that those jurors who did not believe Russell's murder had been proved beyond a reasonable doubt would use that murder as the deciding factor in their penalty calculus. Moreover, we find no indication in the record that the jurors at the penalty phase were confused about the meaning of the reasonable doubt standard to be applied to evidence of other criminal activity, and it is unlikely the jurors would have forgotten the meaning of that term, given that the question of defendant's guilt of the Russell murder was hotly disputed at the guilt phase. Under all the circumstances, and considering the strength of the aggravating evidence, we conclude any errors both singly and in combination were harmless under any

standard and did not render defendant's penalty trial fundamentally unfair. (See *People v. Lewis, supra*, 43 Cal.4th at p. 538; *People v. Davis, supra*, 36 Cal.4th at pp. 572–573.)

### III. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 15, 2010.